UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV12232-PBS

_____
                                          )
ADRIAN McCRAY,                            )
                                          )
            Plaintiff,                    )
                                          )
v.                                        )
                                          )
H&R BLOCK EASTERN ENTERPRISES, INC.,      )
   and LINDA MURPHY,                      )
                                          )
            Defendants.                   )
_____)


### DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT[1]

### A.    THE PARTIES

1.      H&R Block Eastern Enterprises, Inc. ("Block") is an indirect subsidiary of H&R Block, Inc., an international financial services company that specializes in tax preparation services for consumers.  H&R Block, Inc. is headquartered in Kansas City, Missouri, and its subsidiaries operate more than 9,000 tax offices and 98 financial centers in the United States, including numerous offices in Massachusetts.  (See Affidavit of Linda Murphy ("Murphy Aff.") at ¶ 2, attached to the Affidavit of Jennifer Belli (BA) Tab 1, filed herewith.)

2.      Linda Murphy ("Murphy") is the Vice President and Managing Director of the Northeast Division of Block.  (BA Tab 1, Murphy Aff. at ¶ 1.)

_____

[1] The defendants file this Statement of Undisputed Material Facts pursuant to Local Rule 56.1.  The defendants accept the facts stated herein as true for summary judgment purposes only.  If McCray's claims are not dismissed on summary judgment, the defendants reserve the right to contest any fact asserted by McCray at trial.

1

3.     Gill, an African-American woman, hired Adrian McCray as a regional human resources manager in August 2001.  (See Affidavit of Franciene Gill ("Gill Aff.") at ¶ 2.) McCray worked out of an office in Pembroke, Massachusetts and reported jointly to Franciene Gill ("Gill"), the Director of Field Human Resources for Block, who worked out of Block's corporate headquarters in Kansas City, and Murphy, who worked out of the Pembroke office. (BA Tab 1, Murphy Aff. at ¶¶ 1, 5; BA Tab 2, Gill Aff. at  ¶¶ 1, 3.)

**B.     McCRAY'S JOB RESPONSIBILITIES**

4.     As a regional human resources manager, McCray's job duties included providing human resources support to supervisory and non-supervisory employees in his designated geographic region; investigating and resolving issues related to employee performance, behavior and policy compliance; coordinating the process of recruiting and selecting job candidates for positions within Block; ensuring the compliance of all human resources activities with EEO guidelines; delivering in-house and management training programs; and responding to inquiries regarding human resources policies and procedures, including compensation and benefits.  (BA Tab 3, Regional Human Resources Manager Job Description.)

5.     Largely in order to ensure independent investigation and decision-making within the human resources function, Block typically requires that its human resources managers report to two different supervisors -- primarily reporting to a supervisor within the human resources organization and reporting through a "dotted line" to an operations manager at the site where they work.  (BA Tab 1, Murphy Aff. at ¶¶ 5-6; BA Tab 2, Gill Aff. at ¶¶ 3-4.)

6.     In McCray's case, he reported to Gill within the human resources organization and Murphy in operations.  (Id.)

7.      Gill was McCray's primary supervisor and was responsible for making disciplinary and other decisions related to McCray's employment.  Murphy did not have authority to discipline McCray or to take any action against him without Gill's sign-off.  (BA Tab 1, Murphy Aff. at ¶ 5; BA Tab 2, Gill Aff. at ¶ 4.)

8.      Another manner in which Block attempts to ensure accurate and independent investigation of human resources issues is through a computer-based record-keeping system called "Clarify."  Clarify enables Block's human resources managers to log into the computer the issues or employee complaints they are handling, along with the actions they plan to take or recommendations they have regarding the issue or complaint, for review by more senior personnel in the human resources department.  (BA Tab 2, Gill Aff. at ¶ 5; BA Tab 4, Description of Clarify Cases.)

9.      At the time of McCray's employment, human resources managers were required to enter any "major" employee relations issue they were handling into the Clarify system.  Gill reviewed each Clarify entry on a weekly basis to make sure that Block's policies and procedures were being followed.  (BA Tab 2, Gill Aff.  at ¶¶ 5-6.)

10.     Moreover, at the time of McCray's employment, only human resources professionals at Block had access to the employee relations issues logged into the Clarify system. In other words, no one from the operations part of the business (e.g., Murphy or her staff) could access the information entered about employee relations issues.  (BA Tab 2, Gill Aff at ¶ 7; BA Tab 1, Murphy Aff. at ¶ 7.)

