UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV12232-PBS

_____
                                                )
ADRIAN McCRAY,                                  )
                                                )
       Plaintiff,                               )
                                                )
v.                                              )
                                                )
H&R BLOCK EASTERN ENTERPRISES, INC.,            )
   and LINDA MURPHY,                           )
                                                )
       Defendants.                              )
_____)

## AFFIDAVIT OF LINDA MURPHY

I, Linda Murphy, hereby depose and state:

1. I am currently employed as a vice president and managing director of the Northeast Division at H&R Block Eastern Enterprises, Inc. ("Block"). I have held that position since April, 2002. Prior to that time, I was employed for twenty years as regional director of Block's Region 10. I have worked at Block since 1969.

2. Block is an indirect subsidiary of H&R Block, Inc., which is headquartered in Kansas City, Missouri and operates more than 9,000 tax offices and 98 financial centers in the United States, including numerous offices in Massachusetts.

3. I work in Block's New England divisional office in Pembroke, Massachusetts.

4. The plaintiff, Adrian McCray ("McCray"), worked for Block from August 2001 to January 2003. He held the position of regional human resources manager and worked in the same office as me in Pembroke, Massachusetts.

5. During his employment at Block, McCray reported directly to Franciene Gill ("Gill"), who was Block's director of field human resources and McCray's primary supervisor. McCray had a "dotted line" reporting relationship to me, which meant that I directed him as necessary to conduct the day-to-day operation of the Pembroke office. I did not have the authority to discipline McCray or other regional human resources managers for performance issues without consulting with Gill. When a regional human resources manager exhibited performance problems, Gill and I would consult regarding those performance problems, agree upon a course of action, and implement that course of action together.

6. Largely in order to ensure independent investigation and decision-making within the human resources function, Block typically requires that its human resources managers report to two different supervisors -- directly reporting to a supervisor within the human resources organization and reporting only through a "dotted line" to an operations manager at the site where they work.

7. I am aware that human resources employees at Block use a computer system called "Clarify" to record and keep track of employee relations issues. During McCray's employment at Block, I did not have access to the employee relations complaints logged into Clarify.

8. Beginning almost immediately after McCray's hiring, I noticed a number of problems with his work performance. McCray was tardy and/or absent on numerous occasions with only last-minute notice or no notice at all. In addition, McCray lacked organizational skills; did not appear to understand Block's benefits plans; had difficulty writing job descriptions; and did not know how to maintain the personnel files he was charged with maintaining.

9. In his first performance review, dated May 15, 2002, McCray received a rating of "meets expectations" in three categories and "meets expectations minus" in four categories. (A true and accurate copy of McCray's first performance review is attached to the Affidavit of Jennifer Belli (hereinafter, "Belli Aff.") at Tab 5.)

10. On May 24, 2002, the Friday before McCray was scheduled to be on vacation for a week, McCray was absent from work. McCray did not tell me beforehand that he would be absent on that day.

11. While McCray was on vacation in May 2002, I discovered that he had failed to show me certain documentation relating to a pending lawsuit to ensure that it was completed on time. I also discovered that McCray had failed to ensure that certain management contracts for which he was responsible were executed properly and to ensure that his position was covered properly while he was on vacation. As a result of these performance problems, Gill and I decided to issue McCray a performance warning on May 31, 2002. (A true and accurate copy of the May 31, 2002 performance warning is attached to the Belli Aff. at Tab 7.)

12. I observed that McCray's work performance continued to deteriorate from May 2002 to August 2002.

13. In August 2002, Gill drafted and she and I presented McCray with a "development plan." That plan required that McCray meet with Gill and/or me on a periodic basis to discuss his work performance. Specifically, the plan called for a meeting on November 30, 2002. (A true and accurate copy of the August 2002 development plan is attached to the Belli Aff. at Tab 11.)

14. In August or September 2002, I learned that McCray was not working his scheduled hours, which required him to arrive early on Fridays. Further, during one of McCray's

absences from work, I observed that McCray had not locked up employee personnel files, as required by Block policy, and had confidential employee information on his desk. Also around this time, McCray gave work directly to the administrative assistant in the Pembroke office rather than following established office procedures for the distribution of such work. This went directly against my express instruction. I spoke with McCray about each of these performance issues and informed him that he was continuing to fail to meet Block's performance expectations.

15. In mid-November 2002, several managers in the Block organization complained to me about employee training seminars conducted by McCray. They stated that McCray was unprepared for the training, read directly from training manuals as his presentation, and arrived late. Those managers also mentioned that McCray had complained to training participants during the training about Block management. I spoke to McCray about the complaints I received.

