UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV12232-PBS

| | |
|---|---|
| ADRIAN McCRAY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| H&R BLOCK EASTERN ENTERPRISES, INC., and LINDA MURPHY, | ) ) ) |
| Defendants. | ) ) |

## AFFIDAVIT OF FRANCIENE GILL

I, Franciene Gill, hereby depose and state:

1. I am an African-American woman. From November 1999 until January 2005, I was employed as the director of field human resources for H&R Block Services, Inc., an indirect subsidiary of Block, Inc. (collectively, "Block"). During my employment at Block, I and my co-director, Carol Kane, supervised the 17 field human resources managers working in the regions and divisions of H&R Block across the United States. Throughout my tenure at Block, I worked out of its corporate headquarters in Kansas City, Missouri. I left Block in January 2005 to accept new employment.

2. I made the decision to hire Adrian McCray as a regional human resources manager in August 2001.

3. During his tenure as a regional human resources manager at Block, McCray reported directly to me. In addition, McCray had a "dotted line" reporting relationship to Linda Murphy, the Vice President and Managing Director of the Northeast Division of Block.

1

4. Block created the dual reporting structure for field human resources managers, in part, to ensure independent investigation and decision-making within the human resources function. Regardless of the dual reporting structure, I was McCray's primary supervisor and had responsibility for training, discipline, corrective action, and review of McCray's job performance. I was also responsible for preparing and issuing his performance reviews. Murphy was not authorized to take disciplinary action against McCray without my sign-off.

5. Another manner in which Block attempted to ensure accurate and independent investigation of human resources issues was through a computer-based record-keeping system called "Clarify." Clarify enabled Block's human resources managers to log into the computer the issues or employee complaints they were handling, along with the actions they planned to take or recommendations they had regarding the issue or complaint. Senior human resources managers, including myself, would then review the information in the Clarify system.

6. At the time of McCray's employment, human resources managers were required to enter any major employee relations issue they were handling into the Clarify system. It was my practice to review each Clarify entry on a weekly basis to ensure that Block's policies and procedures were being followed.

7. Also, during the time McCray worked at Block, only human resources personnel could access the employee relations complaints logged into the Clarify system.

8. I observed that McCray suffered from performance issues from the very beginning of his employment. For example, he often failed to record the employee relations issues he was handling in the Clarify system. In addition, he often failed to produce the written reports required by the human resources department and when he produced them, it was only after my prompting and they were often incomplete and insufficient to serve Block's purposes. I

also learned from Murphy, early in McCray's tenure at Block, that he was often absent and/or tardy with little or no notice and that he had difficulty with basic human resources skills.

9. In observing McCray handle employee relations issues during the first several months he worked at Block, I saw that he demonstrated a tendency to be too quick to jump to conclusions and was not able to comprehend the subtleties of a given situation. I coached McCray on an almost daily basis regarding the handling of employee relations issues. It was my opinion that these were qualities that McCray needed to improve in order to be successful in his position.

10. As a result of these performance problems, I gave McCray a mixed performance review in May 2002. He received a rating of "meets expectations" in three categories and "meets expectations minus" in four categories. (A true and accurate copy of the performance review is attached to the Affidavit of Jennifer Belli ("Belli Aff.") at Tab 5.)

11. On Friday May 24, 2002, I learned from Murphy that McCray had failed to report to work without notice to her. McCray had not told me of his absence that day either. McCray went on vacation the following week and Murphy and I discovered and discussed a number of problems that McCray left unresolved while on vacation. Specifically, McCray failed to complete certain documentation required for a pending lawsuit and failed to complete certain management contracts (which had to be completed on time or they would automatically renew without the necessary changes). As a result, Block issued McCray a performance warning on May 31, 2002. (A true and accurate copy of the written warning is attached to the Belli Aff. at Tab 7.)

12. I observed that McCray's work performance deteriorated rather than improved after he received the performance review in May 2002 and the performance warning on May 31, 2002.

