```
 1                     VOL. I, PAGES 1 -  128

 2

 3              UNITED STATES DISTRICT COURT

 4              DISTRICT OF MASSACHUSETTS

 5                C.A. No. 04-CV-12232-PBS

 6

 7   ADRIAN MCCRAY

 8                         Plaintiff

 9   V.

10   H&R BLOCK EASTERN ENTERPRISES, INC.

11   and LINDA MURPHY

12                         Defendants

13

14               - - - - - - - -

15          Deposition of ADRIAN McCRAY

16             Tuesday, June 7, 2005

17                  10:55 a.m.

18              Goulston & Storrs

19              400 Atlantic Avenue

20              Boston, Massachusetts

21               - - - - - - - -

22          Reporter:  Deborah Roth, RPR/CSR

23

24
```

1                                              Volume: II

2                                        Pages:  129 – 208

3            UNITED STATES DISTRICT COURT

4                    C.A. No. 04-CV-12232-PBS

5

6   ADRIAN MCCRAY,

7                Plaintiff,

8       v.

9   H&R BLOCK EASTERN ENTERPRISES, INC.

10  and LINDA MURPHY,

11               Defendants.

12

13

14

15                   * * * * * * * * * *

16           DEPOSITION OF ADRIAN MCCRAY

17            Wednesday, June 8, 2005

18              Goulston & Storrs

19             400 Atlantic Avenue

20            Boston, Massachusetts

21               10:10 a.m.

22         Reporter:   Linda M. Grieco

23       320 Congress Street, Boston, MA 02210

24

Page 209

1                                  Volume:   III

2                                  Pages:   209 - 279

3            UNITED STATES DISTRICT COURT

4                       C.A. No. 04-CV-12232 PBS

5

6   ADRIAN McCRAY,

7                        Plaintiff,

8            v.

9   H&R BLOCK EASTERN ENTERPRISES, INC.,

10   and LINDA MURPHY,

11

12                        Defendants.

13

14

15                    * * * * * * * * *

16      CONTINUED DEPOSITION OF ADRIAN McCRAY

17           Friday, October 21, 2005

18              Goulston & Storrs

19              400 Atlantic Avenue

20            Boston, Massachusetts

21                 10:20 a.m.

22         Reporter:   Linda M. Grieco

23      320 Congress Street, Boston, MA 02210

24

Page 54

1 A. We always have -- I have to bring to her
2 attention that something is going on. I have to
3 discuss --
4 Q. "Her" being Ms. Murphy?
5 A. Yes.
6 Q. We are taking this in baby steps.
7 A. I have to -- yeah, anything that happens I
8 have to let her know, Ms. Murphy.
9 Q. Did the investigation, did the complaint come
10 in to you?
11 A. The complaint comes through a system. I
12 don't know if it came directly to me through the
13 system, or it came in through some other method,
14 but...
15 Q. Do you recall how you first heard about the
16 complaint?
17 A. I don't remember.
18 Q. Okay. In any event, before starting the
19 investigation, you spoke with Ms. Murphy?
20 A. Yes.
21 Q. Did you speak with anyone else?
22 A. Probably Kathy was there. She generally was
23 there, also.
24 Q. In this meeting between you, Kathy and

Page 55

1 Ms. Murphy, before the investigation, what do you
2 recall being said?
3 A. I don't remember what was said. I just know
4 we had to go out there and investigate.
5 Q. You don't recall Ms. Murphy making any
6 comments that were of any concern to you in that
7 meeting?
8 A. I don't remember that. I don't remember the
9 conversation at all.
10 Q. After that conversation, did you then begin
11 the investigation?
12 A. Yes.
13 Q. And you said you did that with Kathy?
14 A. Yes. Kathy. She sent Kathy out, also.
15 Q. Did you conduct the investigation together,
16 or did you each take different parts of it?
17 A. I believe we talked to people together.
18 Q. And who were the people -- first of all,
19 describe what the allegation was.
20 A. That this person was being discriminated
21 against because of his sexual orientation.
22 Q. Who was the person making the complaint?
23 A. He was a seasonal manager in one of the
24 offices.

Page 56

1 Q. What was Rick's position?
2 A. He was the district manager.
3 Q. When you went out there, what did you do to
4 investigate the complaint?
5 A. We interviewed different individuals.
6 Q. Was there a specific act that was complained
7 of, or was it a general --
8 A. It was several acts, I believe. You know,
9 like I said, I don't remember exactly, but I know it
10 was several acts.
11 Like, if he came in late, and he got
12 treated differently than if someone else that came in
13 late. Someone else was allowed to, and he wasn't.
14 I don't remember the nature specifically.
15 Q. Okay. Any of the interviewees that you
16 interviewed, were there any who had actually
17 witnessed the conduct?
18 A. Yes.
19 Q. Who were they?
20 A. The assistance district manager, Frank
21 Dejour, and the -- I don't know if she was the office
22 accountant. I can't remember her name, but they both
23 told me that they specifically witnessed him being
24 discriminated against, and they truly believed that

Page 57

1 it was true.
2 Q. When you say they said to you that he was
3 specifically discriminating against this individual,
4 what was the conduct they observed?
5 A. Treated him differently. He would get
6 reprimanded where others wouldn't.
7 Q. Did you have any knowledge of his work
8 performance?
9 A. As far as?
10 Q. How he was performing his job.
11 A. I'm sure there was discussion regarding that.
12 I don't know if he had been hired several
13 years in a row. It wasn't his first time. He kept
14 coming back. So I don't know what his -- I can't
15 remember what his performance was.
16 Q. Was that part of your investigation to learn
17 whether there were performance issues between he and
18 the district manager?
19 A. Yeah, of course.
20 Q. What was your conclusion?
21 A. I don't remember. I don't remember.
22 Q. Okay.
23 A. If that was issue. I don't know if that was
24 an issue or not.

15 (Pages 54 to 57)

**Page 58**

1   Q. Other than the interviews with people out
2 there, was there anything else that you did in
3 connection with the investigation?
4   A. That was pretty much it. You just
5 interviewed the people to try to get a feel for what
6 was going on.
7   Q. Did you and Kathy confer on what you had
8 learned from these interviews?
9   A. Yes.
10   Q. Okay. Did you do that with Ms. Murphy
11 present?
12   A. Well, this was in New Hampshire when we was
13 doing the investigation. She wasn't present in New
14 Hampshire.
15   Q. So you conferred immediately after these
16 interviews in New Hampshire?
17   A. Kathy and I?
18   Q. Yes.
19   A. Yes.
20   Q. What did you and Kathy -- did you come to any
21 conclusions, the two of you?
22   A. No. Well, no. We didn't -- it wasn't
23 Kathy's job. It was my job. It was up to me to come
24 to a conclusion.

**Page 59**

1   Q. So Kathy was just there for the ride?
2   A. Because it was her son-in-law, she wanted him
3 protected. So she sent Kathy out.
4   Kathy never came on any other
5 investigation. I did many investigations.
6   Q. Let me break that out.
7   It was not Kathy's son-in-law?
8   A. Yes.
9   Q. You are telling me Kathy was there --
10   A. To protect Ms. Murphy's interest.
11   Q. Did anyone tell you that?
12   A. That's why she went out there.
13   Q. Did anyone tell you that?
14   A. She said, "I am going to send Kathy, because
15 I want to make sure that" -- I can't say. I can't
16 say that.
17   I can't say if she said that, but what I
18 am telling you is Kathy never went on any other
19 investigation with me, except for that one. That's
20 what I'm telling you.
21   Q. So it is your conclusion that it was to
22 protect Ms. Murphy's interests?
23   A. Yes.
24   Q. Okay. And you don't recall anyone saying

**Page 60**

1 that to you?
2   A. You know, it's so foggy. I can't say yes. I
3 can't say no.
4   Q. You have no memory at this moment?
5   A. Yes.
6   Q. Was it your understanding that Kathy would
7 have no role in the investigation?
8   A. It wasn't Kathy's job.
9   Kathy was there. She wanted to hear and
10 see what was going on, so she could report to
11 Ms. Murphy directly.
12   Q. Now, when you and Kathy talked, did you
13 describe to her your conclusions -- when did you
14 formulate your conclusions that there had been
15 discriminatory conduct by Rick?
16   A. Almost immediately.
17   Q. So while you were out there in New Hampshire?
18   A. Yes.
19   Q. Did you say that to Kathy?
20   A. I told Catherine.
21   Q. Who is Catherine?
22   A. Catherine, she was the head of the complaint
23 department or whatever. I can't remember her last
24 name either, but I got on the phone when I got away

**Page 61**

1 from Kathy. I went outside, and Catherine asked me
2 directly, "Do you believe that he is guilty?" And I
3 said "He is." I told her directly.
4   Q. You didn't tell that to Kathy?
5   A. No.
6   Q. Why not?
7   A. Because, as I said, she was sent out there to
8 formulate -- to protect Ms. Murphy's interests,
9 that's why. It wasn't her job, and I didn't report
10 to Kathy.
11   Q. When you told me that you and Kathy
12 conferred, what did you confer about?
13   A. Based on, do you believe this person or that
14 person. I didn't give her my opinion. They knew how
15 I felt when I went back to the office.
16   Q. Who is "they"?
17   A. Ms. Murphy and Kathy.
18   Q. Let me finish up with New Hampshire.
19   A. Okay.
20   Q. After you and Kathy discussed whom you
21 believed -- did you describe to Kathy that you
22 believed the witnesses' versions of what happened?
23   A. Well, Kathy and I talked about -- I guess the
24 underlying thing was that even if it was true -- this

Page 62

1  is the belief -- even if it was true, you are
2  supposed to protect the people above you. That was
3  the whole culture.
4  　　　If something was wrong, let's deal with
5  it, but you're supposed to protect the people you
6  work with. That was the whole culture at that
7  regional office.
8  　　Q. Did anyone say that to you?
9  　　A. Absolutely.
10  　　Q. Who said that?
11  　　A. Ms. Murphy and Kathy.
12  　　Q. Words to the effect that if --
13  　　A. "You are not supposed to tell. You are
14  supposed to protect." I remember those words, yes.
15  　　Q. Those words were in a discussion with
16  Ms. Murphy?
17  　　A. Yes.
18  　　Q. By Ms. Murphy?
19  　　A. Yes.
20  　　Q. In front of you?
21  　　A. And Kathy, yes.
22  　　Q. And Kathy?
23  　　A. Yes.
24  　　Q. It was in the context of this investigation?

Page 63

1  　　A. Absolutely.
2  　　Q. It was after you went up to New Hampshire?
3  　　A. Yes.
4  　　Q. Let me ask, after you went up to New
5  Hampshire, did you have this conference with Kathy,
6  did you have any discussion with Kathy before coming
7  back and having this meeting with Ms. Murphy?
8  　　A. I don't recall if we did or did not. She
9  drove separately. I drove separately. I left and
10  she left.
11  　　　As I said, I had a conversation with
12  Catherine, who is the person responsible for all of
13  the complaints, and I told her straight, yes, I
14  believed that he discriminated.
15  　　Q. You don't recall saying that to Kathy?
16  　　A. Not in New Hampshire.
17  　　Q. When you got back from New Hampshire, was
18  this taken up in a meeting pretty quickly?
19  　　A. Yeah. I mean, any complaint, we tried to get
20  it resolved as quickly as possible.
21  　　Q. The next thing that happened was this meeting
22  with Ms. Murphy, Kathy and you.
23  　　A. Yes.
24  　　Q. Was anyone else in that meeting?

Page 64

1  　　A. I don't believe so.
2  　　Q. Can you describe for me what the purpose of
3  that meeting was?
4  　　A. What is going be -- what is the report going
5  to say? That was the purpose of the meeting.
6  　　Q. The three of you were in the room, in
7  Ms. Murphy's office?
8  　　A. Yes.
9  　　Q. Did you give her a report on what you had
10  heard in New Hampshire?
11  　　A. I told her before that, you know, based on
12  what Frank said, and the other lady, whose -- I can't
13  remember her name, that, you know, he looks guilty.
14  　　Q. What did she say?
15  　　A. She said, like, "I don't know why they are
16  saying this. I am going to get them."
17  　　Q. Those were her words, exact words?
18  　　A. I don't know if it was the exact, but,
19  remember, again, those are the same thing. It was
20  somewhere along the lines that I am going to get her.
21  I am going to get him, and she actually did, down the
22  line.
23  　　Q. What did you say when she said that?
24  　　A. I was, like, "Look, I will do the report the

Page 65

1  way you want me to do it."
2  　　Q. Did you ask her how she wanted you to do it?
3  　　A. I knew how she wanted me to do it.
4  　　Q. You didn't ask her? You knew?
5  　　A. Yes.
6  　　Q. Did Kathy say anything in this meeting?
7  　　A. I don't recall if she said anything or not.
8  I don't remember.
9  　　Q. Okay. Did you have any discussion with Kathy
10  after this meeting?
11  　　A. Not regarding that that I can recall.
12  　　Q. Okay. So what happens next in this
13  investigative effort after this meeting that you have
14  described?
15  　　A. I just wrote in the report that it was
16  inconclusive.
17  　　Q. Did you talk with Catherine again after you
18  had called her from New Hampshire?
19  　　A. I believe I talked to Franciene and told her
20  the same thing.
21  　　Q. Told her the same thing that you had told
22  Catherine?
23  　　A. Yes.
24  　　Q. That you believed that Rick was guilty of

17 (Pages 62 to 65)

Page 66

1  what was alleged?
2     A. Yes.
3     Q. And what did Franciene say to you?
4     A. I don't recall what she said, but I know
5  Linda Murphy had been with H&R Block a very long
6  time, and she has a lot of power, and people are
7  afraid of her. They were not willing to be at odds
8  with her.
9     Q. So in answer to my question as to whether
10 Franciene said anything in response to you, you still
11 cannot remember her saying anything?
12    A. As far as what?
13    Q. When you told her --
14    A. I don't remember what she said.
15    Q. Did you have that discussion with Franciene
16 before you wrote up your report?
17    A. Absolutely.
18    Q. Did you tell Franciene what you were going to
19 do with the report?
20    A. They knew what I did.
21    Q. I am asking whether you told Franciene before
22 you had this conversation before writing the report,
23 I want to know whether in that conversation --
24    A. I may have --

Page 67

1     Q. Please, sir. You need to let me get the
2  question out for the record.
3        Whether you told Franciene that you had
4  concluded that you had to write the report against
5  your beliefs?
6     A. I may have told her.
7        I can't tell you 100 percent. I don't
8  recall, but I know I had a conversation. I know
9  whatever I do I have to tell them what I am doing.
10 Within that context, probably.
11    Q. You don't remember one way or the other?
12    A. Right.
13    Q. Then you wrote a report?
14    A. Yes.
15    Q. And in the report, as you've described it,
16 you say that you decided that the evidence was
17 inconclusive?
18    A. Uh-huh.
19    Q. "Yes" or "no"?
20    A. Yes.
21    Q. What happened as a result of that report?
22    A. Nothing happened to Rick.
23    Q. Was the investigation closed?
24    A. Pretty much. The guy got terminated, but he

Page 68

1  got terminated with pay or something. It was only a
2  week or so left in the tax season. They either paid
3  him and said, "don't come back." It was such a short
4  time left.
5     Q. He was a seasonal employee whose contract
6  ended at the end of tax season?
7     A. Right.
8     Q. Did you talk with anyone about your concerns
9  about this incident, while you were employed?
10    A. The only one I had to talk to was Catherine
11 or Franciene. There was no one else to talk to.
12    Q. Other than the two discussions that we have
13 just described, you don't recall any other
14 discussions --
15    A. No. After the report, you know, I went back
16 and I told them I was very uncomfortable with writing
17 the report, and I am not going to do that again.
18    Q. Who did you say that to?
19    A. Linda.
20    Q. So you had a direct conversation with Linda
21 about this?
22    A. Yes.
23    Q. That was the report?
24    A. Yes.