C.      McCRAY'S JOB PERFORMANCE (August 2001-May 31, 2002)

11.     Beginning almost immediately after his hiring, McCray's supervisors observed a number of performance deficiencies on his part.  For example, McCray often failed to record the

employee relations issues he was handling in the Clarify system and failed to produce the written reports on human resources issues that Block required.  (BA Tab 2, Gill Aff. at ¶ 8.)  In addition, McCray was tardy and/or absent on numerous occasions with only last-minute notice to his supervisors.  (BA Tab 1, Murphy Aff. at ¶ 8; BA Tab 2, Gill Aff. at ¶ 8.)  McCray also lacked organizational skills and demonstrated a tendency to be too quick to jump to conclusions and an inability to comprehend the subtleties of a given situation.  (Id.)

12.     These performance deficiencies and others were described in McCray's first performance review, dated May 15, 2002.  In that review, McCray received a rating of "meets expectations" in three categories and "meets expectations minus" in four categories.  (BA Tab 5, Dre McCray Performance Review, May 15, 2002 ("Perf. Review").)

13.     McCray himself admitted that there were aspects of his job performance that he could have improved.  For example, he agreed with Block that he did not always comply with the procedure requiring him to enter cases into the Clarify system.  (BA Tab 6, McCray Dep. at 73.)  In addition, he agreed with Block's critique that he could be viewed as rigid or inflexible.  (Id. at 75.)  He described himself as a "black-and-white person."  (Id.)  Finally, he admitted that he was not meeting expectations with respect to the monthly reports Block required him to file.  (Id. at 76.)  Regardless of his agreement with a significant portion of the performance review, McCray refused to sign the review.  (BA Tab 5, Perf. Review; BA Tab 6, McCray Dep. at 76-7.)

14.     McCray failed to notify either of his supervisors that he would be absent from work on May 24, 2002, the Friday before he was to be on vacation for a week.  (BA Tab 1, Murphy Aff. at ¶ 10; BA Tab 2, Gill Aff. at ¶ 11; BA Tab 7, Written Warning, May 31, 2002 ("5/31/02 Warning").)

15.     During his absence, Murphy discovered that McCray had failed to review certain documentation relating to a pending lawsuit with Murphy to ensure its timely completion and that McCray had failed to ensure that certain management contracts for which he was responsible were executed properly.  (BA Tab 7, 5/31/02 Warning; BA Tab 1, Murphy Aff. at ¶ 11.)

16.     Accordingly, on May 31, 2002, Block issued McCray a written warning for failing to notify his supervisors of his absence; failing to ensure proper human resources coverage during his absence; and failing to execute the management contracts properly.  (BA Tab 7, 5/31/02 Warning.)

17.     In response to the warning, McCray informed his supervisors that he believed he had taken the proper steps to request May 24 as a vacation day and that he disagreed with the issuance of a warning as a result of that behavior.  (BA Tab 6, McCray Dep. at 80.)

**D.     INVESTIGATION OF RICK BARTLETT**

18.     In April 2002, in his capacity as a human resources manager, McCray participated in the investigation of a complaint by an employee that he was being harassed because of his sexual orientation.  The employee, Paul Rogers, complained that employees in his office had inappropriate comments about his sexual orientation and that he did not believe that his district manager, Rick Bartlett, had taken sufficient action in response to the complaint.  (BA Tab 8, Paul Rogers Investigation Summary ("Rogers Summary"); BA Tab 10, Affidavit of Catherine Watson ("Watson Aff.") at ¶ 4.)  McCray and Kathy Hawk, a Block director of regional management, together investigated the complaint by interviewing a number of employees in the relevant offices.  (BA Tab 6, McCray Dep. at 55; BA Tab 8, Dep. Ex. 16; BA Tab 10, Watson Aff. at ¶ 6.)

19.     Bartlett -- who is Murphy's son-in-law -- believed he took sufficient action and denied treating Rogers any differently from other employees. (BA Tab 9, Deposition of Linda Murphy ("Murphy Dep.") at 11; BA Tab 8, Rogers Summary) The majority of employees that McCray and Hawk interviewed also did not support Rogers' claim, but McCray believed that some of the employees made certain statements that could be seen as supportive of the complaint. (BA Tab 6, McCray Dep. 56-57; BA Tab 8, Rogers Summary.)