16. Throughout the time I have worked at Block, the company has required its field human resources managers to work on Saturdays during tax season. McCray himself worked on Saturdays, as required, during the 2002 tax season (January - April 2002).

17. On or about November 18, 2002, I sent McCray and the other human resources manager in my region an email reminding them about the Saturday work schedule for the 2003 tax season. McCray replied to my email that same day and copied Gill on his reply. In his reply email, McCray refused to come to the office on Saturdays. Rather, McCray agreed only to be available by cell phone. Gill, McCray, and I had a lengthy back and forth about Block's expectation that McCray come to work on Saturdays, and I felt that McCray behaved in an unacceptable manner towards me and Gill in our communications about working on Saturdays.

4

(A true and accurate copy of the email exchange among Gill, McCray and me regarding Saturday work is attached to the Belli Aff. at Tab 13.)

18. In preparation for the November 30, 2002 meeting called for by McCray's development plan, I consulted with Gill and drafted a memorandum, dated November 25, 2002, summarizing the ways in which McCray's performance had continued to decline. (A true and accurate copy of the November 25, 2002 Performance Update is attached to the Belli Aff. at Tab 14.) It was my intention to provide that memorandum to McCray, and I eventually did so on December 9, 2002.

19. Gill and I also decided in advance of the scheduled November 30 meeting that, because McCray was not arriving at work at his scheduled time (7:00 a.m.) on Fridays, we would no longer permit him to work from 7:00 a.m. to 4:00 p.m. on Fridays.

20. The November 30, 2002 meeting called for in the development plan was first rescheduled to December 2 and then to December 9, 2002 because McCray was absent from work on November 30 as part of a two-week FMLA leave (November 17, 2002 - December 2, 2002) and failed to report to work at the end of that leave.

21. On December 9, 2002, Gill (by telephone) and I met with McCray as planned and informed him that he had not improved his performance and that he was not making sufficient progress on the development plan. McCray continued to work as a regional human resources manager out of the Pembroke office, but, after that meeting, his performance became even worse. He seemed to have no interest in coming to work and little investment in his job.

22. Some time in the week after the December 9, 2002 meeting, I received the Charge of Discrimination filed by McCray at the Massachusetts Commission Against Discrimination, which alleged that he had been discriminated against on the basis of his race and was dated

December 4, 2002. (A true and accurate copy of the Charge is attached to the Belli Aff. at Tab 21.)

23. On or about December 26, 2002, McCray led fair employment practices training for employees. After having received complaints about McCray's performance at the trainings in mid-November 2002, Gill and I decided to attend that training to observe McCray's performance first hand. At the training we attended, I observed that McCray was unprepared, that he read directly from the training materials as his presentation (in fact, McCray even read aloud the words "turn the page" that appeared at the bottom of a page of the training materials), and that he had failed to make certain normal arrangements for the training (e.g., coffee or lunch for the participants).

24. Because of the steady decline in McCray's work performance and attitude and his flagrant flouting of work directives, on January 14, 2003, Gill and I issued McCray a final written warning. The warning summarized McCray's performance problems, including his failure to be prepared for trainings; to meet the expectations of the August 2002 development plan; to report absences and to complete work in a timely manner; and to attend a required training in Kansas City. (A true and accurate copy of the final written warning is attached to the Belli Aff. at Tab 30.)

25. I met with McCray regarding the final written warning on January 14, 2003. During the meeting, McCray got very hostile and agitated. At one point, he stood up with his fist raised at my face. I was very afraid of McCray during the meeting.

26. As I testified at my deposition, at this meeting, I also told McCray that he had not provided sufficient notice of his requested FMLA leave, that the surgery he scheduled was scheduled for Block's busiest season (January - April), and therefore, that Block was not going

to grant such leave. Finally, during the January 14, 2003 meeting, McCray made clear that he would not comply with the expectations spelled out in the final written warning.

26. McCray called in sick to work on January 15, 16, 17, and 20, 2003. He did not provide any medical documentation for his absences on those days. After consulting with Gill about the proper course of action, on January 20, I called McCray at home. I asked him when he would be returning to work or if he would be providing Block with further medical documentation to support his absences. McCray told me that he would not be reporting to work that day and I informed him that his employment was terminated.

Signed under the pains and penalties of perjury this 15th day of November 2005.

/s/ Linda Murphy

_____

Linda Murphy