13. From May to November 2002, Murphy and I discussed McCray's performance difficulties on numerous occasions and she informed me of a number of issues she observed (e.g., McCray failing to maintain personnel files properly; follow her directions not to give work directly to an administrative assistant; failing to work his scheduled hours.) I discussed many of these performance issues directly with McCray.

14. Eventually, based on the number of performance problems McCray continued to have, Murphy and I decided to issue McCray a "development plan" in August 2002. (A true and accurate copy of the development plan is attached to the Belli Aff. at Tab 11.) The development plan spelled out specific steps for McCray to improve his performance and called for him to meet with me and/or Murphy to assess his progress. Specifically, the plan called for a meeting on November 30, 2002.

15. Even though he was under a development plan, McCray did not improve his performance.

16. Throughout the time I worked at Block, it was a requirement that field human resources managers work in the office on Saturdays during tax season (January - April). It is my understanding that McCray worked on Saturdays in the office without incident during his first tax season (2002).

17. When Murphy informed McCray and the other regional human resources manager she supervised that they would have to report to work on alternate Saturdays during the 2003 tax season, McCray initially refused. He sent a number of emails to Murphy and me stating that he

would only be available by cell phone on Saturdays and would not come into the office. (A true and accurate copy of the email exchange is attached to the Belli Aff. at Tab 13.) It is my opinion that McCray's conduct regarding this clearly-stated work rule was inappropriate.

18.     In addition, I learned from Murphy that McCray had been unprepared for employee training sessions that he led in November 2002. I learned that McCray had arrived late for the trainings, read from the training materials, and had been otherwise unprepared.

19.     On December 9, 2002, Murphy and I had a meeting with McCray (at which I participated by telephone) regarding his performance. This meeting had been previously scheduled for November 30, 2002 at the time that McCray received his development plan in August 2002. The meeting was re-scheduled because McCray had been out of work on November 30 as part of a two-week FMLA leave (November 17, 2002 - December 2, 2002) and failed to return to work after that leave. The outline for what we discussed at that meeting is contained in Murphy's November 25, 2002 Memorandum that she prepared and shared with me in advance of the meeting. (A true and accurate copy of the November 25, 2002 Performance Update is attached to the Belli Aff. at Tab 14.)

20.     During the December 9 meeting, Murphy and I gave McCray a long list of performance issues that he needed to address, including being better prepared for employee trainings; following office rules; and working his scheduled hours. Nonetheless, in December 2002 and January 2003, McCray had a number of unexcused absences and his work performance continued to decline. He seemed to have no interest in performing his job well or in coming to work at all.

21.     Because of the problems that had been reported to me regarding trainings led by McCray, Murphy and I traveled to Boston specifically to attend a training session that McCray

5

presented on or about December 26, 2002, so that we could observe his performance first hand. At that training, McCray was unprepared again, read directly from the training materials as his presentation, and failed to provide coffee, water or lunch for the training participants, as is standard practice for a full-day, in-house training. In addition, McCray did not require the non-exempt employees attending the training to take the required breaks during the training.

22. Because of the myriad performance problems that McCray had at Block, Murphy and I decided to issue him a final written warning on January 14, 2003. I drafted that warning and Murphy met with McCray alone to deliver the warning. (A true and accurate copy of the final written warning is attached to the Belli Aff. at Tab 30.)

23. After the meeting, Murphy informed me that McCray had raised his fist at her in the meeting and acted in a menacing and threatening way such that she was afraid to be alone with him. Murphy also told me that McCray refused to acknowledge any of his performance problems and stated that he would not comply with the requirements listed in the warning. As a result, I wrote McCray an email describing Block's expectations and giving him a second chance to agree to meet those expectations and save his job. (A true and accurate copy of this email is attached to the Belli Aff. at Tab 31.)

24. During his employment at Block, McCray took one approved FMLA leave and requested a second FMLA leave that Block ultimately denied.