Page 69

1     Q. Did you go to see her?
2     A. I went to see her.
3     Q. Tell me what you said to her.
4     A. Just what I told you.
5     Q. That you were uncomfortable writing the
6  report, and you weren't going to do it again?
7     A. Right.
8     Q. What was her response?
9     A. She said, "Okay."
10    Q. Was anyone else present when you --
11    A. No.
12    Q. So now let's return to your performance
13 evaluation.
14       We started this line of questioning when
15 you told me you believed that the performance
16 evaluation was retaliation for this incident.
17    A. Uh-huh. That was a start.
18    Q. "Yes"?
19    A. Uh-huh.
20    Q. Were there any other things about this
21 performance evaluation that you disagreed with?
22    A. I mean, I didn't agree that I should have
23 received the evaluation that I received.
24    Q. Was this considered a two in a scale --

Page 70

1  A. Two in a scale of five.
2  Q. That's your memory of it?
3  A. Yes. That's what it was, two in a scale of
4  five.
5       EXHIBIT NO. 2 MARKED
6  Q. Just take a look at it, and tell me whether
7  this looks like the evaluation that you were given?
8  A. Yes.
9  Q. How was this first given to you? Was it
10 given orally, the first time you learned of your
11 evaluation?
12 A. No. It was given to me, handed to me.
13 Q. Who was it that handed it to you?
14 A. Franciene.
15 Q. Was Ms. Murphy present at that time?
16 A. No.
17 Q. Did you have a discussion with Franciene when
18 she handed this to you?
19 A. Yes.
20 Q. Describe for me that discussion.
21 A. I just basically said that I didn't
22 understand how -- when I met all of my criteria, that
23 I received a two, and then I also told her that I
24 think I only got a two because I'm not going to be on

Page 71

1  board anymore with the nonsense.
2  Q. By "nonsense," you are referring to the
3  incident with Ms. Murphy's relative?
4  A. Yes.
5  Q. What did Franciene say when you said that?
6  A. She said, "No. You have got a lot of
7  potential. It has nothing to do with that."
8  Q. What did she describe as the -- did she go
9  through these issues with you one by one?
10 A. Yes. But, like, for example, "Did not
11 complete a formal plan." Like, I don't have all of
12 my stuff, but I do have a plan.
13      There was no direction given as far as
14 what we were supposed to be doing. You know, it was
15 just general, but I know I met every criteria, and I
16 did -- you know, I was on the task force. I did all
17 of the training I was supposed to do.
18      I was -- you know, like I said, this came
19 out of nowhere. I had no knowledge prior to this
20 that this was anywhere near a two.
21 Q. Did you say that to Franciene?
22 A. Absolutely.
23 Q. What did she say were the things you needed
24 to be working on?

Page 72

1       MR. MANOFF: Objection. If you can
2  answer.
3  A. Like this communication --
4  Q. The question is: What did she say?
5  A. I don't remember what she was saying.
6  Q. After she said to you that you had a lot of
7  potential, did you say anything in response to that?
8  A. You know what, after I said what I said, I
9  was just quite. I didn't say much more --
10 Q. Because you disagreed with it?
11 A. I disagreed totally.
12 Q. There was not a single thing in here that you
13 thought was a valid critique of your work?
14 A. Everyone can improve in different areas.
15      Even just reading this, you know, it's
16 very -- like, she says to clarify cases. Entering
17 them into the system. I didn't have a lot of cases.
18 Q. What is a clarified case?
19 A. Like, someone had a complaint. As I told
20 you, it comes through a system, the clarify system.
21 We get it through the system. You enter it back in
22 saying whatever the results of the case are.
23      I guess, because a lot of other HR
24 managers had a whole lot of cases entered, I only had

Page 73

1  a few. But a lot of them had no merit, or for one
2  reason or another they wasn't in the system.
3  Q. You are supposed to enter them into the
4  system whether they have merit or not?
5  A. I didn't have a lot of cases.
6       Even that being the case, yeah, that's an
7  area where I probably could have improved, entering
8  the results into clarify. I could agree with that.
9       However, if you read the whole thing, I
10 did everything I had to do as far as training, except
11 for entering a clarify case.
12 Q. How about on that same page, up above,
13 there's a sentence that reads, "As of 3/9/02 Dre
14 submitted a total of 21 PAFs with a 24 percent
15 exception rate. This rate is above the five percent
16 acceptable range."
17      What is an PAF?
18 A. I don't remember what a PAF is. I don't know
19 if it is for the people working. I don't remember
20 what it stands for. In that section, I got a meets
21 expectations.
22      I am looking at the "did not meet
23 expectations." That's what I am focusing on. If I
24 meet expectations, I meet expectations.

Page 74

1    Q. Let's go to the top of Page 30.
2    A. "While Dre is able to meet his current
3  responsibilities, there are additional ways he can
4  contribute to the region."
5        They are saying I meet my
6  responsibilities. If I want to do better, yeah, that
7  will take me to the meets plus. I am able to meet my
8  current responsibilities.
9    Q. When she says, "He has not reached out to
10  look for new challenges to support the regional
11  directors of both tax and financial services," do you
12  disagree with that?
13    A. Absolutely. There was no diversity in the
14  region. I went to Brandeis University trying to set
15  up an internship program. I tried to set up a
16  diversity program. I tried to get us involved in
17  advertising in African American magazines, so we
18  could attract more people.
19        I also -- what else did I do? I set up a
20  program with AARP to get some of the seniors to come
21  and work for -- during the tax season seasonally.
22        I did a lot of things. I have it all
23  documented that I did those things and that wasn't in
24  the normal course of -- okay, your day-to-day

Page 75

1  responsibilities.
2    Q. Did you tell her you disagreed?
3    A. Absolutely.
4    Q. What did she say?
5    A. It is what it is.
6    Q. Let's go down to the next one, communication,
7  positive working relationships, where it is also a
8  meets expectations minus.
9    A. Uh-huh.
10    Q. Look in the box there. You could read this
11  one to yourself.
12        Is there anything in what she says -- my
13  question will be -- that you agree with?
14    A. It's like flip-flop.
15    Q. Is there anything that is a reasonable thing
16  that she had pointed --
17    A. What is reasonable is my style. I am a
18  structured person. I am a black-and-white person, if
19  that's what it is supposed to be.
20    Q. So her critique about sometimes being viewed
21  as inflexible or rigid is something that you can
22  understand?
23    A. Absolutely.
24        If you read the last line, "Dre

Page 76

1  communicates well with others. He can organize his
2  thoughts and express himself in the clear," and
3  whatever. It says, "Dre communicates well with
4  others." If I communicate well with others, how am I
5  not communicating? It doesn't make sense. You can't
6  have both. I am communicating or not?
7    Q. It wasn't the last sentence.
8    A. On that page.
9        My monthly reports were -- I am very
10  short and to the point, and that is an area I have to
11  agree that I could have been more -- but for me it's
12  fluff. This is what it is. I can write long and
13  drawn out. It's a waste. It's inefficient. It's my
14  style.
15    Q. Do you agree with her that you could have
16  improved in that area?
17    A. Yes.
18    Q. I note at the back of this it indicates that
19  you refuse to sign this?
20    A. Yeah. I don't believe it to be true.
21    Q. And the date on the line about the signature
22  is August 21?
23    A. Yeah. I never received my copy until August.
24  We talked about it in May, but I never received it

Page 77

1  until August.
2    Q. So you sat there with it, talking about it in
3  May, and then she took it back, and then you received
4  it in hard copy in August for signature?
5    A. I believe so.
6    Q. I am trying to get --
7    A. That's pretty much what happened. We talked
8  about it in May, but I didn't get it until August.
9    Q. Was there a discussion about what kind of
10  follow-up would be done after this evaluation?
11    A. I didn't even get it until August.
12    Q. The question is, a discussion in the meeting
13  with Ms. Gill?
14    A. No, there was no follow-up.
15    Q. No follow-up discussion, is the first
16  question. Let me rephrase it. I know it's a little
17  bit of a tedium.
18        In the discussion with Ms. Gill about
19  your performance evaluation, did she discuss what
20  kind of follow-up would be done around the issues
21  that she was identifying in here?
22    A. No.
23    Q. Okay.
24    A. Not that I remember.

Page 78

1    Q. Did you have any expectation that there would
2  be additional follow-up?
3    A. Basically what I told her is I would work on
4  everything that she said, and I will do my best. I
5  will try to improve.
6    Q. How would you describe your relationship with
7  Ms. Gill up to this point in time?
8    A. It was not adversarial. It was okay.
9    Q. Did you feel in any way that she was
10 discriminating against you up until the time you
11 received your evaluation in May?
12   A. I felt like this was unwarranted at that
13 point, and I didn't know where it came from.
14   Q. And your sense of where it came from was
15 because of what --
16   A. Had transpired.
17   Q. -- you had to do with Ms. Murphy's family
18 member?
19   A. Yes.
20   Q. You felt that was the whole basis for this?
21   A. Absolutely.
22      Now --
23   Q. You are not supposed to talk when there's not
24 a question.

Page 79

1    A. Okay.
2    Q. Now, at some point did you receive a written
3  notice warning about absenteeism in this same time
4  frame?
5        MR. MANOFF: Objection.
6    A. Yes.
7    Q. What do you recall about that?
8    A. Our vacations were planned a month prior --
9  absenteeism? No, nothing about absenteeism.
10      EXHIBIT NO. 3 MARKED
11   Q. Let me ask if you've ever seen Exhibit 3
12 before.
13   A. On August 21, when I seen this (indicating).
14 I had never seen this (indicating) until I had seen
15 this (indicating).
16      MS. MARKHAM: Mr. McCray is pointing to
17 Exhibit 2, the performance evaluation.
18   Q. When you received the written performance
19 evaluation you received this?
20   A. Yes.
21   Q. That was the first time you had sign it?
22   A. Yes.
23   Q. Had anyone sat down and talked with you about
24 the statement of the problem that is articulated in

Page 80

1  this memo?
2    A. Okay. Now, you're stating absenteeism.
3  However what happened is I had scheduled my vacation
4  time, which included that Friday before my vacation.
5        I told -- we had training during that
6  week. I think it was Tuesday, Wednesday, Thursday.
7  We had training that week, and that Friday I was
8  going to be off. There was a lot going on. This was
9  all planned. Also, this is the same time that the
10 regions were merging.
11       Ms. Murphy was gone to Buffalo to do
12 something over there. So the people in charge was
13 Kathy and the other assistance regional manager.
14       Kathy knew I was leaving Friday. The
15 other regional manager knew I was leaving Friday. It
16 was on the calendar. It states here it was on the
17 calendar that I was going to have that time off. It
18 was already documented. They knew.
19       Again, this is trumped up to make it look
20 like it was more than it is.
21   Q. You believed you had notified the directly
22 properly?
23   A. Yes.
24   Q. You think this was trumped up because of the

Page 81

1  situation that you had investigated relating to
2  Ms. Murphy's relative?
3    A. Uh-huh.
4    Q. "Yes" or "no"?
5    A. Yes. But there was another situation,
6  ongoing situation, also.
7    Q. What was that?
8    A. This other district manager that worked at
9  the company for, like, 27 years, and I was instructed
10 to -- whatever she did wrong, to write her up,
11 because Ms. Murphy wanted to fire her because she
12 didn't like her.
13   Q. Who gave you --
14   A. Ms. Murphy.
15   Q. And whatever she did --
16   A. Whatever she did, write her up, and
17 Ms. Murphy had also told me at one time that if she
18 wanted to find a reason to get rid of someone, she
19 could.
20   Q. What was the name of the person that --
21   A. She was the Poughkeepsie manager. I think
22 Michelle. I don't remember the name.
23   Q. How would it come to your attention
24 information to write up a Poughkeepsie manager?

21 (Pages 78 to 81)

Page 82

1    A. Anything that was going on. That was my
2 responsibility. Anything that was wrong.
3        There was supposed to be a warning or
4 written warning or kind of warning for the manager.
5 It was my responsibility.
6    Q. Let me understand the process here. I am
7 trying to understand how somebody in Poughkeepsie
8 could get warnings from you.
9    A. Okay.
10    Q. Are you authorized in the position you held
11 to issue warnings?
12    A. Yes.
13    Q. To whom?
14    A. Whoever needed to have a warning issued.
15    Q. You would be the person signing out on those
16 warnings?
17    A. I would write it up, and I would sign it, and
18 Ms. Murphy would sign on them.
19    Q. Now, how would information come --
20    A. Ms. Murphy.
21    Q. -- to you about the performance of these
22 individuals?
23    A. Ms. Murphy.
24    Q. You would get information from Ms. Murphy

Page 83

1 about whatever individuals in the region required
2 disciplinary action; you would do the written form of
3 the disciplinary action --
4    A. Uh-huh.
5    Q. -- and then Ms. Murphy would sign it and it
6 would issue it?
7    A. Yes.
8    Q. And you would sign it as well?
9    A. Yes.
10    Q. So there would be two signatures --
11    A. I think so. I don't know if I had to sign
12 it. I know I was a part of it.
13    Q. Okay. When you had this discussion with
14 Ms. Murphy about writing up the Poughkeepsie manager,
15 was she saying, "Any time I say something to you
16 about her that's bad, write it up"?
17    A. She wanted to fire her. That was from day
18 one.
19    Q. She told you that?
20    A. She wanted to fire her. Whenever she did
21 something wrong, whether -- like, again, if another
22 -- another district manager did the same thing, it
23 was no problem, but if Michelle did it, write her
24 because she wanted to fire her.