20.     After conducting the investigation, McCray formed the belief that Bartlett had engaged in wrongful conduct and claims to have communicated that belief to Catherine Watson, Block's Manager of Fair Employment Practices, and to Gill.[2] (BA Tab 6, McCray Dep. at 60-1; 65.)

21.     McCray and Hawk also reported their results to Murphy and, according to McCray's deposition testimony, Murphy made it clear to him that she did not believe Bartlett had engaged in any wrongdoing and that McCray should ensure that his report to Block comported with her belief. (Id. at 63-5.)

22.     At deposition, McCray could not recall whether or how he had communicated with anyone at Block about Murphy's alleged comments about the investigation. At one point, he stated that he complained to Gill and Watson directly about Murphy's comments. (Id. at 67-8.) Later in the deposition, he stated that he did not know whether he had called Gill, Watson or an anonymous hotline, and at yet another point, he stated that he had complained to Gill and Watson via email. (Id. at 221-24.)

---

[2] For these purposes, the defendants accept as true McCray's allegations regarding the Bartlett investigation and his complaint to Watson regarding his conclusion. Watson, however, specifically denies that McCray ever told her that he believed Bartlett engaged in wrongdoing or improper conduct in relation to Rogers. (BA Tab 10, Watson Aff. at ¶ 9.) Further, Murphy testified at deposition that she "deliberately stayed out of the issue" of Rogers' complaint about Bartlett. (BA Tab 9, Murphy Dep. at 13.)

23.     In the end, McCray drafted a report summarizing the interviews of witnesses and stated that the investigation was "inconclusive" as to whether Bartlett engaged in improper conduct.  (BA Tab 8, Rogers Summary; BA Tab 6, McCray Dep. 65, 67.)  At deposition, McCray could not point to any specific portion of the report that he would have written differently had he not had the alleged conversation with Murphy about the investigation.  (BA Tab 6, McCray Dep. at 227-29.)

24.     Block took no disciplinary action against Bartlett as a result of the investigation. (BA Tab 9, Murphy Dep. at 15.)

**E.      EMPLOYEE RELATIONS ISSUES HANDLED BY McCRAY**

25.     At some point in early 2002, McCray worked with a district manager, David Gross, to obtain FMLA leave for Gross because of his wife's serious health condition, i.e., cancer.  (BA Tab 6, McCray Dep. at 189-90; 192-93.)

26.     Murphy initially encouraged Gross to take FMLA leave and when she could not convince him to take the time off, Murphy asked McCray to speak to him and encourage him to take the leave.  (BA Tab 9, Murphy Dep. at 21; BA Tab 6, McCray Dep. at 192-93.)  Ultimately, Gross took FMLA leave to care for his wife.  (BA Tab 9, Murphy Dep. at 21-2.)

27.     During Gross's absence, Murphy sent the assistant district manager who reported to Gross for additional training due to his lack of experience and his expressed desire not to run the district in Gross's absence.  (BA Tab 6, McCray Dep. at 190-91; BA Tab 9, Murphy Dep. at 22.)  Instead, Murphy transferred a more seasoned manager to run the district while Gross was out of work.  (BA Tab 9, Murphy Dep. at 22.)

28. McCray testified that he understood Murphy to be sending Gross's assistant for further training in an attempt to force Gross back to work from his FMLA leave. (BA Tab 6, McCray Dep. at 190-91.)

29. Secondly, in late April 2002, McCray worked with Murphy to provide substantial performance documentation to a district manager in Poughkeepsie, New York, Michelle Lamberg. (BA Tab 6, McCray Dep. at 81-86; BA Tab 9, Murphy Dep. at 15-16.)

30. Murphy formed the opinion that Lamberg was failing to perform her job and met with Lamberg to discuss her performance issues. (BA Tab 9, Murphy Dep. at 15-19.) Murphy then instructed McCray, because of his role as the human resources manager for her region, to assist her in documenting the performance problems, which he did. (BA Tab 6, McCray Dep. at 82-85; BA Tab 9, Murphy Dep. at 19-20.)