25. While I worked at Block, it was Block's practice to grant requested FMLA leave on a conditional basis pending receipt of medical documentation from the requesting employee.

26. McCray took FMLA leave for an apparent back injury in November and December 2002. After he had returned to work, McCray sought to work an intermittent schedule and presented Block with a medical note from a chiropractor that stated he could work 20-40

6

hours per week. (A true and accurate copy of the Medical Note from Alves Chiropractic Center is attached to the Belli Aff. at Tab 22.) Block returned McCray to his position and permitted McCray to work an intermittent schedule pending receipt of medical documentation.

27. On Wednesday December 11, 2002, McCray informed me that he would not be coming to work on Thursday or Friday of that week because he had already worked 20 hours in the week and had aggravated his back lifting boxes. The next day, I informed McCray that, on a going forward basis, to the extent he was working an intermittent schedule, Block would require that he work six hours per day, five days per week.

28. As part of his request for intermittent leave under the FMLA, Block required that McCray undergo an independent medical examination, which, in turn, led to him having an MRI. I learned in early January 2003 that the MRI was scheduled for January 13, 2003, a day on which McCray was supposed to attend a required certification training session in Kansas City. I also learned that McCray had not opened the boxes of training materials that he had received in December in preparation for the training. Upon learning this, I arranged to reschedule McCray's MRI for an earlier date so that it did not conflict with the training session. Regardless, McCray failed to attend either the rescheduled MRI or the required training session.

29. McCray was absent from work from January 7-10, 2003. On or about January 9, 2003, McCray requested a second FMLA leave for a different medical condition. It is my understanding that he requested leave for a foot problem similar to a callus. Consistent with Block's practice, McCray's requested leave was approved conditionally pending receipt of medical documentation.

30. McCray initially stated that he needed to be out of work through January 22, but then provided medical documentation that stated he could work, provided that he did not stand

more than 40% of the time. (A true and accurate copy of the Medical Certification regarding Intractable Plantar Keratoma is attached to the Belli Aff. at Tab 28.) As such, Block required that he return to work and report to the training on Monday, January 13, 2003.

      31.      On or about January 10, 2003, McCray presented Block with an additional medical certification stating that he was having surgery on his foot on January 23, 2003. (A true and accurate copy of the medical note is attached to the Belli Aff. at Tab 29.) I rejected McCray's request for FMLA leave for the surgery because the surgery was foreseeable and he had failed to provide Block with 30 days' notice. In addition, I rejected McCray's request for FMLA leave because he had scheduled the surgery during tax season, which is Block's busiest time.

      32.      I informed Murphy that McCray's request for FMLA leave was denied and it is my understanding and belief that she informed him of that decision during her meeting with him on January 14, 2003, at which time she provided him with the final written warning. I also sent McCray an email on January 14, 2003 informing him that Block had denied his request for FMLA leave. (A true and accurate copy of the January 14, 2003 email to McCray is attached to the Belli Aff. at Tab 31.)

      33.      After McCray received the final written warning on January 14, 2003, he failed to report to work for four consecutive days. I consulted with Murphy during that time and we agreed that, if he continued to fail to report to work, we would terminate his employment. Based on my discussions with Murphy, I am aware that she informed him that his employment was terminated when she called him at home on January 20, 2003 and he stated that he would not be reporting to work.

34. After that discussion, I drafted and sent McCray a termination letter detailing the reasons for his termination. (A true and accurate copy of McCray's termination letter is attached to the Belli Aff. at Tab 32.)

35. McCray's employment was terminated because of his unacceptable work performance, his demonstrated unwillingness to work, his excessive unauthorized absences, and his insubordination during the January 14, 2003 meeting regarding the final written warning. McCray's failure to report to work on January 20, 2003 was the culmination of a series of performance problems that resulted in his termination.

Signed under the pains and penalties of perjury this 15th day of November 2005.

/s/ Franciene Gill

_____

Franciene Gill