Page 84

1    Q. Can you give me an example of something like
2 that.
3    A. When they opened the tax season, you're
4 supposed to have all your stores opened and some of
5 them open late, but she wasn't the only manager that
6 opened late, but she would get written up.
7        Then there would be managers who --
8 again, who didn't open theirs up and didn't get
9 written up. If they was on her good list, nothing
10 would happen.
11        For example, one of the managers had
12 someone steal money and never got written up, but if
13 someone else did something like this Michelle,
14 because she wanted to fire her, she got written up.
15    Q. You said "Michelle." I assume this is a
16 woman.
17    A. Yes.
18    Q. You don't remember her last name?
19    A. I can't think it's Michelle. I can't
20 remember.
21    Q. Was she a white women?
22    A. Yes.
23    Q. And she had been with the company how long?
24    A. Like 27 years.

Page 85

1    Q. Had you had occasion to look at her
2 performance record, beyond the things you wrote up?
3    A. She had been with the company 27 years. We
4 had their files.
5    Q. Did you look at her file?
6    A. Yeah. If I had to write her up, I had to go
7 and audit all of the files.
8    Q. Did you see anything in the file that caused
9 you concern about her performance?
10    A. No.
11    Q. Was this woman fired?
12    A. Yes.
13    Q. For what reason?
14    A. Not performing.
15    Q. Were you involved in that?
16    A. I wasn't involved in the firing. That was
17 something that happened at a higher level than me.
18        However, as I said, every time she did
19 something wrong, she got written up. It was laying
20 the groundwork. The culture of the company -- they
21 knew how to lay the groundwork to make someone look
22 bad or do whatever their purpose was.
23    Q. So it is your testimony that -- how many
24 times did you write this person up?

22 (Pages 82 to 85)

Page 86

1    A. I can't remember.
2    Q. More than once?
3    A. More than once.
4    Q. Did you disagree with every time that you
5    wrote her up?
6    A. It wasn't for me to disagree or agree.  I was
7    doing my job.
8         However, I noticed that other people did
9    things and didn't get written up.  For example, there
10   was this manager who wasn't doing anything, and he
11   was a manager in Hartford, and everyone was
12   complaining, he wasn't doing anything, but because
13   Ms. Murphy liked him, when he needed to get written
14   up, she said, "I don't want to ruin his career."
15   Q. The things that he did and should have been
16   written up for, was that anything that was done by
17   Michelle?
18   A. I can't recall.
19   Q. Other than the example of Michelle opening up
20   late and getting written up and other managers
21   opening up late and not getting written up, are there
22   any specifics relating to Michelle that you can tell
23   me about right now --
24   A. I can't tell you off the top of my head, but

Page 87

1    that there were certain events that occurred that
2    Ms. Murphy did that she wanted her fired.  She
3    stated, "I want her fired."
4         That's what happened.  She got her fired.
5    Q. Do you recall what incident --
6    A. It was a culmination.  You start up -- it's
7    a process.  You get a written warning, a second
8    written warning and a final written warning.
9    Q. To your memory, there was no specific thing
10   that caused that termination other than the
11   progression of discipline?
12   A. Yes.
13   Q. Did Ms. Murphy tell you why she wanted the
14   person fired?
15   A. She didn't like her.
16   Q. Did she say to you she didn't like her?
17   A. Yes.
18   Q. Did she give you reasons why she didn't like
19   her?
20   A. No, she did not.  I don't think she thought
21   she was a good manager.
22   Q. Why do you think that?
23   A. I don't know.  I mean, I don't know.
24   Q. Okay.  So going back to this warning, when

Page 88

1    you received this in August, as you say, did you talk
2    with Ms. Gill about it?
3    A. Yes.
4    Q. Did you do that in person?
5    A. Yes.  In person.
6    Q. Was she visiting out to your region, or were
7    you with her somewhere else?
8    A. Excuse me?
9    Q. Was she in your region for the day, or was
10   she somewhere else where you had this conversation?
11   A. I'm sorry.  I was reading.  I'm sorry.
12   Q. You told me when you had the discussion with
13   Ms. Gill about this warning it was in person.
14   A. Okay.
15   Q. My question is --
16   A. August.
17   Q. -- was she with you?
18   A. Yes.  She was in our regional office.
19   Q. And it was in August?
20   A. Yes.
21   Q. What did you say to her about this?
22   A. I said, "This is bogus," and I explained what
23   happened again, which I had already explained what
24   happened, that it was scheduled.

Page 89

1         It was -- again, if it is on the calendar
2    a month ahead of time, it's -- you know, I had
3    conversations about it.  The day before you are
4    leaving, I notify the people in charge.
5         At that time you did what you had to do.
6    However, again, you can formulate things to make it
7    whatever you want.
8    Q. How did she react?
9    A. She was, like, "Dre, Just sign the thing,"
10   and I said, "I am not going to sign something I don't
11   agree with."
12        MS. MARKHAM:  I think we are all getting
13   tired.  We are going to take a break for lunch, let's
14   come back at two o'clock.
15        (A half-hour lunch break was taken.)
16
17
18
19
20
21
22
23
24

Adrian McCray                                                            06/07/2005

Page 98

1    EXHIBIT NO. 4 MARKED
2    A. Okay. Again, it was in August.
3    Q. Okay. Before I go to Exhibit 4, let me ask
4    one follow-up question on the hours.
5       Who gave you approval to do the Friday
6    hours?
7    A. I don't know.
8    Q. Did you ask Ms. Gill for it first?
9    A. I don't know who I asked for it first. I
10   asked someone.
11   Q. Did you ask both Ms. Gill and Ms. Murphy?
12   A. I don't know. I may have. I may not have.
13   I can't say for sure if I asked Franciene first or
14   Linda first, but they both knew.
15   Q. Did you tell Ms. Gill that Ms. Murphy had
16   approved it?
17   A. Did I tell Ms. Gill that Ms. Murphy had
18   approved it?
19   Q. Yes.
20   A. I did not tell one to say yes. I did not
21   finagle, saying one thing to one and one thing to the
22   other. No, I did not.
23   Q. So you didn't tell one the other had approved
24   it?

Page 99

1    A. No.
2    Q. When the other hadn't approved it?
3    A. No. It did not happen.
4    Q. And you don't remember who it was you spoke
5    to about it first?
6    A. No. I don't remember who I spoke to about
7    it, but it never was an issue. I was doing it for a
8    long period of time without issue; and like I said, I
9    don't know if I told Franciene or if I told Linda or
10   if I asked -- I know a lot of time if I said
11   something to Franciene, she would say, "You have to
12   ask Linda because she is your day-to-day."
13      It may -- I might have said, "Franciene,
14   I need this," and she might have said, "You need to
15   ask Linda," or sometimes I would ask Linda.
16      That's what happens when you're in a dual
17   reporting. I might ask Linda, and she might say,
18   "You have to ask Franciene."
19   Q. Did Ms. Murphy ever tell you that she
20   received a report that you were not coming in at 7:30
21   as you promised?
22   A. No.
23   Q. This is the first time you are hearing that?
24   A. Yes.

Page 100

1    Q. Is it your testimony that you were in 7:30 on
2    Friday as you promised?
3    A. Maybe it was 7:30. Maybe it was 7:45. If I
4    came in at 7:30 or 7:45, I left at 4:15.
5    Q. Your testimony is you were pretty close to
6    7:30?
7    A. Absolutely.
8    Q. Turning to Exhibit 4, is this the development
9    plan that Ms. Gill gave to you?
10   A. Yes.
11   Q. Let me ask, how did you receive this? Did
12   she meet with you?
13   A. Yes. She was at the office in August.
14   Q. Was she the only one who met with you?
15   A. Yes, I think so.
16   Q. And what did she say to you in that meeting
17   about this development plan?
18   A. Nothing really. Just, you know, she pretty
19   much just gave me the document. It was like a
20   formality. She did not given me anything the whole
21   summer. "Okay, you need to sign these."
22   Q. This was at the same time you received the
23   evaluation?
24   A. Yes.

Page 101

1    Q. It was the same meeting?
2    A. Yes.
3    Q. Did you say anything to her about this
4    development plan?
5    A. I just said, "Listen, I am going to do the
6    best I can, and I don't agree, and I am not going to
7    sign it."
8    Q. When you told her you didn't agree, did you
9    point to anything specific in the development plan?
10   A. I felt, like, it was all together. The
11   evaluation, the development plan, this written thing
12   (indicating), it was all compromised of one event.
13      I told her I am going to do whatever I
14   need to do to do the job to the best of my ability,
15   but I'm not signing this, because of the reasons I
16   told you before.
17   Q. I take from that answer you did not go one by
18   one with her in this meeting?
19   A. No.
20   Q. And you never did afterwards?
21   A. This is what happened, exactly what happened.
22      We was talking about the evaluation. I
23   said I wasn't signing it. We had a discussion.
24      "Dre just sign it. All it is saying is

26 (Pages 98 to 101)

Page 102

1 you saw it." This is what they tell people to sign
2 it. I am in HR. I do it, too. Then later they say
3 you signed it. "Why did you sign it if you didn't
4 agree with it?"
5      I didn't sign it. She was, like, "You're
6 not signing this either?" "No." We didn't even
7 really look at it. That's what happened.
8     Q. Did you look at it afterwards to see what was
9 expected of you in this development plan?
10    A. I don't remember if I did or didn't.
11    Q. Because you didn't put much stock in this
12 process?
13    A. I didn't put much stock into that evaluation,
14 you're right. But I said whatever I need to do to
15 improve, I am going to do.
16    Q. Let me ask you about a convention in Florida.
17 Do you recall that?
18    A. Yes, I do.
19    Q. What was that convention?
20    A. It was the corporate convention. Every year
21 they have a corporate convention.
22    Q. It's a full week down there, this time in
23 2002?
24    A. Yes.

Page 103

1    Q. That was sometime in October?
2    A. Yes.
3    Q. You bought your girlfriend with you?
4    A. I didn't bring her, but she came down later.
5    Q. So sometime during the week, you were joined
6 by your girlfriend?
7    A. Yes.
8    Q. When was that?
9    A. Maybe the middle of the week. I'm not sure.
10    Q. Were you scheduled in advance to attend
11 seminars?
12    A. I don't know if we were scheduled in advance,
13 but I know we had to go to seminars, yes.
14    Q. And there were seminars throughout the day.
15 Were there seminars in the evening, too?
16    A. I don't believe there was any in the evening.
17 In the evening, maybe there was a get-together event.
18    Q. You all went to Disney one night?
19    A. Right.
20    Q. Did you go to all of the seminars?
21    A. Absolutely.
22    Q. Do you recall which seminars, what they were?
23    A. I don't know which ones, but I know
24 everywhere I was supposed to be. I was there. I

Page 104

1 never had an incident of not being somewhere I was
2 supposed to be during my entire tenure with H&R.
3    Q. When you are saying where you were supposed
4 to be, focusing on the convention, were there
5 specific seminars you were supposed to attend?
6    A. We were told you have to be here. You go
7 there.
8      I don't know how preplanned or whatever
9 it was, but I know that, you know, different groups
10 had to go to different seminars.
11    Q. Did you ever observe any of your supervisors
12 in the room at all at any of the seminars?
13    A. Absolutely.
14    Q. Do you know whether they were keeping track
15 of what people were attending, what they needed to
16 attend?
17    A. I don't know. I didn't even know that was a
18 concern. That wasn't a concern to me.
19    Q. At some point during the convention did
20 anybody say anything to you about your attendance?
21    A. Never.
22    Q. Did Franciene Gill ever mention it to you?
23    A. Never.
24    Q. When did you leave that convention?

Page 105

1    A. I might have left -- I had a toothache, and I
2 got permission from Franciene to leave. I don't know
3 if it was that morning, Friday morning, I think,
4 because I had to go to the dentist. I had a -- I was
5 taking Advil every five seconds and had to go to the
6 dentist.
7    Q. When did the toothache begin?
8    A. Maybe a day or two before.
9    Q. Before you had to leave?
10    A. Yes.
11    Q. When did you change your travel plans to go
12 home early?
13    A. After I spoke to Franciene. I can't give you
14 specifics. I think in the documents I signed, I
15 think I sent that to you. I gave it to them, and I
16 went to the dentist immediately upon arriving home.
17    Q. You were down there? You all flew down on a
18 Sunday night?
19    A. I believe so.
20    Q. And the return was going to be on that
21 Saturday?
22    A. Friday. I think Friday evening. I left
23 Friday morning as opposed to leaving Friday evening.
24    Q. And you spoke with Ms. Gill when?

27 (Pages 102 to 105)

Adrian McCray

06/07/2005

**Page 106**

1    A. I don't know. Because she left early. I
2  don't know if it was Thursday night or Friday
3  morning.
4    Q. Okay. By the way, just to give you a time
5  marker, Thursday night was the night that the company
6  went to Disney.
7    A. I was there Thursday night.
8    Q. Was Ms. Gill there?
9    A. I don't recall.
10    Q. Okay. And you went to that social event with
11  your girlfriend, right?
12    A. Yes, I did.
13    Q. Did you go to any seminars on Friday?
14    A. Whatever happened -- I don't think so, in the
15  morning.
16        Like I said, after I spoke to Franciene
17  and got permission to leave, I left that next
18  morning. The flight was in the morning. I wanted --
19  I didn't want to go through the whole weekend with my
20  tooth.
21    Q. And you got to the dentist and went there on
22  Friday?
23    A. Yes.
24    Q. What was done to your tooth?

**Page 107**

1    A. I don't remember. Whatever they did, they
2  did.
3    Q. They took care of it?
4    A. Yes.
5    Q. On that one visit?
6    A. Yes.
7    Q. And you're certain that you left the hotel,
8  checked out of the hotel on Friday and came back on
9  Friday?
10    A. I am certain it was Friday. I am going to
11  say Friday, yes.
12    Q. Did Ms. Gill ever question you about that?
13    A. No, never questioned me about it.
14    Q. Did you take any time off on the following
15  Monday?
16    A. I don't believe I did. It was a toothache.
17  It was very painful. I needed to go to the dentist.
18    Q. Do you recall coming into work on that
19  Monday?
20    A. I don't remember.
21    Q. Did you at any time on that Monday ask
22  Ms. Murphy for time off to go to the dentist?
23    A. No. I don't recall.
24    Q. No, or you don't recall?