31. McCray disagreed with Murphy's approach to Lamberg's performance, but stated that he believed Murphy targeted Lamberg for termination because "[s]he didn't like her" and didn't think that "she was a good manager." (BA Tab 6, McCray Dep. at 87.) McCray testified that he did not tell any manager at Block that he disagreed with Murphy's handling of Lamberg's performance issues. (Id. at 230.)

32. Further, McCray testified at deposition that he believed Murphy refused to hire a job applicant because she was afraid that the applicant would have issues with childcare. (Id. at 241-43.) He could not recall the name of the applicant, the name of the person who was hired instead of the job applicant, or the date of the alleged incident. (Id.)

33. McCray admitted at deposition that he never used the Clarify system to complain about Murphy's conduct generally and, specifically, that he did not register any complaint in Clarify about Bartlett, Lamberg or Gross. (Id. at 224.)

**F.**     **McCRAY'S PERFORMANCE (June 2002-November 30, 2002)**

34.     Despite having given McCray a poor rating in his annual performance review and a written warning for performance deficiencies in May 2002, McCray's supervisors observed that his performance at Block continued to deteriorate.  In fact, his performance deteriorated sufficiently so that Gill and Murphy issued a "development plan" to him in August 2002.  (BA Tab 11, Dre McCray Development Plan ("Development Plan"); BA Tab 1, Murphy Aff. at ¶¶ 12-13; BA Tab 2, Gill Aff. at ¶¶12-14.)

35.     The plan required him to improve his ability to act as a team player; to improve his written communication skills; to listen and respond appropriately to his supervisors and other employees; and to report absences on a more timely basis.  (BA Tab 11, Development Plan.) Importantly, most of these performance problems, especially the attendance issues, had plagued McCray from the beginning of his employment at Block.  The development plan spelled out specific steps for McCray to undertake in respect to each of the development areas and required that he meet with Gill and/or Murphy on a periodic basis to discuss his work performance.  (Id.) Specifically, the plan called for a meeting on November 30, 2002.  (Id.)

36.     Again, McCray refused to sign the plan and testified that he disagreed with much of its content, although he testified at deposition that he saw the plan as a "formality" and did not ever read it in its entirety.  (BA Tab 6, McCray Dep. at 100-02.)

37.     McCray's performance difficulties continued after the issuance of the development plan.  For example, McCray had the following issues:

>        (a)     In mid-November 2002, McCray led trainings for certain employees in the
>        Block organization.  Several district managers complained to Murphy that McCray
>        was unprepared for the training, read from the training manuals, and arrived late.  In

addition, the managers complained that McCray complained to the training participants about Block management. (BA Tab 1, Murphy Aff. at ¶ 15; BA Tab 2, Gill Aff. at ¶ 18.) Murphy spoke to McCray about the complaints she received. (BA Tab 1, Murphy Aff. at ¶ 15; BA Tab 12, Gill/McCray Email Exchange, November 13, 2002 ("11/13/02 Emails").)

(b)    During one of McCray's absences from the office, Murphy discovered that he had not locked up employee personnel files, as required by Block policy, and had confidential employee information on his desk. (BA Tab 1, Murphy Aff. at ¶ 14.)

(c)    In addition, Murphy learned that McCray was not working his scheduled hours, which required him to arrive at work early on Fridays. (Id.).

(d)    Despite Murphy's instructions to the contrary, McCray gave work directly to the administrative assistant in the Pembroke office rather than following the office's established procedures for distribution of such work. (Id.)

38.    Murphy and Gill spoke to McCray about each of these performance issues and informed him that he was continuing to fail to meet Block's performance expectations. (BA Tab 1, Murphy Aff. at ¶ 15.)

39.    All human resources managers at Block are required to work on Saturdays during tax season and McCray performed Saturday work during his first tax season, January - April 2002. (BA Tab 1, Murphy Aff. at ¶ 16; BA Tab 2, Gill Aff. at ¶ 16; BA Tab 6, McCray Dep. at 120-21.)

40.    On or about November 18, 2002, Murphy sent a reminder email to McCray and the other human resources manager in her region regarding the Saturday work schedule for the 2003 tax season. Initially, McCray sent a reply email refusing to come to the office on

Saturdays, agreeing only to be available by cell phone or email. (BA Tab 9, Murphy Dep. at 46-7; BA Tab 6, McCray Dep. at 120-22; BA Tab 13, Murphy/Gill/McCray Email Exchange, November 18-19, 2002 ("11/18-19/02 Emails").) Ultimately, after behaving in an unacceptable fashion toward his supervisors in the email exchange (BA Tab 2, Gill Aff. at ¶ 17; BA Tab 1, Murphy Aff. at ¶ 17), McCray said that he would comply with the Saturday work schedule. (BA Tab 13, 11/18-19/02 Emails.)