**Page 108**

1    A. I don't remember. I don't remember what
2  happened on that Monday, to be honest with you. But
3  I don't remember taking additional time to go back to
4  the dentist or anything.
5    Q. You never told Ms. Murphy that you didn't
6  make it to the dentist on Friday?
7    A. Of course not. I have proof that I did.
8  That's easily provable.
9    Q. We are going to get the dentist records.
10    A. Absolutely.
11    Q. Is it your testimony that you didn't have any
12  discussion with Ms. Gill about this either at the
13  conference or after?
14    A. No. There was -- there was no reason. I
15  talked to her about it.
16        This was brought up after I filed. Then
17  they started trying to look and find things to point
18  a finger at me.
19    Q. When you say this was pointed out, this issue
20  of your attendance?
21    A. Yes. All of this was brought up after I
22  filed with the MCAD.
23    Q. Do you recall having a public dispute with
24  Ms. Gill during the conference?

**Page 109**

1    A. No.
2    Q. Which many people observed?
3    A. No.
4    Q. Do you remember shouting at her?
5    A. Shouting at her at the conference in Florida?
6    Q. Yes.
7    A. No. Never. No. The only time Franciene and
8  I had any incident was in California when she chewed
9  me out.
10    Q. According to your testimony, you didn't shout
11  at her either?
12    A. She chewed me out.
13    Q. In this instance, you have no memory --
14    A. Nothing.
15    Q. -- absolutely nothing --
16    A. This is the first --
17    Q. -- happened in Florida relating to Ms. Gill
18  and shouting at her in public?
19    A. No.
20    Q. Now, at some point you had a car accident.
21  We have the dates.
22        Sometime in November you had a car
23  accident?
24    A. Yes.

28 (Pages 106 to 109)

Page 110

1    Q. Tell me what exactly happened. Were you
2  driving the car alone?
3    A. I don't think so.
4    Q. Who do you think was with you?
5    A. I think my girlfriend was with me.
6    Q. What's your girlfriend name?
7    A. Amelia Moore.
8    Q. That was the girlfriend that had gone to
9  Florida with you?
10   A. Yes. My ex-girlfriend.
11   Q. Now your ex-girlfriend.
12   A. Right.
13   Q. When did this accident occur, the time of
14  day?
15   A. Afternoon, I would say. I am not exactly
16  sure.
17   Q. Where were you?
18   A. I was on the -- I was on one of the routes.
19  I-195 ramp or something. I don't remember. It was
20  in New Bedford.
21   Q. And it was on one --
22   A. One --
23   Q. One of the access ramps?
24   A. Yes.

Page 111

1    Q. Can you briefly describe what happened.
2    A. I was rear-ended.
3    Q. Were you at a standstill when that happened?
4    A. I don't know if I had to stop short because
5  someone stopped short in front of me, and I got hit
6  in the rear from a truck.
7    Q. It was a truck?
8    A. SUV.
9    Q. Close enough.
10   A. Someone told me yesterday, "I don't know why
11  people call SUVs trucks."
12   Q. What was the date of the accident?
13   A. I don't know.
14   Q. Let me see if I have something that can help
15  with that.
16       EXHIBIT NO. 5 MARKED
17   Q. I am asking you to review Exhibit 5, if you
18  will note the e-mail from you in the middle of page
19  that has a sent date of Tuesday, November 9, 2002, at
20  12:10 a.m., and it is indicating that you won't be
21  able to work for the following three days due to
22  injuries in a car accident.
23       Looking at that e-mail, can you tell me
24  whether that helps you determine what date you had

Page 112

1  the accident?
2    A. No.
3    Q. Did you have the accident -- were you working
4  on the day that you had the accident?
5    A. No.
6    Q. You were not working?
7    A. No. Actually it might have been Sunday.
8  That was Tuesday, the 19th?
9    Q. That's what this date says.
10   A. Maybe it was Sunday. I had some training on
11  Monday. I was in pain and had to leave. It may have
12  been that Sunday, the 17th, maybe.
13   Q. What happened to your car as a result of the
14  accident?
15   A. There was damage in the back.
16   Q. Could you still drive it?
17   A. Yes.
18   Q. Did you drive it away from the accident?
19   A. I think so.
20   Q. Did you drive it the next day to the
21  training?
22   A. I don't remember.
23   Q. Okay. Did you immediately put the car in for
24  a repair?

Page 113

1    A. I don't even remember what happened. I don't
2  remember what happened. I don't even know if I
3  sustained massive injuries to the car, whatever. I
4  don't know. I don't remember.
5    Q. Did you get the car repaired?
6    A. I think so, if it needed repairs. I don't
7  know if it needed major repairs. I don't know. I
8  can't remember.
9    Q. You don't recall what happened to the car at
10  all?
11   A. I don't remember.
12   Q. Was there a bumper, fender issue?
13   A. I don't remember. I don't remember.
14   Q. On Sunday after the accident occurred, did
15  you seek any medical assistance?
16       MR. MANOFF: On Sunday?
17       MS. MARKHAM: On that Sunday.
18   A. I don't know. I don't remember.
19   Q. Did you go to a hospital?
20   A. Did I go to a hospital? I don't remember if
21  I went to the hospital or not. I don't remember.
22   Q. Now, you've indicated that after the accident
23  you had pain develop.
24   A. I think I went to the hospital on Monday.

29 (Pages 110 to 113)

Adrian McCray                                                                                    06/07/2005

Page 118

1    Q. What's his name?
2    A. I don't know.
3    Q. Had you gone to him before?
4    A. No. First time.
5    Q. How did you come know about him?
6    A. It was on the road or something, or in the
7    Yellow Pages. I don't know.
8    Q. I have heard of ambulance-chasers. I hope he
9    wasn't on the road, as you say.
10   A. On the road, like, you see it. "Hey I just
11   got in an accident."
12   Q. You saw the sign indicating a chiropractor,
13   and you thought that might be helpful to you?
14   A. Right.
15   Q. Did he give you any indication of what he
16   thought was wrong with your back?
17   A. He said something was wrong. I don't
18   remember. He told me something. I started going to
19   him. I was in pain. I just started getting therapy.
20   Q. What would he do for you?
21   A. Put things on your back. I don't know the
22   whole routine he did. It was a process of things he
23   did to try to make it better.
24   Q. So some manipulation of your back?

Page 119

1    A. Uh-huh, yes.
2    Q. Was your neck involved in this injury?
3    A. Yeah. I think my neck was, too. You know,
4    like I said, I really don't remember. I know I was
5    injured.
6    Q. Now, how long did you see the chiropractor?
7    A. I don't know.
8    Q. Did you go for more than a week?
9    A. Months.
10   Q. You've indicated that you saw him for months
11   after this accident.
12       Have you continued to see him on any
13   regular basis?
14   A. No.
15   Q. The last time you saw him was in connection
16   with this accident?
17   A. Yes.
18   Q. What did he say to you in terms of being able
19   to work?
20   A. That I was going to need some time off.
21   Q. Had the doctors at the hospital said anything
22   to you about that?
23   A. No, they did not.
24   Q. Did you talk with the chiropractor about the

Page 120

1    nature of your duties?
2    A. No, I didn't. I don't think so. I may have.
3    He may have asked me, but I don't remember.
4    Q. You don't have a specific memory one way or
5    the other?
6    A. No, not one way or the other.
7    Q. Now, at some point in 2002, the end of the
8    year, did Ms. Murphy inform you of the need to work
9    alternative Saturdays during the tax season?
10       MR. MANOFF: Which tax season?
11       MS. MARKHAM: The 2003 tax season.
12   A. Yes.
13   Q. Just so that I'm clear, what is the tax
14   season for Block? When would they begin the tax
15   season?
16   A. From January to -- I think the last week in
17   January through April.
18   Q. Did you object to that request?
19   A. I asked if I could work from home. I didn't
20   object. I just asked if I could work from home.
21   Q. Did you tell Ms. Murphy that you were
22   unavailable to work on Saturdays?
23   A. I told her I had my son on Saturdays, and I
24   would like to work from home.

Page 121

1    Q. And what did she say to you?
2    A. "No," basically.
3    Q. Did you tell her that you didn't understand
4    that to be a requirement of your job?
5    A. Yes.
6    Q. Why did you say that to her if you had worked
7    the prior tax season on Saturdays?
8    A. Because it wasn't -- it was nothing set in
9    stone. I thought it was something that, you know,
10   that was done, but I didn't think that it was a
11   requirement.
12   Q. Have you come to learn that it is a
13   requirement?
14   A. I still -- I mean, I haven't had an
15   opportunity to come to learn that it is a
16   requirement.
17   Q. Did you think that was somehow imposed on you
18   and not other people?
19   A. No. I didn't say that. Not at all.
20   Q. You don't think that requirement was imposed
21   on you in a discriminatory way?
22   A. No. That was never an issue with that.
23   Working Saturdays, no, I did not.
24       I just wanted to work from my house,

31 (Pages 118 to 121)



Page 122

1  that's all, because other people were allowed to do
2  different things, and I didn't see why it would be an
3  issue, because the previous tax season, when I was
4  there, there was no activity while I was there.
5      Q. So you didn't think you were needed in the
6  office?
7      A. Absolutely.
8      Q. Ms. Murphy told you you would have to work
9  the alternative Saturdays?
10     A. Yes.
11     Q. And you did?
12     A. Well, I didn't get an opportunity. I was
13 fired.
14         EXHIBIT NO. 6 MARKED
15     Q. Just so the record is clear, I believe you
16 have produced this document in connection with your
17 automatic disclosures in this case to us. This
18 document comes from you.
19         Let me ask you, what is it?
20     A. That's a temporary order for visitation.
21     Q. And that was an order that was in effect on
22 December 12, 2001, for your visitation with your
23 child?
24     A. 2001. It wasn't for 2002.

Page 123

1      Q. I know. I will get to 2002.
2         Does that accurately reflect the schedule
3  for when you had your son -- is it your son?
4      A. Yes.
5      Q. -- on weekends?
6      A. That was accurate at the time, yes.
7      Q. For how long did this schedule -- this
8  schedule provides for your having your child every
9  other weekend, right?
10     A. Right.
11     Q. And not every weekend?
12     A. That one -- it changed.
13     Q. You are telling me it changed at some point?
14     A. Yes.
15         EXHIBIT NO. 7 MARKED
16     Q. Again, I will represent to you that this was
17 a document that was produced to us in connection with
18 the automatic disclosures.
19     A. Yes.
20     Q. Is this another order of the court relating
21 to your weekend arrangements with your son?
22     A. Yes.
23     Q. And does the order as described in Paragraph
24 3 accurately reflect your custody arrangements and

Page 124

1  visitation rights with your son during the year from
2  April 2002 forward?
3      A. Yes.
4      Q. And how long did this order remain in effect?
5      A. It's still in effect.
6      Q. This is the order that is currently still
7  governing?
8      A. Yes.
9      Q. During the time that you were working for H&R
10 Block, did you continue to do work on your own
11 company's business?
12     A. I did -- during the time I worked for H&R
13 Block, I did one training, one.
14     Q. All right. That was on a Saturday?
15     A. Yes. It was in the October/November time
16 frame. It was one day.
17     Q. You were advertising yourself as available to
18 do seminars on Saturday, weren't you?
19     A. With regard to that, the Website is never
20 updated. I called them to change it.
21         As a matter of fact, it still says it
22 today, with a number that is disconnected, and I have
23 never done any in Worcester, any in Lawrence, any in
24 East Boston. It's still the same up there. It just

Page 125

1  hasn't changed.
2      Q. But isn't it fair to say, Mr. McCray, to the
3  extent it was out there being announced to the
4  world --
5      A. Yes.
6      Q. -- that during the fall of 2002 you were
7  advertising yourself as available to give courses for
8  your own company on Saturdays?
9      A. Yes, I was.
10         EXHIBIT NO. 8 MARKED
11     Q. Directing your attention to what has been
12 marked as Exhibit 8, is this a posting from your
13 Website during the fall 2002 time period?
14     A. It is not my Website.
15     Q. It is a Website that reflects your company's
16 availability to do deleading classes?
17     A. The information is inaccurate.
18     Q. Is the answer to my question that, yes, it
19 reflects your company being available on Saturdays?
20     A. It's inaccurate.
21     Q. Does the Website posting reflect that?
22     A. That's what it reflects.
23     Q. That's all I am asking, sir. I hear you.
24         MS. MARKHAM: I am going to put on the

32 (Pages 122 to 125)

Page 134

1  couldn't tell you.
2      Q. You don't have a memory of seeing it in your
3  interviewing process?
4      A. No, I do not.
5      Q. So if you saw it, it was sometime after your
6  interviewing process, to your best memory?
7      A. Yes.
8      Q. Can you tell me --
9      A. Can I see it again, please?
10     Q. Yes, I was just going to ask you some more
11 questions. Please do. Can you tell me if those job
12 duties that are described in Exhibit 9 look like the
13 duties that you were performing?
14     A. It's a general description. It's not
15 specific.
16     Q. But nothing there looks completely
17 unfamiliar to you as far as duties?
18     A. Correct.
19     Q. Okay, thank you. Now, you testified
20 yesterday about an MCAD complaint against your
21 immediately prior employer to H&R Block; do you
22 recall that?
23     A. Yes.
24     Q. You indicated you settled that out of court.

Page 135

1      A. Yes.
2      Q. What kind of discrimination claim did you
3  assert against that employer?
4      A. It was for promotion.
5      Q. Was it that you claimed that you were denied
6  promotion based on wrongful discrimination?
7      A. I can't be exactly sure the exact. I just
8  know that it was based on the promotion.
9      Q. Well, sir, you're an HR specialist, right?
10 Are you an HR specialist?
11     A. Not anymore.
12     Q. You have that experience in your past.
13     A. Yes.
14     Q. And you know to file a complaint with the
15 MCAD, you need to assert a type of discrimination?
16     A. Right.
17     Q. What was the type of discrimination you
18 asserted?
19     A. I don't remember exactly.
20     Q. Was it racial discrimination?
21     A. I don't know if it was racial
22 discrimination.
23     Q. Was it retaliation?
24     A. I don't know what it was. I don't remember.