41.     In preparation for their previously scheduled November 30 meeting to discuss McCray's performance under the development plan, Murphy drafted a memorandum summarizing the ways in which McCray's performance had continued to decline. (BA Tab 14, McCray Performance Update, November 25, 2002 ("Performance Update"); BA Tab 1, Murphy Aff. at ¶ 18.)

42.     Murphy and Gill also decided that, because of McCray's repeated failure to arrive at work at his scheduled start time on Fridays, they would no longer permit him to work from 7:00 a.m. to 4:00 p.m. on Fridays, a special schedule that had been permitted so that McCray could spend more time with his son. (BA Tab 1, Murphy Aff. at ¶ 19; BA Tab 2, Gill Aff. at ¶ 19; BA Tab 14, Performance Update.)

## G.     McCRAY'S FMLA LEAVE (November-December 2002)

43.     On or about November 19, 2002, McCray informed Gill and Murphy that he had suffered back injuries in a car accident and asked for time off from work. (BA Tab 6, McCray Dep. at 109-12; BA Tab 15, Murphy/Gill/McCray Email Exchange, November 19, 2002 ("11/19/02 Emails"); BA Tab 16, McCray Email to Murphy and Gill, November 18, 2002.)

44.     McCray ultimately requested leave under the Family and Medical Leave Act (the "FMLA") and, pending the receipt of medical certification, Block conditionally granted McCray's request.[3]  (BA Tab 17, McCray Request for Leave of Absence, November 24, 2002.)

45.     On or about December 3, 2002, McCray provided Block with two medical certifications in support of his request for FMLA leave.  First, McCray provided a certification from a chiropractor that stated he had "sustained injuries to his neck and back" in the car accident and that he was totally unable to work from November 17-December 2, 2002.  (BA Tab 18, McCray Certification of Health Care Provider, November 27, 2002.)  Therefore, Block approved McCray's request for FMLA leave for that time period.  (BA Tab 19, Natalie Smith Email, January 16, 2003 ("Smith 1/16/03 Email").)

46.     In addition, McCray provided Block with a note from the same chiropractor that stated he could return to work part-time (20-40 hours per week) as of December 2, 2002.  (BA Tab 20, Medical Note from Alves Chiropractic Center, November 27, 2002.)

47.     McCray failed to report to work on December 2, 3, 4 or 6.  (BA Tab 19, Smith 1/16/03 Email.)

48.     On December 4, McCray filed a charge of discrimination at the Massachusetts Commission Against Discrimination, alleging that he had been subject to different terms and conditions of employment based on his race (McCray is African-American).[4]  (BA Tab 21, McCray Charge of Discrimination, December 4, 2002.)

---

[3] It is Block's practice to grant requested FMLA leave on a conditional basis pending receipt of medical documentation from the requesting employee and evaluation of the appropriateness of the leave.  (BA Tab 2, Gill Aff. at ¶ 25.)

[4] In connection with the December 4, 2002 Charge, McCray filed a Rebuttal Statement with the MCAD in which he provided further facts allegedly supporting his claims.  Consistent with MCAD practice, the defendants did not receive a copy of the rebuttal at the time it was filed with the MCAD.  The first time that the defendants received the rebuttal was in connection with the initial disclosures in this action.

49.    Block received a copy of the Charge on or after December 10, 2005.  (BA Tab 1, Murphy Aff. at ¶ 22.)

**H.    THE DECEMBER 9, 2002 MEETING**

50.    On Monday, December 9, 2002, <u>before Block had received a copy of the Charge McCray filed with the MCAD</u>, McCray returned to work (in the same position with the same duties).  (BA Tab 1, Murphy Aff. at ¶ 21; BA Tab 2, Gill Aff. at ¶ 26).  Murphy and Gill (by telephone) met with him to discuss his performance under the August 2002 development plan. (The development plan called for a follow-up meeting on November 30, 2002, which was rescheduled -- first to December 2 and then December 9 -- due to McCray's FMLA leave and his failure to return to work at the end of that leave.)  (BA Tab 11, Development Plan; BA Tab 1, Murphy Aff. at ¶ 20; BA Tab 2, Gill Aff. at ¶ 19.)