Page 136

1      Q. Who represented you in that case?
2      A. I represented myself.
3      Q. Do you have documents relating to that case?
4      A. I don't -- I don't believe I have any copies
5  of documents.
6      Q. Turning back to the period in the fall of
7  2002. At some point did Ms. Murphy talk to you
8  about complaints she had received in connection with
9  a training that you had performed?
10     A. I don't recall.
11     Q. Do you recall a training that you did called
12 District Employment Assistance training?
13     A. DEA training, yes.
14     Q. DEA training?
15     A. Yes.
16     Q. Do you recall receiving any feedback from
17 Ms. Murphy at any time about the DEA training that
18 you conducted?
19     A. I don't remember.
20     Q. Tell me, what is DEA training?
21     A. It was the employees who worked in the
22 offices would be responsible for gathering the
23 hiring paperwork on the seasonal employees.
24     Q. Was that the kind of training that you were

Page 137

1  in fact doing on the day after you had the accident
2  in November?
3      A. It may have been. I don't remember.
4      Q. Let me show you a document here.
5         MS. MARKHAM: Exhibit 10, please.
6         (Exhibit 10 marked for identification.)
7         (Document exhibited to witness.)
8      Q. Let me know when you've finished reviewing
9  Exhibit 10.
10     A. Okay.
11     Q. Turning to the second two pages of Exhibit
12 10, B68 and B69, can you tell me, have you ever seen
13 that November performance update before?
14     A. Yes, I am familiar with this document.
15     Q. Okay, looking at number three on B68, it
16 references a September training, it's called DEA and
17 FEP training. Let me ask you, do you recall
18 discussing with Linda Murphy that September training
19 and the managers' complaints that she references in
20 this?
21     A. I don't know what managers' complaints she
22 references in this. But what we have is after we do
23 a training that's before
24 out. And all my evaluation forms met the standards

Page 138

1  necessary.  So I don't really --
2      Q.  Could you now answer my question,
3  Mr. McCray?
4      A.  I am answering your question.
5      Q.  I asked you whether you discussed with Linda
6  Murphy the complaints that she referenced in
7  Paragraph 3?
8      A.  I don't know what complaint that is.
9      Q.  Is your answer that you did not discuss this
10  with Ms. Murphy?
11      A.  No.
12      Q.  No, you did not --
13      A.  I did not discuss.
14      Q.  Now, let's go to the evaluation forms.
15  Those evaluation forms are things that you bring to
16  the evaluations?
17      A.  Yes.
18      Q.  And you distribute them?
19      A.  Yes.
20      Q.  Was it your practice to always distribute
21  them at the end of the sessions?
22      A.  Yes.
23      Q.  No time that you forgot to do that?
24      A.  I don't know if -- I can't be certain that

Page 139

1  every training required it.  But I know some of them
2  did.
3      Q.  When it required it, you always consistently
4  did hand them out?
5      A.  Yes.
6      Q.  Would they be given back to you at the
7  training or sent in afterwards?
8      A.  They would be given back to me at the
9  training.
10      Q.  Did you ever talk with Francine Gill about
11  complaints regarding the September trainings?
12      A.  No.
13      Q.  So you say you're familiar with this memo.
14  Did you receive it on or around November 25th?
15      A.  Yeah, probably somewhere around that time
16  frame.
17      Q.  Who did you receive it from?
18      A.  I believe Linda.  I'm not sure.  Maybe I got
19  it in an e-mail.  I don't know if I -- I don't
20  really remember.
21      Q.  Did you have any discussion with Linda once
22  you received this memo?
23      A.  Yes, once I received the memo, yes.
24      Q.  What did you discuss with her about bullet

Page 140

1  point number three?
2          MR. MANOFF:  Objection.
3      A.  Basically -- I don't know, to be honest with
4  you.  I know we had a discussion.  If she gave me
5  this, then there was a discussion.  But at this
6  point, this was all retaliation.  So, you know, I
7  know that at that point prior to this time frame of
8  me being hurt, me being out, this is one of the
9  incidents that lead to me filing.  Because now I
10  understood the methods of how if they wanted to put
11  you in a bad situation or if they wanted to make
12  something out of nothing, how they could.  They
13  would start just documenting things just so that
14  they could either get rid of you -- and it even says
15  here at this point she wants to get rid of me.  So
16  she's trying to get rid of me at this point.  It's
17  retaliation.
18      Q.  Are you done?
19      A.  Yes.
20          MS. MARKHAM:  Could you read back my
21  question?
22          (Question read back.)
23      A.  I don't remember.
24      Q.  Do you remember any of the specifics of your

Page 141

1  discussion with Linda Murphy about the November 25th
2  memo?
3      A.  I really don't remember.
4      Q.  Now, I've talked with you about what is
5  identified In number three.  Let me ask you some
6  questions about number one.  Do you disagree that
7  you failed to follow up on the MTM job for
8  Pittsburgh and the ADM position in Danbury?
9      A.  No, I do not.
10      Q.  You don't disagree?
11      A.  No, I do disagree.  I'm sorry.  I do not
12  agree.
13      Q.  Why do you disagree?
14      A.  Because there was -- my whole background
15  specialty was recruiting.  I hired every position
16  that I filled.  The only reason this wasn't filled
17  is because I was out of work.  And I couldn't -- I
18  wasn't available to follow up or to fill the Danbury
19  position.  But whatever positions that was available
20  and open were always -- this even noted there, prior
21  to November.  All of this started because I was out
22  of work, and I, you know, at this point it was
23  several other incidents that had occurred that I
24  wasn't happy with that I brought to her attention.

Page 142

1  So all of this is a culmination of okay, now, all of
2  a sudden you're not doing your work, your job.
3      Q. How about number two here, do you disagree
4  that there were contracts, applications and
5  personnel data piled on your desk?
6      A. No, absolutely not.
7      Q. So when I ask you that you disagree, tell me
8  yes, you disagree.
9      A. Yes, I disagree. I'm sorry.
10     Q. So you are saying that if somebody had
11  walked into your office, there would not -- they
12  would not have found contracts --
13     A. No.
14     Q. -- applications and personnel data on your
15  desk?
16         MR. MANOFF: Objection.
17     A. They would not have found.
18     Q. They would not have?
19     A. Yes.
20     Q. Just please remember that because of the
21  need for the stenographer to get the full question
22  down, even if you know the answer in the middle of
23  my question --
24     A. I know, I know, I keep doing that, but I'm

Page 143

1  sorry. I got to remember it's not a conversation.
2      Q. I think we talked about the other ones
3  yesterday.
4      A. All set with this?
5      Q. Yes, thank you. Now, you think it's an
6  appropriate thing for a supervisor to do to observe
7  your performance at various points in time?
8      A. Absolutely.
9      Q. So a supervisor coming to observe your
10  performance in a training would be something you'd
11  consider normal, right?
12     A. Yes.
13     Q. Isn't it true that Ms. Murphy and Ms. Gill
14  did come to attend one of your presentations?
15     A. Yes.
16     Q. And they did that after, sometime after the
17  September training programs?
18     A. I believe so.
19     Q. Was that sometime in December that you were
20  giving a training program that they attended?
21     A. It may have been. I'm not exactly sure of
22  the time, but I know they showed up one time.
23     Q. Was it another DEA training that you were
24  doing?

Page 144

1      A. I don't know if it was DEA or it was another
2  training about all our rules and regulations. I
3  don't remember the name of it. It might have been
4  FEP.
5      Q. By the way, how long do each of those
6  trainings go? Is it for a set period of time?
7      A. No, it's not.
8      Q. How many people attend those trainings?
9      A. It varies. It can be 20, 30, 10. It varies
10  depending on the location.
11     Q. Who are the people that are the attendees?
12     A. It's various seasonal employees generally
13  speaking, I believe.
14     Q. So is this done in the fall season to
15  anticipate the tax season that's coming up?
16     A. Yes, yes. Fair Employment Practices, that's
17  the name of it.
18     Q. Now, do you think it was the -- have you
19  refreshed your memory as to whether it was the Fair
20  Employment Practices or the DEA training that they
21  observed?
22     A. It was the Fair Employment Practices
23  training.
24     Q. Can you describe to me where that took

Page 145

1  place?
2      A. I don't know if it was in Maine or
3  New Hampshire. I think somewhere up in that area.
4  I'm not one hundred percent sure.
5      Q. Lawrence sound familiar?
6      A. It could have been Lawrence.
7      Q. Doesn't refresh your memory that it was
8  Lawrence, though, my mentioning it?
9      A. No.
10     Q. Do you recall how many people were in
11  attendance when --
12     A. I don't recall.
13     Q. -- they made this observation of your
14  training?
15     A. I don't recall.
16     Q. Can you describe for me whether either
17  Ms. Murphy or Ms. Gill made any comments to you
18  during the course of that training day?
19     A. They were on the agenda. Yes, they did.
20     Q. They were on the agenda?
21     A. They came up there to sabotage, and whatever
22  I was doing wasn't good enough; although I received
23  evaluations from all the attendees in a positive
24  light, I received e-mails from managers saying

5 (Pages 142 to 145)

Page 158

1  Q. Yes or no.
2  A. Yes, I'm sorry.
3  Q. And to become certified, you had to prepare
4  for that kind of seminar?
5  A. Yes.
6  Q. It essentially involved you putting on a
7  presentation?
8  A. Yes.
9  Q. And it had materials that you had to prepare
10 to do that presentation?
11 A. Yes.
12 Q. And had you reviewed and prepared to do
13 that?
14 A. Yes.
15 Q. And you agree that it is a part of what had
16 been anticipated to be done long before November of
17 2002?
18 A. The situational leadership training?
19 Q. Right.
20 A. Yes.
21 Q. So after receiving this memo -- first of
22 all, you indicated it was in a meeting with
23 Ms. Murphy?
24 A. Yes.

Page 159

1  Q. Was anyone else present?
2  A. I believe Kathy was present and Ms. Gill was
3  on the phone.
4  Q. Did you in any way raise your voice to
5  Ms. Murphy?
6  A. No.
7  Q. How did you respond to receiving this?
8  A. I just -- I told them it was ridiculous.
9  Q. So you disagree with just everything that's
10 in here?
11 A. Absolutely, absolutely.
12 Q. There's not a single valid criticism of your
13 performance in this warning?
14 A. No.
15 Q. After the meeting, what did you do?
16 A. I went out and went back to my office, began
17 working.
18 Q. Did you ever have a meeting with Ms. Murphy
19 where you raised your fist to her?
20 A. Of course not.
21 Q. Never shouted at her?
22 A. No.
23 Q. Never shouted at Ms. Gill?
24 A. No.

Page 160

1  Q. I'm going to go back now to your leave
2  request that occurred after the same period of time,
3  November, December and January. We covered some of
4  this yesterday. So I apologize. I'll try not to
5  repeat questions for you. You indicated yesterday
6  that you went to Milton Hospital after the training
7  on the day after the accident, right?
8  A. The day after the accident I went to the
9  hospital.
10 Q. You testified yesterday, just let me give
11 you some back-up, that you believed you had the
12 accident on a Sunday, you did training on Monday,
13 and then you went to Milton Hospital, right?
14 A. Yes, I believe that to be true.
15 Q. Was there a specific doctor that you went to
16 at Milton or did you go to the emergency room?
17 A. Emergency.
18 Q. Do you recall the name of the doctor that
19 you saw?
20 A. I don't recall.
21 Q. Did you ever go back to Milton Hospital in
22 connection with that particular injury?
23 A. No.
24 Q. How long was it after going to Milton

Page 161

1  Hospital that you went to the chiropractor that you
2  mentioned yesterday?
3  A. I don't know.
4  Q. Was it a matter of days?
5  A. Probably. I'm not sure.
6  Q. It wasn't right away afterwards, like that
7  day?
8  A. I don't know. It wasn't -- no, it wasn't
9  like Milton Hospital to the chiropractor. I don't
10 believe it was like that, no.
11 Q. This was a chiropractor that you had never
12 gone to before?
13 A. Yes.
14 Q. Did you have any knowledge of him, other
15 than the sign that you described seeing?
16 A. It's actually -- no knowledge of him, no.
17 Q. Is he a relation of people that you know?
18 Did you get any referrals?
19 A. I don't remember getting any referrals or
20 anything like that.
21 Q. So you really did not -- that was the first
22 time that you were meeting this person, this
23 chiropractor?
24 A. Yes.

9 (Pages 158 to 161)

Page 178

1    Q. So you took, prior to your surgery, you took
2  six days off?
3    A. I don't know how many days.
4    Q. Were you told by Ms. Murphy that you were
5  not permitted to do that?
6    A. Not permitted to do what?
7    Q. To take that time off.
8    A. Sick days that I had available to me, did
9  she tell me I couldn't take the sick days that I had
10  available to me? No, she never did.
11    Q. Was the time that you were taking off
12  related to your foot?
13    A. I don't know what it was related to. I was
14  sick. So I called in sick.
15    Q. What were you sick with?
16    A. I don't remember. I don't know if it was my
17  foot related or I don't know if I was with cold or
18  flu or -- I don't remember.
19    Q. You never -- do you remember telling
20  Ms. Murphy you were going to take the leave whether
21  it was granted or not?
22    A. No, I do not.
23    Q. Do you remember saying that to Ms. Gill?
24    A. No.