51.    Murphy and Gill informed McCray that he had not improved his performance and that he was not making sufficient progress under the development plan.  Murphy presented McCray with the written memorandum that she had drafted for the November 30 meeting summarizing his performance problems.  Specifically, Murphy and Gill informed McCray that: (1) his performance in relation to recruiting new employees had deteriorated; (2) the disorganized condition of his office was unacceptable; (3) she had received complaints about his lack of interest in and preparedness for company trainings; (4) he had been rude and insubordinate to Murphy, refusing to follow office rules regarding assigning work to the administrative assistant and Saturday work; and (5) he was failing to work his scheduled hours. (BA Tab 1, Murphy Aff. at ¶ 21; BA Tab 2, Gill Aff. at ¶ 20; BA Tab 14, Performance Update.)

52.    Like the earlier conversations with Block management about his performance, McCray disagreed with Murphy and Gill's conclusions about his performance.  (BA Tab 6,

McCray Dep. at 137-43.)   McCray was particularly upset about Block's decision to take away his modified Friday work schedule.  (Id. at 187-88.)

## I.     McCRAY'S REQUEST FOR INTERMITTENT LEAVE

53.     On December 11, 2002, McCray provided Block with a supplemental doctor's note indicating that he continued to suffer from the injuries incurred in the car accident and that he should not perform any lifting or bending at the waist and should limit his work to between 20-40 hours per week for the next 4-8 weeks.  (BA Tab 22, Medical Note from Alves Chiropractic Center, December 11, 2002.)  Also on that day, McCray informed Murphy and Gill that he would not work Thursday and Friday of that week because he had aggravated his back lifting boxes.  (BA Tab 2, Gill Aff. at ¶ 27; BA Tab 23, McCray/Murphy/Gill Email Exchange, December 11, 2002.)  Block permitted McCray to work an intermittent work schedule pending receipt of medical documentation.  (BA Tab 2, Gill Aff. at ¶ 26.)

54.     The following day, Gill informed McCray that going forward Block would require that he work six hours per day, five days a week for the remainder of the time he required a part-time schedule.  (BA Tab 2, Gill Aff. at ¶ 27.)  McCray did not report to work on December 12 or 13.  (BA Tab 19, Smith 1/16/03 Email.)

55.     Due to the vagueness of his medical certification and the fact that it came from a chiropractor rather than a medical doctor, on or about December 13, 2002, Block asked McCray to submit to an independent medical examination regarding the injuries for which he sought intermittent FMLA leave.  (BA Tab 6, McCray Dep. at 254-57; BA Tab 24, Letter from Ellen J. Bardy to Adrian McCray, December 13, 2002.)

56.     Without undergoing the independent medical examination, McCray informed Gill on or about December 23, 2002 that he was no longer in need of leave and was well enough to work.  (BA Tab 6, McCray Dep. at 256.)

57.     McCray ultimately submitted to the independent medical examination on January 6, 2003.  As part of that examination, the doctor scheduled McCray for an MRI on January 13, 2003.  (BA Tab 25, McCray Email, January 6, 2003; BA Tab 6, McCray Dep. at 255-57.)

**J.**    **UNAPPROVED ABSENCES AND PERFORMANCE PROBLEMS (December 2002-January 2003)**

58.     McCray's work performance continued to decline steadily throughout December 2002.  On or about December 26, McCray conducted fair employment practices training for Block employees.  After having received complaints about McCray's performance at trainings in mid-November 2002, both Murphy and Gill attended the training to observe first hand his performance.  (BA Tab 1, Murphy Aff. at ¶ 23; BA Tab 2, Gill Aff. at ¶ 21; BA Tab 6, McCray Dep. at 143.)

59.     Each supervisor observed that McCray was unprepared for the training session, read directly from the training materials for his presentation (in fact, McCray even read aloud the words "turn the page" that were printed at the bottom of a page of the training materials), and failed to make certain required logistical arrangements (e.g., coffee or lunch arrangements for participants) (BA Tab 1, Murphy Aff. at ¶ 23; BA Tab 2, Gill Aff. at ¶ 21.)