Page 179

1         (Exhibit 14 marked for identification.)
2         (Document exhibited to witness.)
3    Q. My first question, after you've had an
4  opportunity to review it, is going to be whether
5  you've seen this letter before?
6    A. Excuse me?
7    Q. Have you seen this letter before?
8    A. Yes. It's my termination letter. My
9  liberation.
10    Q. Yes indeed, sir. Did you receive this by
11  overnight delivery to your home?
12    A. I believe -- I'm not sure. It says here
13  overnight. I don't know.
14    Q. Did you have any discussion with anyone from
15  H&R Block on January 20th?
16    A. Excuse me?
17    Q. On January 20th, did you have --
18    A. I don't remember.
19    Q. This exhibit references sick time during --
20  that you had called in sick to work each day since
21  the meeting on January 14th. Is that accurate?
22    A. Yes.
23    Q. Is it accurate that you didn't describe what
24  your reason for being out was, other than saying

Page 180

1  that you were sick?
2    A. I didn't go into detail. I said I'm calling
3  in sick.
4    Q. And you would leave that as a voice message?
5    A. Yes.
6    Q. You didn't talk to anyone live?
7    A. No.
8    Q. Had you provided medical certification for
9  the FMLA leave that you had requested for your foot?
10    A. Yes, I did.
11    Q. What was the nature of that certification?
12    A. Whatever the note from the doctor was.
13    Q. When you say a note from the doctor, was
14  that on a prescription pad or something?
15    A. I don't know exactly what it was on, but I
16  know it stipulated that whatever my condition was
17  for the FMLA part of it.
18    Q. Did it say how much time you needed?
19    A. I don't remember.
20    Q. Do you have a copy of that?
21    A. I don't know, but the doctor must have a
22  copy of it.
23    Q. Did you at any time hand Ms. Murphy a note
24  on a prescription pad requesting six weeks off for

Page 181

1  your foot condition?
2    A. Six weeks off?
3    Q. Yes.
4    A. I don't remember anything being six weeks
5  off. I don't remember. I don't know if the doctor
6  would have gave me six weeks off.
7    Q. Now, at some time during the week of January
8  14th when you were out ill, did you come into the
9  office at night?
10    A. Yes.
11    Q. And you came into the office at night and
12  took your computer out of the office?
13    A. Yes.
14    Q. What else did you take?
15    A. That's it.
16    Q. Did you take any other files?
17    A. No.
18    Q. And you took your computer out of the
19  office, and did you do anything with that computer
20  after leaving the Block premises?
21    A. No.
22    Q. It just sat at your home?
23    A. The reason I took it because I was sick and
24  I said, at least I can try to do some stuff from

14 (Pages 178 to 181)

Page 186

1    Q. What documentation did you provide to Block
2  for your request for -- to support the FMLA leave in
3  January?
4    A. I don't know, because this is just saying
5  serious health condition. I know at the time -- I
6  don't know if I was already on FMLA or the other one
7  had ended. I'm just confused at this point. I
8  can't tell you.
9    Q. Well, we do have documents that can help.
10 We have been not going through those just for timing
11 reasons, but I assure you we have documents we can
12 get that from. In response to one of my earlier
13 questions today, you had indicated that there were a
14 series of things that Ms. Murphy did that you
15 considered retaliatory. Do you recall saying that
16 or something to that effect?
17   A. Uh-hum.
18   Q. You have to say yes.
19   A. Yes.
20   Q. Can you list for me the things that you were
21 referring to when you made that statement?
22   A. Towards me or -- I think the statement that
23 I, I don't know what we were talking about at the
24 time, but I think what I was trying to say was there

Page 187

1  was numerous amount of things that I didn't like in
2  my position that she had done that I didn't think
3  was appropriate. I think it was a violation of
4  employment laws.
5    Q. Okay.
6    A. One being -- is that what you're alluding
7  to.
8    Q. No, but let's hold that for later. Let me
9  ask you a better question, then. Do you claim that
10 Ms. Murphy or -- strike that.
11       Do you claim that Block retaliated
12 against you in any way?
13   A. Yes.
14   Q. Who are the people at Block that you say
15 acted in a way that was retaliatory?
16   A. I believe it was lead by Ms. Murphy and
17 assisted by Ms. Gill.
18   Q. What do you say they were retaliating
19 against you for?
20   A. I believe Ms. Murphy wanted to have me
21 fired, because, A, from the incident leading back to
22 her son-in-law; B, because I spoke out against
23 things that she was doing that was against
24 employment laws.

Page 188

1    Q. Anything else?
2    A. Those are the main things that I believe.
3    Q. What action did she take that you claim is
4  retaliatory?
5    A. Taking away my -- she created a hostile
6  environment for me to work in. Taking away my
7  alternative work schedule. She wanted me fired. So
8  she accomplished that.
9    Q. Well, I know that's what you say. Now what
10 I just want are the specifics of the retaliatory
11 conduct. And I know --
12       MR. MANOFF: He just gave it to you.
13   Q. I know the termination and you've mentioned
14 taking the alternative schedule away. Is there
15 anything else?
16   A. Like specific things like harassment. She
17 was just harassing me daily. "Don't close your
18 door." "Why do you have your door closed?" "When
19 you leave, tell me. Come in, tell me." You know,
20 it was just a lot of little -- just things that
21 weren't happening before. Now every day it was
22 like, you know, just conjured things that was
23 occurring daily that made my work environment not
24 conducive to a good work environment.

Page 189

1    Q. Did you ever tell her how you felt about
2  that?
3    A. I complained to Katherine, who was the
4  person responsible, and Katherine just blew it off.
5    Q. When did you complain to Katherine?
6    A. I complained to Katherine during this period
7  of time.
8    Q. During this period of time being the end of
9  January?
10   A. From November to January, I complained that,
11 you know, I'm being harassed. There's a procedure
12 if you've been harassed that's required for them to
13 stop it. And they took no action to try to stop it.
14   Q. How did you complain to Katherine?
15   A. I called her on the telephone, and I may
16 have sent an e-mail. And I complained to Francine
17 Gill. I was being scrutinized to the point that I
18 couldn't even, if I was walking wrong. And I've
19 seen it done before by her with other individuals.
20 So I knew exactly what was happening.
21   Q. Who were the other individuals that you saw
22 it with?
23   A. Well, for an example there was -- one of the
24 managers, his wife had cancer. Him and the

16 (Pages 186 to 189)

Page 190

1    assistant was working in the office, and he was on
2    FMLA. She took his assistant out of the office to
3    force him to go and work. And I told her, "You
4    can't do that." So she didn't do it as a transfer.
5    She was like I -- she changed it to cover it up.
6    "I'm just going to send him over here for training,"
7    things like that, covert things.
8        Q. Let me make sure I have that information
9    right. Do you have the name of the manager that
10   you're referring to?
11       A. Dave Gross.
12       Q. It's your testimony that the wrongful
13   conduct of Ms. Murphy was removing his assistant
14   during a time when he was on family medical leave?
15       A. Yes.
16       Q. What was this about a transfer, what
17   happened?
18       A. Well, she took him out to force him to work.
19   She was like, "He's not working enough." She was
20   forcing him to work, but he was on FMLA. This guy
21   never had time off, but his wife had cancer. So he
22   was going through a process. He started taking time
23   off, and she was upset that he wasn't coming into
24   work. She was like, "I got to get him to work. He

Page 191

1    got to work. I understand the cancer, but he got to
2    work." So she removed his assistant out of the
3    office. She was just transferring him. I was like,
4    "You can't do that."
5        Q. Transferring him or the assistant?
6        A. Transferred the assistant out of the office,
7    because it was only them two there working. So she
8    took the assistant out of the office to force him to
9    work. I was like, "You can't do that, you know,
10   because he's on FMLA leave." Then she did it. She
11   changed it to the, "Oh, I'm just going to send him
12   over for training."
13       Q. "Him" being the manager again?
14       A. The assistant.
15       Q. Assistant for training.
16       A. Yeah, she needed a reason why to take him
17   out of the office, because her reasoning was she was
18   taking him to force this guy to go back to work.
19       Q. So she wanted the manager to come back, and
20   by taking the assistant away --
21       A. Absolutely.
22       Q. -- the manager would come back and do the
23   assistant's job?
24       A. No, to do the work that was required of him.

Page 192

1    He wasn't working a lot because he was out sick -- I
2    mean, out on FMLA. He wasn't coming into work, and
3    she was upset about that.
4        Q. You never heard that Ms. Murphy encouraged
5    this individual to take family medical leave because
6    his wife was dying of cancer?
7        A. I'm the one who talked to him about taking
8    it.
9        Q. Did you have any discussion with Ms. Murphy
10   about doing that?
11       A. I told her that's what he should do. Yes, I
12   did.
13       Q. So, your testimony is you went to Ms. Murphy
14   and said, "This individual should be on family
15   medical leave"?
16       A. Well, his wife was sick, and he needed to be
17   on family medical leave.
18           MS. MARKHAM: Could you read my question
19   back?
20       A. Okay, I don't know the specifics of the
21   conversation.
22       Q. My question is, did you initiate the idea of
23   this district manager --
24       A. I believe I did.

Page 193

1        Q. Wait, please.
2        A. Okay.
3        Q. District manager going out on family medical
4    leave?
5        A. Yes, I believe I did.
6        Q. And you initiated it how?
7        A. I don't know if I had a conversation with
8    her or I had a conversation with him, but his wife
9    was sick; and it was quite apparent that he needed
10   to take some time on FMLA. He was an old-timer, and
11   I guess he had never took a lot of time off. I'm
12   not sure he was familiar with the FMLA process or
13   anything.
14       Q. And did Ms. Murphy prohibit you from --
15       A. I didn't say it was prohibited, no.
16       Q. So she did not discourage you from having
17   him go out on family medical leave?
18       A. No.
19       Q. Now, you mentioned when I asked you about
20   retaliation that you felt Ms. Gill assisted
21   Ms. Murphy. Tell me in what ways you observed
22   Ms. Gill to assist Ms. Murphy in what you consider
23   to be wrongful conduct.
24       A. For example, with the FEP training. Here

17 (Pages 190 to 193)

Page 218

1    Q.    Did you file an MCAD claim against him?
2    A.    No.
3    Q.    You never filed an MCAD claim against Labor
4    Ready USA?
5    A.    No.
6    Q.    What is No HR Dot Com?
7    A.    It was a company I had started.  It was going
8    to be an internet company that provided assistance to
9    companies.  You could hire people through -- it was when
10   the dot com boom had started.  So I was going to start
11   the company, and I was going to do criminal background
12   checks.  I was going to do -- things to assist HR
13   professionals.
14   Q.    When was that?
15   A.    That was just -- I don't know.  I started so
16   many companies, I can't remember.
17   Q.    Did that company ever do any activity?
18   A.    No, it never did -- well, maybe one or two
19   things, but nothing major.  It was a good idea at the
20   time, but I never pursued it fully, because it wasn't
21   generating enough income to support me.
22   Q.    Was that around the time period of the
23   situation with Labor Ready USA?
24   A.    No, that was after that time period.

Page 219

1    Q.    That No HR was after Labor Ready?
2    A.    Yes.  That was after I owned a staffing agency,
3    Employment Network.
4    Q.    Was Employment Network --
5    A.    A staffing agency, also.
6    Q.    The staffing agency.  Were you doing that by
7    yourself?
8    A.    Yes.
9    Q.    Did the relationship that you and Mr. Okoyo, is
10   that how you say it?
11   A.    Yes.
12   Q.    Did that ever get formulated into an
13   organization that had a name?
14   A.    It was Labor Ready.
15   Q.    Okay.  So you were going to be brought into
16   that?
17   A.    Yes, yes.
18         MS. MARKHAM:  Can we go off the record for a
19   minute?
20         (Discussion off the record.)
21   Q.    Back on the record.  Going back to your
22   employment with H&R Block, Mr. McCray.  We talked briefly
23   last time about the Clarify system.
24   A.    Uh-hum.

Page 220

1    Q.    Do you recall that?
2    A.    Yes.
3    Q.    And some criticisms of your performance that
4    were made in relation to that; do you recall that?
5    A.    I recall us talking about Clarify, yes.
6    Q.    Can you tell me what exactly was Clarify?
7    A.    It's where you documented cases that you had
8    and results of cases you pulled cases off regarding the
9    complaints against the company.
10   Q.    When you say you, was this a software tool that
11   was available for the HR professionals at H&R Block?
12   A.    Yes.
13   Q.    Was access to it restricted?
14   A.    I don't know who it was restricted to.  I can't
15   answer that question.
16   Q.    Okay.  Did you ever have any training on the
17   Clarify system?
18   A.    No.
19   Q.    How did you learn about it?
20   A.    Well, maybe we had a day of training, but no
21   thorough -- we might have went in together and maybe had
22   a day of training.  Nothing in-depth.
23   Q.    Is it fair to say that after you were trained
24   on it, you did know how to use it?

Page 221

1    A.    I can't say that's fair to say.
2    Q.    All right.  What do you think you didn't know
3    how to do?
4    A.    It was very -- it was a complicated software.
5    So I knew how to do some things, but I did not know how
6    to do all the things.
7    Q.    Okay.  What did you understand your
8    responsibilities to be with respect to the Clarify
9    system?
10   A.    You were supposed to post some of the results
11   or you were supposed to pull some of the -- you know, I
12   can't -- I know you were -- it was supposed to be an
13   interactive where you posted or pulled and closed cases.
14   Q.    Is it fair to say that when there were
15   complaints that you were involved in investigating or
16   resolving, you were supposed to put the results of that
17   into the Clarify system?
18   A.    Yes.
19   Q.    Did H&R Block maintain a hotline, an anonymous
20   hotline for its employees?
21   A.    Yes.
22   Q.    What is your understanding -- first of all, did
23   you ever report anything on the anonymous hotline?
24   A.    Did I report something on the anonymous

4 (Pages 218 to 221)

Page 222

1  hotline?
2      Q.   Right.
3      A.   I may have.
4      Q.   Do you have any current recollection of that?
5      A.   I know when I was complaining about Linda, I
6  don't know if I called the hotline or if I called
7  Franciene or Katherine directly, but I know I did
8  complain.  But I don't know if I complained --
9      Q.   So you don't have any memory of complaining on
10 the hotline?
11     A.   I don't -- no, I don't know if I did or didn't.
12 It's possible.
13     Q.   Right, sir.  I just need your best memory.  Are
14 you telling me you don't have a memory of doing it?
15     A.   Right, right.
16     Q.   Were you ever involved in investigating claims
17 that were brought to your attention through the hotline?
18     A.   Yes.
19     Q.   How would those claims come to you?
20     A.   They would either come through -- some of them
21 would go directly to Katherine and Katherine would
22 sometimes call me or Franciene or they would come to me
23 and I would look at it and I would see it.  It wasn't one
24 way.

Page 223

1      Q.   But -- I guess my question is trying to
2  ascertain whether you directly pulled information off the
3  hotline or somebody else at Block had that responsibility
4  and then would direct it to you?
5      A.   See, I can't say definitely, because I know
6  that sometimes I would get a call and say -- because I
7  think it was dual.  It would come to me, but it would
8  come to them, also.  So maybe they would get it first,
9  and they'd be like, "Dre, we have this emergency,"
10 because I know a lot of times they would call and say,
11 "Dre, you need to go and investigate this right away."
12 So I don't know if I was getting them first directly or
13 they were getting them first directly.  But I know
14 sometimes I would pull some off and sometimes they would
15 call me.  So like I said, there's no set standard of this
16 is it, black.
17     Q.   Now, did you ever complain about Linda Murphy
18 on the Clarify system?
19     A.   Didn't I just answer that question?
20     Q.   No, we were talking about the hotline.
21     A.   Like go into the computer?  I don't think we
22 had the option of doing that.  It was a number or
23 something that you could --
24     Q.   So you don't think you could have made a

Page 224

1  complaint about Ms. Murphy's conduct on the Clarify
2  system?
3      A.   I don't -- no, I don't know.  I don't think so.
4      Q.   Did you put in any information --
5      A.   I think --
6      Q.   I'm sorry, I thought you had finished.
7      A.   I don't think I complained -- I think I
8  complained directly to Franciene Gill and Katherine via
9  e-mail.
10     Q.   Did you put any information on the Clarify
11 system regarding Rick Bartlett?
12     A.   No.
13     Q.   Why not?
14     A.   I don't know.
15     Q.   Did you put any information on the Clarify
16 system regarding Michele Lamberg?
17     A.   No.
18     Q.   David Gross?
19     A.   No.
20     Q.   Now, with respect to your duties at H&R Block,
21 did you have any training in conducting investigations?
22     A.   With --
23     Q.   H&R Block.
24     A.   Yes.