60.     McCray testified that he believed that Murphy was unduly scrutinizing his work at this time.  Specifically, he testified that Murphy asked him why he had the door closed in his office; asked him to tell her when he arrived and departed from the office; and generally expressed dissatisfaction with his activities.  (BA Tab 6, McCray Dep. at 188-89.)

61.    In early January 2003, McCray informed Gill that he would not be attending a required training session in Kansas City because the MRI he had scheduled conflicted with the training.  (BA Tab 2, Gill Aff. at ¶ 28.)  In response, Gill arranged to reschedule the MRI to an earlier date and informed McCray that he was required to attend the training.  (BA Tab 26, Natalie Smith Email to Adrian McCray, January 6, 2003.)  Regardless, McCray failed to report to the MRI re-scheduled by Block.  (BA Tab 2, Gill Aff. at ¶ 28; BA Tab 27, Natalie Smith Email to Franciene Gill, January 9, 2003; BA Tab 6, McCray Dep. at 256-57.)

**K.    McCRAY'S REQUEST FOR A SECOND FMLA LEAVE**

62.    From January 7-10, 2003, McCray was absent from work for "foot problems," for which he ultimately requested FMLA leave.  (BA Tab 19, Smith 1/16/03 Email; BA Tab 6, McCray Dep. at 245-46; BA Tab 34, McCray Request for Leave of Absence, January 9, 2003.)  Consistent with Block's practice, McCray's requested leave was approved conditionally pending receipt of medical documentation.  (BA Tab 2, Gill Aff. at ¶ 29.)

63.    On Friday, January 10, 2003, McCray presented Block with a medical certification allegedly in support of his request for FMLA leave that stated he suffered from an "intractable plantar keratoma" (or, a callus on the bottom of the foot) (BA Tab 6, McCray Dep. at 246-47) on his left foot and could work provided that he was permitted to sit 60% of the time and stand 40% of the time.  (BA Tab 28, McCray Medical Certification regarding Intractable Plantar Keratoma.)  Because the medical certification stated that McCray could work, Block requested that McCray return to work.  (BA Tab 2, Gill Aff. at ¶ 30.)

64.    An additional medical note stated that McCray planned to undergo surgery for his foot condition on January 23.  (BA Tab 29, Frederic Schwartz Pre-Operative Instructions and Information.)

65.    On Monday, January 13, McCray reported to work in Pembroke rather than attending the required training in Kansas City, despite Gill's specific directive that he do so. (BA Tab 2, Gill Aff. at ¶ 28.)

**L.    THE FINAL WRITTEN WARNING (January 14, 2003)**

66.    Because of the steady decline in McCray's work performance and attitude and his flagrant flouting of work directives, on January 14, Gill and Murphy issued McCray a final written warning.  (BA Tab 30, McCray Final Written Warning, January 14, 2003.)

67.    The warning summarized McCray's performance problems, including his failure to be prepared for trainings; to meet the expectations of the August 2002 development plan; to report absences and to complete work in a timely manner; and to attend the required training in Kansas City.  (Id.)

68.    The warning also laid out specific steps that McCray would be required to undergo, including submitting daily work updates to Murphy and Gill; notifying his supervisors of his arrival and departure at work every day; rescheduling the Kansas City training; and submitting to a follow-up performance review on January 31, 2003.  (Id.)

69.    During the meeting regarding the final written warning, Murphy informed McCray that Block had denied his request for FMLA leave for surgery because he had not provided the company with 30 days' notice of the foreseeable leave and had scheduled the leave for the busiest time of Block's business cycle.[5]  (BA Tab 9, Murphy Dep. at 43-44; 48.)

70.    During her meeting with McCray to discuss the final written warning, Murphy testified that McCray got "very hostile [and] very agitated."  (Id. at 35.)  She stated that he "[s]tood up with his fist raised at [her] face" and that she was "very afraid" of him during the

---

[5] According to McCray's medical records, he did not have surgery on the callus for which he sought leave from Block in January 2003 until June 9, 2003.  (BA Tab 35, Medical Records of Dr. Frederic Schwartz.)

meeting.  (Id.)  Murphy testified that McCray made it clear that he would not comply with the requirements of the final written warning.  (Id. at 41-42.)  Moreover, with respect to his FMLA request, McCray stated that he would continue to take time off regardless of Block's decision about the request.  (Id. at 36-37.)