Page 225

1      Q.   Can you describe what that was?
2      A.   Like I said, we went down for a week, and they
3  covered a lot of different areas in a short period of
4  time.
5      Q.   What areas do you remember being covered?
6      A.   I don't remember the areas.
7      Q.   Were you required, when you first began your
8  duties at H&R Block, to discuss the investigation with
9  Franciene Gill as you performed it?
10     A.   Yes.
11     Q.   Was she involved in the decision-making
12 relating to the investigations?
13     A.   She was my supervisor.
14     Q.   So is that an answer yes?
15     A.   I believe so.  I'm not sure.  Clarify the
16 question.  I'm not clear --
17     Q.   Okay, let me see --
18     A.   -- what you're asking.
19     Q.   -- if I can ask it another way.  When you first
20 began doing investigations at H&R Block, you've testified
21 that you would report as you went along to Ms. Gill.  My
22 question now is was Ms. Gill involved in making the
23 decision of the determination of the investigation?
24         MR. MANOFF:  Of all of them or some of them?

Page 226

1    MS. MARKHAM: When he first began working
2    there.
3    A.    The investigations? Did she make the decision
4    on the investigations? She couldn't make a decision if
5    she -- I don't, you know, I don't know. I can't answer
6    that question. I don't --
7    Q.    Mr. McCray, isn't it fair to say that in your
8    first year at H&R Block, you did not have authority to
9    decide the resolution of an investigation without
10   Franciene Gill?
11   A.    No, that's not fair to say. I don't think she
12   made the decision. I think it was we did the
13   investigation, and we came up with the determination. I
14   don't think she was making the decisions on what
15   happened, because she wasn't there to investigate.
16   Q.    Who is the "we" you're referring to in that
17   answer?
18   A.    The HR managers.
19   Q.    So you're saying you each individually had the
20   authority to make the decision on the investigation
21   results?
22   A.    Because we did the investigation.
23   MS. MARKHAM: I'm going to mark this document.
24   (Exhibit 16 marked for identification.)

Page 227

1    MS. MARKHAM: Just for the record, it's
2    identified as B463 to B467.
3    Q.    Mr. McCray, I'd ask you to look at what has
4    been marked as Exhibit 16.
5    (Document exhibited to witness.)
6    MR. MANOFF: Is that one of the things you just
7    gave me?
8    MS. MARKHAM: Yes.
9    MR. MANOFF: The Paul Rogers investigation?
10   MS. MARKHAM: The e-mail from Mr. McCray
11   attaching the Paul Rogers investigation.
12   A.    Okay.
13   Q.    Have you finished looking at it?
14   A.    Uh-hum.
15   Q.    Can I ask you, Mr. McCray, is that the report
16   you were referring to in your prior testimony when you
17   said that you wrote up the report on the Rick Bartlett
18   issue the way Linda Murphy wanted it and not the way you
19   intended?
20   A.    Uh-hum.
21   Q.    Yes or no.
22   A.    Yes.
23   Q.    Now, having reviewed the document, please tell
24   me what information do you see that is not in there that

Page 228

1    you would have put in there.
2    MR. MANOFF: Objection.
3    A.    I don't have my notes of -- I have some other
4    notes that I had. I don't -- I don't remember what
5    should have went in there besides this. But I have the
6    original notes all written out, and I have to review
7    those.
8    Q.    So there's nothing, as you review this now,
9    that you remember as being missing from this report?
10   MR. MANOFF: Objection. You can answer.
11   A.    Well, what I -- the main thing here is that
12   several people did say he was being treated differently.
13   I gave the weight to the people who were Frank DeSure and
14   Debbie Landry. But, as I said, I felt when I spoke with
15   all the people that he was -- he was treating the guy
16   differently because of his sexual orientation.
17   Q.    That's because certain people had told you he
18   was being treated differently?
19   A.    Yes.
20   Q.    And you note those people on this report,
21   right?
22   A.    Yes.
23   Q.    They're included in the report that you give?
24   A.    Yes, uh-hum.

Page 229

1    Q.    Katherine Watson that you sent this report to
2    was the manager of fair employment practices?
3    A.    Yes.
4    Q.    Was this your final report on the incident?
5    A.    Yes, I believe so.
6    (Exhibit 17 marked for identification.)
7    Q.    I'm going to show you what's been marked as
8    Exhibit 17.
9    (Document exhibited to witness.)
10   Q.    Have you ever seen Exhibit 17 before?
11   A.    Most likely I have.
12   Q.    Does it reflect your understanding of when
13   information had to be entered into Clarify?
14   MR. MANOFF: Objection.
15   A.    No. I mean, yes, now I see what's supposed to
16   be there, but I -- as I said, we weren't using Clarify.
17   We were supposed to use Clarify to put in complaints or
18   whatever.
19   Q.    Turning back to Exhibit 16, which is right
20   before it, did you put Exhibit 16 into the Clarify
21   system?
22   A.    I don't believe -- I don't believe I did.
23   Q.    Did you have any discussion with Katherine
24   Watson after you submitted this report, that is

Adrian McCray, Vol. 3

10/21/2005

Page 230

1  Exhibit 16?
2      A.   I had it prior to.
3      Q.   Did you have any discussion with anybody about
4  Exhibit 16 after submitting it?
5      A.   I think I had all the conversations prior to.
6      Q.   You testified at your first day of deposition
7  about Michele Lamberg up in Poughkeepsie, right?
8      A.   Uh-hum.
9      Q.   Yes?
10     A.   Yes.
11     Q.   Did you ever complain to anyone about your view
12  that Ms. Murphy didn't like her?
13         MR. MANOFF:  What was the question again?
14     Q.   Did you ever complain to anyone?
15     A.   No.
16     Q.   Now just turning to Mr. Gross' assistant and
17  the transfer of that assistant.
18     A.   Yes.
19     Q.   Did you ever complain to anyone about the
20  transfer of the assistant?
21     A.   Yes.
22     Q.   Who did you complain to?
23     A.   Another HR manager who worked in the same
24  division with me.  We both discussed it, because she

Page 231

1  brought it to my attention that it was happening.
2      Q.   This is another one who was in your same
3  position?
4      A.   Yes.
5      Q.   What is her name?
6      A.   Kristen, something like that.  Either Kristen
7  or -- something like that.  Kristen Kerr or Carr,
8  something like that.
9      Q.   I think we have her name somewhere in the
10  documents.
11     A.   Yeah.
12     Q.   She is the other person that was handling this
13  region with you?
14     A.   Yes, they combined two regions together.  She
15  was one region, I was one region, and then they combined
16  it into one division.  So she was in the New York area,
17  and I was in New England.
18     Q.   And your testimony is she brought the
19  information to your attention, the transfer?
20     A.   She called me and said, "Dre, she can't do
21  this."  And I said, "Okay, I'm gonna talk to her."
22     Q.   "Her" being Linda Murphy?
23     A.   Yes.
24     Q.   That was the extent of your discussion with

Page 232

1  Kris?
2      A.   Well, we talked about it, because he was on
3  FMLA and --
4      Q.   "He" being Mr. Gross?
5      A.   Mr. Gross was on FMLA, and it was a violation
6  of FMLA.  She was trying to force him to work because he
7  was missing a lot of time.  So she was going to take the
8  assistant away.
9      Q.   Did you ever -- so you discussed it with
10  Ms. Murphy?
11     A.   Yes, I did.
12     Q.   What did she say?
13     A.   I told her, "You can't do this."
14     Q.   What did she say?
15     A.   She was like, okay, I will -- I'll tell him,
16  instead of me transferring him, I'll just say I'm sending
17  him for training to cover it up.
18     Q.   Is it your testimony that Mr. Gross' area was
19  left without an assistant?
20     A.   Well, after -- I don't know how much time went
21  by or whatever, but the intent of what she was doing was
22  she was trying to force him to work, which is a violation
23  of FMLA.
24     Q.   That's your opinion, right?

Page 233

1      A.   No, that's a fact.  That's what she was doing.
2      Q.   Did you at any time have a discussion with
3  Ms. Murphy --
4      A.   Yes, I did.
5      Q.   Please, please, Mr. McCray.  You need to wait
6  for the question.
7      A.   Okay.
8      Q.   Where she said to you, "My intention is to get
9  David Gross back to work"?
10     A.   She stated, "He needs to be at work."
11     Q.   Okay.  Did you ever have a discussion with her
12  as to whether in fact she put any other assistant in the
13  area?
14     A.   She had not put anyone -- she had not scheduled
15  anyone to be in the area when she was moving -- I don't
16  know how much time lapsed, because it's such a period of
17  time.  I don't know how much time lapsed or when she did.
18  But I brought it to her attention that you can't do this
19  and I told her just like that, "You can't do that."
20     Q.   I heard that.  I need to know whether --
21     A.   I don't know when, but maybe after the fact,
22  after I told her she couldn't do it, maybe she sent
23  someone else over there three or four -- I don't know how
24  much time elapsed or the time frame of everything.  But I

7 (Pages 230 to 233)

Page 234

1  brought it to her attention that she could not do that.
2      Q.   Yes. And do you know for a fact that she did
3  in fact put another assistant in there?
4      A.   I don't know at what point she did.
5      Q.   Do you know whether she did or not?
6      A.   Well, you've told me. So I know now.
7      Q.   No, I don't want it based on my information.
8      A.   That's what it's based.
9      Q.   So your answer to my question, Mr. McCray --
10      A.   I don't remember.
11      Q.   -- is that you don't have any knowledge of
12  that?
13      A.   I don't remember whether she did or did not.
14      Q.   Okay. Other than the discussions that you've
15  described with Kris and Ms. Murphy, did you have any
16  other discussions about this with anyone at H&R Block?
17      A.   I don't think I did.
18      Q.   Did Mr. Gross ever come back from his FMLA
19  leave?
20      A.   I don't -- you know, I don't know what the
21  situation was after that. He wasn't in my region.
22      Q.   When you first filed a claim against H&R Block,
23  you claimed you were being discriminated against on the
24  basis of your race; is that right?

Page 235

1      A.   When I first filed it, yes.
2      Q.   And you're not pursuing that claim now, right?
3      A.   It was retaliation.
4      Q.   The question is --
5      A.   No.
6      Q.   -- are you pursuing that race claim now?
7      A.   No.
8      Q.   Now going to the next question. You're
9  pursuing a retaliation claim against H&R Block, right?
10      A.   Yes.
11      Q.   For what acts that you did are you claiming
12  that Block retaliated against you?
13      A.   As stated in the complaint.
14      Q.   I'd like your testimony of your own present
15  state of mind what those acts were.
16      A.   Those acts are for bringing to Ms. Murphy's
17  attention her violations and her retaliatory manner.
18  Consistent process of manipulating individuals and
19  violating employment laws. And initially a lot of things
20  were left unsaid because I wanted my job. But as time --
21  more time went by and there was consistent pattern of
22  this towards behavior, this behavior, I just couldn't
23  tolerate it anymore.
24      Q.   Okay. So the acts that you did that you claim

Page 236

1  Block has retaliated against you for --
2      A.   Ms. Murphy, yes.
3      Q.   Are bringing to Ms. Murphy's attention her
4  violations?
5      A.   Employment law.
6      Q.   Of the employment law. And which violations
7  specifically are you referring to?
8          MR. MANOFF: Objection. We already went
9  through this the last time.
10      A.   Yes.
11          MR. MANOFF: All of these situations.
12          MS. MARKHAM: You'll have to indulge me. I'm
13  going further -- probing further into this.
14          MR. MANOFF: I'm not sure that you have a right
15  to do that. We've already covered that ground, all of
16  the situations he and Ms. Murphy talked about.
17          MS. MARKHAM: His testimony is far from clear
18  about what he claims he did that lead to retaliation, and
19  I'm entitled to ask him for his statement on that. So
20  please give it to me.
21          MR. MANOFF: I object and move to strike. You
22  can answer.
23      Q.   What did you do, sir, what actions, specific
24  ones did you take that you claim --

Page 237

1      A.   I told Ms. Murphy I was not going to write
2  anymore reports that were inaccurate. I told Ms. Murphy
3  that she couldn't force people to work. I told
4  Ms. Murphy she couldn't just not hire people based --
5  because they had children and she didn't want them to
6  work in the office. I told Ms. Murphy that I was no
7  longer writing reports to substantiate firing people. I
8  told Ms. Murphy I would no longer be subjected to her
9  intimidation and manipulation.
10          MR. MANOFF: All of which he testified to the
11  last time.
12          MS. MARKHAM: Could I have the answer back?
13          (Answer read back.)
14      Q.   Please turn back to Exhibit 16. What is in
15  that report that you claim is inaccurate?
16      A.   The outcome.
17      Q.   What is in that piece of paper, that is that
18  report, can you show me what you're referring to when you
19  say the outcome?
20      A.   The outcome --
21      Q.   Where is it in the report?
22      A.   I don't know if this is complete. There was no
23  action taken because of the -- I don't see where -- let
24  me see. There's no outcome. Where's the outcome?

Page 238

1    Q.    There's no outcome stated there, that's true.
2  I'm asking you if there is anything in that report that
3  is inaccurate?
4    A.    I'm talking about the outcome.
5        MR. MANOFF:  Objection.
6    Q.    Okay. You just told me that you were asked to
7  write a report that was inaccurate.
8    A.    Outcome. That was inaccurate.
9    Q.    And you just told me that there is no outcome
10  in this report, right?
11    A.    Right.
12    Q.    So is it now your testimony that the report
13  isn't inaccurate?
14    A.    I'm not clear, because this isn't complete.
15  This is incomplete. It would be complete with the
16  outcome.
17    Q.    Are you telling me --
18    A.    To me the whole thing is together and you only
19  gave me partial.
20    Q.    You're telling me you had a written outcome
21  that is no longer in that document?
22    A.    There's an outcome, yes.
23    Q.    No, listen to my question.
24    A.    I understand your question.