71.    McCray denied that he ever raised his fist to Murphy, but stated clearly that he told Murphy the final written warning was "ridiculous" and that he did not agree with it.  (BA Tab 6, McCray Dep. at 159.)

72.    After the meeting, Murphy reported to Gill that McCray had threatened her and that he refused to comply with the expectations described in the warning.  (BA Tab 9, Murphy Dep. at 39-40; BA Tab 2, Gill Aff. at ¶ 23; BA Tab 1, Murphy Aff. at ¶ 25.)

73.    Given McCray's response to the final written warning, Gill sent McCray an email attempting to ensure that he understood the Company's expectations and giving him a second chance to agree to meet those expectations and save his job.  (BA Tab 31, Franciene Gill Email to Adrian McCray, January 14, 2003 ("Gill 1/14/03 Email"); BA Tab 2, Gill Aff. at ¶ 23.)  Gill also reconfirmed that McCray's request for FMLA leave for surgery was not approved, noting that he had failed to provide sufficient notice of the need for foreseeable leave and that he had picked the busiest time of Block's year to schedule surgery.  (BA Tab 31, Gill 1/14/03 Email.)

## M.    TERMINATION OF McCRAY'S EMPLOYMENT

74.    McCray never reported to work at Block after January 14, 2003.  He called in sick for four consecutive days, claiming at deposition that he was taking sick days available to him and unable to remember if the absences were "foot related or…if [he had a] cold or flu" or something else.  (BA Tab 6, McCray Dep. at 178.)  On January 20, 2003, Murphy called McCray at home to inquire about his status.  (BA Tab 6, McCray Dep. at 179-80; BA Tab 1, Murphy Aff.

at ¶ 26; BA Tab 9, Murphy Dep. at 48.)  In that conversation, when McCray informed Murphy that he would not report to work that day, Murphy informed him that his employment was terminated.  (BA Tab 1, Murphy Aff. at ¶ 26.)

75.     The next day, Block sent McCray a letter confirming the termination of his employment.  In that letter, Block stated that McCray's termination was the result of his "[a]bsenteeism, in conjunction with insubordination during the meeting on January 14, 2003, [his] refusal to perform work as assigned and unacceptable work performance."  (BA Tab 32, Termination Letter of Adrian McCray.)

**N.      THE LAWSUIT**

76.     On February 3, 2003, McCray filed a second charge of discrimination at the MCAD, alleging that the termination of his employment and other Block actions amounted to retaliation for filing the first charge of discrimination.  (BA Tab 33, Charge of Discrimination, February 3, 2003.)

77.     On March 30, 2004, McCray requested that the MCAD dismiss the retaliation charge and issue him a "right to sue" letter.  Subsequently, McCray filed the instant Complaint in Massachusetts Superior Court, and the defendants removed the case to this Court.

78.     The MCAD ultimately issued a lack of probable cause finding with respect to McCray's race discrimination claim and McCray did not appeal the Commission's ruling on that complaint.

79.     McCray testified at deposition that he is no longer pursuing his race discrimination claim.

> Q:      When you first filed a claim against H&R Block, you claimed you were being discriminated against on the basis of your race; is that right?

A:    When I first filed it, yes.

Q:    And you're not pursuing that claim now, right?

A:    It was retaliation.

Q:    The question is --

A:    No.

Q:    -- are you pursuing that race claim now?

A:    No.

(BA Tab 6, McCray Dep. at 234-35.)

                                              Respectfully submitted,

                                              H&R BLOCK EASTERN ENTERPRISES, INC.
                                              and LINDA MURPHY,

                                              By their attorneys,

                                              /s/ Jennifer Belli

                                            Adrienne M. Markham, BBO# 320740
                                            Deborah Hesford DosSantos, BBO# 641185
                                            Jennifer Belli, BBO # 660278
                                            GOULSTON & STORRS,
                                             A Professional Corporation
                                            400 Atlantic Avenue
                                            Boston, Massachusetts  02110
                                            (617) 482-1776

Dated:  November 15, 2005

## CERTIFICATE OF SERVICE

     I hereby certify that on November 15, 2005, I caused the foregoing Motion to be served upon all counsel of record by first class mail.

                                              /s/ Jennifer Belli
                                            Jennifer Belli