Page 239

1        MR. MANOFF:  Objection.
2    A.    I understand your question.
3    Q.    The question is, are you telling me --
4    A.    I'm telling you --
5    Q.    Wait, please, Mr. McCray. I'm entitled to get
6  the full question out.
7    A.    I understand. I'm entitled to answer, also,
8  and complete my answer.
9        MS. MARKHAM:  Could you instruct your witness
10  to wait until I finish?
11    A.    He can't instruct me. I can listen myself.
12        MR. MANOFF:  Well, he says you interrupted him
13  before he could have a chance to answer.
14        MS. MARKHAM:  No, if you look at the record --
15        MR. MANOFF:  There's no point in arguing about
16  it.
17        MS. MARKHAM:  Well, I ask you to control your
18  witness here.
19    A.    How can he control me? I'm a grown man.
20    Q.    Mr. McCray.
21    A.    Listen, I respect you.
22    Q.    Please do not --
23    A.    Listen, I get a chance --
24        MS. MARKHAM:  Paul, we'll stop there, and I'll

Page 240

1  go to the court, because I have two days of your witness
2  not answering questions. If we're going to do this
3  today, we'll be here until four o'clock.
4        MR. MANOFF:  He's answering the question.
5    A.    I'm not going to be here until four o'clock.
6    Q.    You will be here as long as I need you to be.
7    A.    No, I will not.
8        MR. MANOFF:  Just ask your question.
9    A.    We're going over the same thing over and over
10  again.
11        MR. MANOFF:  I move to strike. There's no
12  question. She's already gone way beyond the limit.
13  We're here indulging you because the local rules provide
14  only one day of deposition.
15        MS. MARKHAM:  That is not the issue.
16        MR. MANOFF:  Let's not argue about it.
17    Q.    Go back to Exhibit 16. My question is,
18  Mr. McCray, you've told me that Exhibit 16 does not have
19  a conclusion in it. My question to you is, did you write
20  Exhibit 16 with a conclusion in it that you now claim is
21  missing?
22        MR. MANOFF:  Just answer yes or no.
23    A.    Yes.
24    Q.    So your testimony is that there is some

Page 241

1  document that has more than what Exhibit 16 shows?
2        MR. MANOFF:  Just answer yes or no.
3    A.    Yes.
4    Q.    That you wrote?
5        MR. MANOFF:  He's already answered that three
6  times. Yes, he said.
7        MS. MARKHAM:  No, he told me that there's a
8  document that includes more.
9    Q.    I want to now know if he's referring to another
10  document that is Exhibit 16 with additional information
11  that you wrote on it?
12    A.    What I'm telling you here is this is just --
13  there's no conclusion.
14        MR. MANOFF:  She asked you, did you write a
15  conclusion.
16    A.    There's a conclusion.
17    Q.    No, that's not the question. Did you write a
18  conclusion? Did you do it?
19    A.    I believe I did.
20    Q.    Did you write that conclusion into this report?
21        MR. MANOFF:  Objection.
22    A.    I believe I did.
23    Q.    I think you mentioned in your answer something
24  new, which is that you told Ms. Murphy that she could not

Page 242

1  be refusing to hire people with children. Who did she
2  refuse to hire with children?
3      A.   There was a person who applied for a position
4  in our office. The person was very qualified for the
5  position. However, Ms. Murphy did not want to hire the
6  woman because she was afraid that she would have issues
7  with daycare. So she hired some -- a person I did not
8  want to hire, who we ended up having to fire because she
9  was irresponsible.
10     Q.   Who is the person who applied for a position?
11     A.   I don't have the name.
12     Q.   When did this occur?
13     A.   When we were hiring someone, an assistant in
14  the office.
15     Q.   What is the name of the person you hired
16  instead?
17     A.   I don't remember her name.
18     Q.   And you say you had a discussion with
19  Ms. Murphy about this?
20     A.   I wanted to hire her.
21     Q.   That's not my question.
22     A.   Yes.
23     Q.   Describe the conversation.
24          MR. MANOFF:  He already did.

Page 243

1          MS. MARKHAM:  No, he has not described a
2  discussion about not having children.
3          MR. MANOFF:  I object, but go ahead.
4      A.   Basically I told Ms. Murphy that this person
5  was qualified, and she would be a good candidate. And
6  Ms. Murphy stated that, "Well, I don't know if she's --
7  she might have issues with child care."
8      Q.   Did you say anything in response to that?
9      A.   I was like, "That shouldn't be a determinative
10  factor of whether we should hire her or not."
11     Q.   Anything else about this discussion?
12     A.   No.
13     Q.   Did you talk about it with anyone else?
14     A.   No, I talked about it with Ms. Murphy.
15     Q.   Now, with respect to your first medical leave,
16  FMLA leave after the accident; do you recall that?
17     A.   Yes.
18     Q.   Are you claiming that any of your rights were
19  violated in connection with that leave?
20     A.   Yes.
21     Q.   What rights?
22     A.   The one with the car accident?
23     Q.   Yes.
24     A.   I was trying -- again, she was trying to force

Page 244

1  me to work when I wasn't necessarily ready to work.
2  Also, Block was -- sent me to a doctor that I ended up
3  having to pay for, which is a violation of second
4  opinion. Also, they were using my confidential
5  information without my permission to gain access to
6  information from the doctor, from my personal doctor that
7  they had on file.
8      Q.   Any other way in which your rights were
9  violated in connection with that leave?
10     A.   I can't think off the top of my head, but
11  that's my best recollection until I go over all this
12  information, which I haven't had time to do.
13     Q.   Now, last time I believe you testified that
14  Block used confidential information to make another
15  appointment with your doctor.
16     A.   Yes, that's what I was just referring to.
17     Q.   That's what you were referring to?
18     A.   Yes.
19     Q.   You just said they used confidential
20  information to gain access to your personal information
21  at the doctors.
22     A.   Well, the doctors needed personal information
23  in order to change an appointment. They called and
24  changed an appointment using my personal information

Page 245

1  without my permission.
2      Q.   Okay, you're not claiming they reviewed
3  information or got information from your doctor?
4      A.   No.
5      Q.   Now, are you claiming that your rights were
6  violated in connection with the second leave request you
7  had in connection with your foot?
8      A.   Uh-hum.
9      Q.   Yes or no.
10     A.   Yes.
11     Q.   And in what way were your rights violated?
12     A.   I was actually granted leave, but I was told
13  that I was not granted leave.
14     Q.   It's fair to say you were ultimately told you
15  were not granted leave, right?
16     A.   I was told I was not granted leave.
17     Q.   Do you have any reason to believe that Ms. Gill
18  was lying to you when she said she wasn't going to grant
19  you leave?
20          MR. MANOFF:  Objection.
21     A.   I don't know what was -- what the issue was.
22  All I can go on is what I was told at the time.
23     Q.   The leave that you were requesting was for a
24  foot operation later in January, right?

10 (Pages 242 to 245)

Page 246

1    A.   Yes.
2    Q.   You weren't requesting leave for the period of
3  time prior to the operation, right?
4    A.   It may have been leading up to. I don't know
5  all the specifics at this time, but I think it was -- I
6  don't know how much time I requested or what I needed. I
7  knew that I wanted to get it done before peak season.
8  The operation would have been a couple of hours, and I
9  would have been back to work in three or four days or
10  five days. It wasn't going to be a long period of time
11  that I was going to be out. But leading up to that point
12  in time, I don't know if I was on restricted -- I believe
13  I was on restricted duty or whatever, because I
14  couldn't -- I still have problems with my foot, even
15  after the operation. I have to have another one.
16    Q.   By the way, that operation was for bunions and
17  calluses on the bottom of your foot?
18    A.   It's not -- I don't know what it is called.
19  It's called something. I have the report. I forgot to
20  bring it again. I have a bone problem in the bottom of
21  my foot. When I stand on it, it's very painful.
22    Q.   Let me see if I can find that report. I
23  believe your attorney provided it to me or somebody did.
24        MS. MARKHAM:  Let's have this marked as the

Page 247

1  next exhibit.
2        (Exhibit 18 marked for identification.)
3        (Document exhibited to witness.)
4    Q.   Take a look at that. You can take as much time
5  as you need to review this, Mr. McCray. The portion of
6  it that I'm going to draw your attention to is a note of
7  the doctor, note for Adrian McCray on 5/30/2003. It's
8  labelled page one. But, frankly, there are many page
9  ones.
10    A.   He actually put in here with good attention to
11  hygiene and body habitus.
12    Q.   It's always interesting to look at doctor's
13  notes.
14    A.   That's funny.
15    Q.   I think you're on the same page that I am. Can
16  I ask you, it describes as the presenting -- the chief
17  complaint as a complaint of corns and calluses; is that
18  right?
19    A.   That's what they are, then.
20    Q.   It's fair to say, sir, that you canceled your
21  surgery in January and rescheduled it for sometime later
22  in the spring?
23    A.   Yes.
24    Q.   You started to tell me that the reason your

Page 248

1  rights were violated in connection with your second leave
2  request was because you were granted leave but informed
3  that you were not granted leave; is that accurate?
4    A.   Yes, that is accurate.
5    Q.   Is there anything else that you claim Block did
6  that was a violation in connection with your -- of your
7  rights in connection with the second leave?
8    A.   I'd have to look at it and review it before I
9  could answer that question.
10    Q.   Look at what?
11    A.   Exactly what happened during that period of
12  time. I don't know exactly what happened, what
13  transpired and how it transpired to give you a -- to
14  state what else was violated.
15    Q.   Okay. Well, we'll have to go through it, then.
16  By the way, how much did you collect in unemployment?
17    A.   Maybe 19 thousand I think.
18    Q.   Do you have documentation of that?
19    A.   I think they send you a W-2. I don't have --
20  maybe I can get it from the state or something, I don't
21  know. It's five hundred a week for six months. I
22  believe that I was unfairly denied leave because it was
23  necessary to perform the duties of my job; because at
24  that time I could not stand, and my job entailed a lot of

Page 249

1  standing.
2    Q.   Is it your testimony that you requested a leave
3  for the entire period prior to your surgery because you
4  couldn't stand?
5        MR. MANOFF:  Objection.
6    A.   I didn't say I could not stand. It was very
7  painful to stand and do my job. I was unable to perform
8  the duties of my job, which entails standing for eight
9  hours at a time giving trainings and delivering training.
10    Q.   So the question is did you request leave for
11  the period of time prior to surgery?
12        MR. MANOFF:  Objection.
13    A.   I don't know if I requested for the entire
14  time. I mean, it's right in the file -- the thing, what
15  I requested.
16    Q.   All right, let's pull it out. You have to give
17  me a minute to pull this out, because -- we've already
18  had this as an exhibit. Here we go. Looking at Exhibit
19  15.
20        (Document exhibited to witness.)
21    Q.   My question is going to be, as you review that,
22  whether Exhibit 15 refreshes your memory as to whether
23  you asked for leave for the period of time prior to your
24  surgery?

11 (Pages 246 to 249)

Page 254

1  follow-up. So I did read it.
2     Q.   Now, it's fair to say that after January 14th,
3  you never returned to work, right?
4     A.   I was sick -- yes.
5     Q.   And you did come into H&R Block's offices in
6  the evening to get your laptop, right?
7     A.   Because I was -- yes.
8          (Exhibit 21 marked for identification.)
9          (Document exhibited to witness.)
10    Q.   Mr. McCray, does this e-mail, is that something
11 you've seen before?
12    A.   No, it wasn't to me. It's not to me. Oh, this
13 from Tanya? I don't know if I read it or not. Again, I
14 don't know if I read it or not.
15    Q.   Did you take any action about getting Sit Lead
16 material back to corporate?
17    A.   I don't remember.
18         (Exhibit 22 marked for identification.)
19         (Document exhibited to witness.)
20    Q.   Mr. McCray, is it true to say that you had an
21 MRI scheduled for January 19th by H&R Block in connection
22 with the second opinion follow-up?
23         MR. MANOFF:  You mean January 9th?
24         MS. MARKHAM:  January 9th, I'm sorry, yes.

Page 255

1     A.   That they scheduled an appointment for me?
2     Q.   Yes.
3     A.   That's the one I told you about that they tried
4  to reschedule for me.
5     Q.   And they were able to do it for January 9th,
6  right?
7     A.   I don't know. I was going to set up my own
8  appointments.
9     Q.   So did you make the decision not to go on
10 January 9th?
11    A.   I don't know. There was a different time frame
12 that I had it set up for that worked out better for me.
13    Q.   You had, had it set up for January 13th?
14    A.   Yes.
15    Q.   And that's the time you were supposed to be at
16 the Sit Lead Conference, right?
17    A.   I don't -- if that's the time the conference
18 was, that's the time the conference was.
19    Q.   Wasn't that the reason that Block intervened
20 and tried to reschedule it for a different time?
21         MR. MANOFF:  Objection.
22    A.   I don't know what the reason was, but they
23 can't use my confidential information to set up
24 appointments for me.

Page 256

1     Q.   And you didn't go to the appointment on January
2  9th, right?
3     A.   Or the 13th. And I sent them an e-mail, and I
4  told them I wasn't going, because there was no need for
5  me to go anymore to have the MRI, because at that point
6  my FMLA for the other accident, I was well enough to
7  work.
8     Q.   Okay. So from your perspective, you no longer
9  wanted to follow through with the second opinion?
10    A.   No. They had gotten a second opinion, and the
11 second opinion referred me to have an MRI. This was for
12 the FMLA leave to continue. However, at this point in
13 time, my back was not the issue that I was dealing with
14 anymore or my shoulder was not the issue that I was
15 dealing with anymore. And there was no need to go to
16 have an MRI.
17    Q.   And you think that was your decision to make in
18 connection with the follow-up on a second opinion?
19    A.   It was. It was my body, and yes, if I can
20 perform the duties of my job.
21    Q.   You don't think the employer has a right to
22 determine whether your request was and the leave you'd
23 already taken in connection with it was properly granted
24 as FMLA time?

Page 257

1     A.   I went through the initial that they didn't
2  even pay for that I paid for, which that's a violation.
3  And I did go to whatever doctor they said I had to go to,
4  and I went.
5     Q.   And it's your understanding the MRI was
6  follow-up to that second opinion?
7     A.   The MRI was for -- to see if I was going to
8  continue to have FMLA.
9     Q.   Was it follow-up to the second opinion?
10    A.   I don't believe it was -- yes. I don't know.
11    Q.   Yes or I don't know?
12    A.   I don't know what it was.
13    Q.   Okay. Let me help you out.
14    A.   I went to their doctor, and he referred me to
15 the MRI. So whatever that is, that's what it is.
16    Q.   Okay. By the way, did you schedule the MRI for
17 January 13th?
18    A.   I don't know. This is the time they had available.
19         MS. MARKHAM:  Mark this.
20         (Exhibit 23 marked for identification.)
21         (Document exhibited to witness.)
22    Q.   Mr. McCray, did you write this e-mail to Linda
23 Murphy that is on the bottom of the first page of Exhibit
24 23?

13 (Pages 254 to 257)