Page 1

1                                        Volume: I
2                                        Pages: 1 - 61
3            UNITED STATES DISTRICT COURT
4                C.A. No. 04-CV-12232-PBS
5
6   ADRIAN MCCRAY,
7               Plaintiff,
8       v.
9   H&R BLOCK EASTERN ENTERPRISES, INC.,
10  and LINDA MURPHY,
11              Defendants.
12
13
14
15                    *********
16            DEPOSITION OF LINDA MURPHY
17              Wednesday, June 8, 2005
18                 Goulston & Storrs
19                 400 Atlantic Avenue
20               Boston, Massachusetts
21                    12:15 p.m.
22            Reporter:  Linda M. Grieco
23      320 Congress Street, Boston, MA 02210
24

Page 10

1  Q. You don't know how much you pay in health
2  insurance?
3  A. I'm sorry, I don't.
4  Q. There's a separate coverage for your
5  husband, you said?
6  A. It is a group policy that covers myself and
7  my dependents.
8  Q. But company only pays fifty percent of the
9  cost of his coverage?
10 A. Right.
11 Q. Company has a 401(k) plan?
12 A. That's correct.
13 Q. How much does it contribute to the plan?
14 A. It's a voluntary contributing. I contribute
15 five percent. They match it.
16 Q. Five percent of your yearly salary?
17 A. That's correct.
18 Q. What are the sick pay benefits, if any?
19 A. The sick pay depends on how long you've been
20 with the company.
21 Q. How about for new employees?
22 A. They accumulate monthly the number of hours
23 that they are entitled to.
24 Q. How many hours a month do they get?

Page 11

1  A. I don't know off the top of my head. I'd
2  have to refresh my memory.
3  Q. Does the company have any rules about
4  excessive absenteeism?
5  A. There is policies -- our standard policies
6  are out on our Block net. They can be looked at.
7  Q. You don't know what the policy is?
8  A. I'm not in HR.
9  Q. You're not in HR?
10 A. No.
11 Q. Did you have a discussion with Mr. McCray
12 about this investigation that he testified about
13 concerning your son-in-law?
14 A. I had very little discussion about it with
15 Mr. McCray.
16 Q. Who's your son-in-law?
17 A. Richard Bartlett.
18 Q. He's married to your daughter?
19 A. That's correct.
20 Q. How long has he worked for H&R Block?
21 A. 20 years.
22 Q. What was his job back in 2002?
23 A. District manager.
24 Q. Is he still at the same job?

Page 12

1  A. Correct.
2  Q. District manager of what?
3  A. District manager of the -- at the time of
4  this, he was the district manager of Manchester,
5  New Hampshire. He's now the -- the territory is now
6  called northern New England.
7  Q. So he managed several locations?
8  A. Correct.
9  Q. How many locations did he manage?
10 A. I don't know off the top of my head. He
11 does not report to me.
12 Q. How did he come to work for H&R Block?
13 A. I don't recall.
14 Q. It had nothing to do with you?
15 A. I hired him. I don't recall how he applied.
16 Q. You hired your own son-in-law?
17 A. I did not. They weren't married at the
18 time.
19 Q. Did you hire him before or after he met your
20 daughter?
21 A. I hired him before.
22 Q. Before. So he met your daughter after he
23 started working at H&R Block?
24 A. Correct.

Page 13

1  Q. How did you come to learn that somebody had
2  accused him of sexual orientation discrimination?
3  A. I don't recall.
4  Q. You don't recall? Who was the person who
5  complained about Mr. Bartlett?
6  A. A Mr. Rogers, I believe.
7  Q. What happened to him?
8       MS. MARKHAM: Objection.
9  Q. Does he still work for the company?
10 A. I don't know.
11 Q. You don't know what happened to him?
12 A. I don't.
13 Q. Did you ever have any discussion with
14 Mr. McCray about this complaint?
15 A. I deliberately stayed out of the issue.
16 Q. How did you even learn that there was such a
17 complaint?
18 A. I believe Mr. McCray told me about it, but I
19 don't recall who actually told me. He may have told
20 me about it, but I deliberately stayed out of the
21 issue.
22 Q. Mr. McCray have any way of knowing that
23 Mr. Bartlett was your son-in-law?
24 A. Yes, it's very common knowledge. Even the

Page 14

1  CEO knows it.
2      Q. So you told Mr. McCray beforehand that
3  Mr. Bartlett was your son-in-law?
4      A. Yes.
5      Q. So tell me everything you can remember
6  saying to Mr. McCray about this complaint and
7  everything you can remember him saying to you about
8  it.
9      A. I believe that's a little broad. I don't
10 think I can answer it.
11     Q. What can you remember saying to Mr. McCray
12 about it, this complaint?
13     A. I told him -- the only thing I recall saying
14 to him was, "It's your job to investigate it." And
15 that was it. I mean, I stayed out of it completely.
16     Q. What, if anything, did he say?
17     A. I don't recall.
18     Q. What did Mr. McCray do as far as that
19 complaint?
20     A. He filed a written report to his supervisor
21 and to Katherine Watson, who both work out of our
22 corporate headquarters.
23     Q. Did you see the written report?
24     A. I did.

Page 15

1      Q. Why did you see the written report?
2      A. I reviewed it prior to coming here today.
3      Q. But did you see it during 2002?
4      A. I don't recall seeing it during that period
5  of time.
6      Q. So you never saw it, as far as you know,
7  until today?
8      A. The only thing I knew that the foundation --
9  there was no foundation for the complaint, and Dray
10 closed the issue.
11     Q. Was Mr. Bartlett given a warning or any
12 other discipline as a result of this complaint?
13     A. No.
14     Q. Do you recall the incident or the person,
15 rather, that Mr. McCray testified about yesterday,
16 the manager in Poughkeepsie that worked there 20
17 some odd years that he claimed you wanted to fire?
18     A. I do recall what he said, yes.
19     Q. What's the name of the individual in
20 Poughkeepsie?
21     A. Michelle Lambert.
22     Q. L-A-M-B-E-R-T?
23     A. I believe so.
24     Q. Was she fired?

Page 16

1      A. I don't remember.
2      Q. You don't remember what happened to her?
3      A. She had been with the company for a long
4  time, and I believe we had a discussion about the
5  fact that her performance was -- she had indicated
6  to me she was going to retire. I suggested she
7  retire earlier than what she did.
8      Q. What she did what?
9      A. Than when she retired, which was in April of
10 that year.
11     Q. So she planned to retire in April or she did
12 retire in April?
13     A. She had planned to retire in April, and she
14 did retire in April.
15     Q. Of 2002?
16     A. I believe that is the year.
17     Q. How long had she been manager of
18 Poughkeepsie?
19     A. I don't remember.
20     Q. How old is she?
21     A. I don't know.
22     Q. Is she older or younger than you?
23     A. I believe she is older.
24     Q. What conversations did you have with

Page 17

1  Mr. McCray about Michelle Lambert?
2      A. I don't recall having very many discussions
3  with him about her at all.
4      Q. Who does she report to?
5      A. She reported to Bob Moretti, Robert Moretti.
6      Q. Where was he?
7      A. He is a regional director who reports to me.
8      Q. Did you discuss Ms. Lambert's performance
9  with Mr. Moretti?
10     A. Yes.
11     Q. What did Mr. Moretti tell you?
12     A. That she essentially had retired on the job.
13     Q. What does that mean?
14     A. She wasn't working.
15     Q. For how long a period had that been,
16 according to Mr. Moretti?
17     A. For several months.
18     Q. For several months, okay. Did you speak to
19 Ms. Lambert about this?
20     A. I did. I went up there to visit with her.
21     Q. What conversations did you have with her
22 about her performance?
23     A. I discussed with her the fact that several
24 of her branches at that point had still not opened,

Linda Murphy                                                                        06/08/2005

Page 18

1  and that it was a problem. Was there something I
2  could do to help her.
3     Q. What did she say?
4     A. She said that she was very tired, and that
5  she wanted to work through the end of the tax
6  season. And I told her I really was very
7  uncomfortable with the fact that we had several
8  branches that were still closed at that point.
9     Q. What do you mean still closed? That had
10 never been opened or that --
11    A. That is correct.
12    Q. -- that she was supposed to open?
13    A. Correct.
14    Q. Were these branches that opened seasonally
15 or these were new branches that had never been in
16 existence before?
17    A. These were branches that were in existence,
18 and she had failed to open them.
19    Q. You mean for the season?
20    A. Correct.
21    Q. What, if any, reason did she give you for
22 why she had failed to open them for the tax season,
23 2002 tax season?
24    A. She had failed to hire the correct number of

Page 19

1  associates to work.
2     Q. Did she say why that was?
3     A. She just had neglected her -- to operate the
4  correct number of tax schools during the fall
5  period.
6     Q. What caused you to discuss Ms. Lambert with
7  Mr. McCray?
8     A. I discussed with him that he needed to just
9  write up for me my discussion with her.
10    Q. Why did he need to do that?
11    A. Because that was his job.
12    Q. That was his job, to write up your
13 discussions with somebody else?
14    A. Correct.
15    Q. What made that his job?
16    A. Because he was in HR.
17    Q. So any discussion anybody had with any
18 employee of a disciplinary nature, he was to write
19 it up?
20    A. Correct.
21    Q. What did you tell Mr. McCray to write up?
22    A. I gave him the synopsis of my conversation
23 and asked him to document it.
24    Q. Did you have any documents that you

Page 20

1  recall -- do you have any notes or other documents
2  that you recalled the conversation from?
3     A. No.
4     Q. You just recalled it out of your memory?
5     A. Correct.
6     Q. How long after you spoke to Ms. Lambert did
7  you speak to Mr. McCray about her?
8     A. I don't recall.
9     Q. What did Mr. -- did Mr. McCray go out and
10 document that?
11    A. I believe he did.
12    Q. What, if anything, did you say to him about
13 her and what did he say to you?
14    A. I just asked him to write up the report. He
15 wrote it up, and that was the end of the
16 conversation.
17    Q. Did you tell him that you wanted her out of
18 the company?
19    A. Absolutely not.
20    Q. Then did he tell you that he thought it
21 might be age discrimination to force her out of the
22 company?
23    A. Absolutely not.
24    Q. Do you recall the individual Mr. McCray

Page 21

1  testified about this morning whose wife had cancer?
2     A. Yes, I do.
3     Q. What was his name?
4     A. Dave Gross.
5     Q. What caused you to discuss Mr. Gross with
6  Mr. McCray?
7     A. I asked him to -- I had, had a couple of
8  conversations. I felt very bad for Dave. His wife
9  of many, many years was dying of cancer, and he was
10 spending a lot of time in the office crying. I
11 asked him to please take family medical leave and go
12 home and stay with his wife. He did not want to do
13 that. I begged him to do that. And I asked Dray to
14 please talk to him to encourage him to go home and
15 stay with his wife.
16    Q. Did you ask Mr. McCray to speak to him?
17    A. Yes, I did.
18    Q. And encourage him to take family leave?
19    A. Yes, I did.
20    Q. What did Mr. McCray say to you?
21    A. He said he would talk to him.
22    Q. How long did Mr. Gross take family medical
23 leave?
24    A. I don't recall how long he was out.

Page 22

1   Q. But he did take some leave?
2   A. Yes, he did.
3   Q. Did you have discussion with Mr. McCray
4   where you said you wanted to get Mr. Gross back to
5   work?
6   A. No.
7   Q. Was it true that he had an assistant that
8   you had transferred or otherwise taken off the job?
9   A. His assistant called me. He was brand new
10  to the company. His assistant called me and said he
11  did not feel comfortable running the district,
12  because his -- he was so new to the company, that he
13  was very afraid. So I suggested that he go to Utica
14  for additional training, and I sent a seasoned
15  assistant to that Finger Lakes District to continue
16  running the district while Mr. Gross was out.
17  Q. For how long a period of time did that
18  happen?
19  A. She was there in December, and she returned
20  home -- she was from New Bedford. She returned home
21  for the Christmas time frame, because I thought it
22  would be inappropriate for her to be away from her
23  family at Christmas. And she returned right after
24  the first of the year to Finger Lakes.

Page 23

1   Q. At some point in time did Mr. McCray, while
2   he still worked at Block, file an MCAD complaint?
3   A. I believe he did.
4   Q. When approximately was that?
5   A. I don't know.
6   Q. It was a couple of months before he was
7   discharged?
8   A. I don't recall the exact date that he --
9   Q. I didn't ask you the exact date. I asked
10  you the approximate date.
11  A. It was sometime in December.
12  Q. How did you learn about the complaint?
13  A. I don't recall.
14  Q. When is the last time you saw it?
15  A. I read it yesterday. Excuse me, correction.
16  I read it on Monday.
17  Q. You were familiar with it at the time it was
18  filed back in December of 2002?
19  A. I was.
20  Q. Did you discuss it with Mr. McCray?
21  A. I did not.
22  Q. Did you discuss it with Ms. Gill?
23  A. I did.
24  Q. What did you tell Ms. Gill about it and what

Page 24

1   did she say about it?
2   A. I asked her to handle it.
3   Q. What did she say?
4   A. She said she would.
5   Q. Where is -- is Ms. Gill still with the
6   company?
7   A. No, she's not. She took a job at the YMCA.
8   She's vice president in charge of HR in Milwaukee.
9   Q. And how long did she work for the company?
10  A. I don't know.
11  Q. What did you understand Mr. McCray to be
12  complaining about?
13  A. In the complaint?
14  Q. In his MCAD complaint.
15  A. He was complaining that we were retaliating
16  against him.
17  Q. I guess I didn't mean that. This came out
18  in Ms. Markham's question. There's two basis of the
19  MCAD complaint. One is the nature and retaliation,
20  and the other is the adverse acts that you're
21  complaining about. So I'd like to focus on the
22  adverse acts. What did you understand -- what
23  adverse acts did you understand him to be
24  complaining about at the time?

Page 25

1   A. He made accusations in the complaint that
2   were unfounded.
3   Q. But what did you understand those to be?
4   A. Well, he was complaining that I had
5   overruled his decision on Mr. Bartlett's action
6   against him, and I did not do that.
7   Q. Well, again, that's more or less the
8   retaliation. But did he complain that you took an
9   adverse action against him as a result of -- based
10  on the retaliation?
11  A. Can you repeat that?
12  Q. Did he say you took any adverse action
13  against him personally in this complaint, which you
14  say you read on Monday?
15  A. I believe he did.
16  Q. What were the adverse actions that he
17  listed, if any?
18  A. You know, I realize I read it on Monday, but
19  at this moment, I cannot remember.
20  Q. Well, did he allude to the fact that you
21  changed his work schedule?
22  A. Yes.
23  Q. Anything else you can recall?
24  A. That I had changed work rules in the office,

Page 34

1  out all the time.
2     Q. That's what Ms. Gill said?
3     A. Correct.
4     Q. You never discussed that issue with him?
5     A. No.
6     Q. What caused you to have a meeting with
7  Mr. McCray on the 14th?
8     A. Francine Gill asked me to.
9     Q. What did she tell you was the reason you
10 should meet with him?
11    A. That I should sit down with him and
12 review -- since she was in Kansas City, I was on
13 site, she asked me to sit down and review with him
14 his development plan.
15    Q. Who decided to issue him a development plan?
16    A. Francine Gill.
17    Q. Who was present when he was given the
18 development plan?
19    A. Dray and I.
20    Q. But not Ms. Gill?
21    A. No.
22    Q. Why was that?
23    A. She was in Kansas City.
24    Q. Who wrote the plan?

Page 35

1     A. Francine.
2     Q. So -- well, what did she tell you, if
3  anything, you should discuss with Mr. McCray on the
4  14th?
5     A. What was on the development plan.
6     Q. Well, when had the development plan been
7  given to him?
8     A. Francine instructed me to discuss the
9  development plan with him on the 14th.
10    Q. Is that the first time you discussed a
11 development plan with him? Was he first given a
12 development plan on the 14th?
13    A. I don't know.
14    Q. You don't know. So what discussion did you
15 have with him on the 14th?
16    A. I started to review the development plan
17 with him step by step. He became very hostile, very
18 agitated. Stood up with his fist raised at my face.
19 I was very afraid, and stood up and stepped towards
20 him and asked him to please sit down. I was shaking
21 so bad at that point, I would not continue the
22 discussion.
23    Q. Well, what can you remember saying to him,
24 other than sit down?

Page 36

1     A. What I remember saying to him was please sit
2  down.
3     Q. Is there anything else you remember saying
4  to him that day?
5     A. I asked him to please calm down and sit down
6  and let's discuss this.
7     Q. Anything else you said to him?
8     A. He then said, "And next week I'm going to be
9  out again," and tossed this piece of paper at me
10 that was on a doctor's prescription pad that gave a
11 description of an ailment. And then said on it that
12 he would be out four to six weeks.
13    Q. For his foot problem?
14    A. Correct. It was from a podiatrist. And he
15 asked for the note back, and I gave it to him.
16    Q. So you saw a note from a podiatrist saying
17 he needed to be out of work for four to six weeks?
18    A. It was on a prescription pad, yes.
19    Q. Why did you give it back to him?
20    A. Because he asked for it.
21    Q. Did you make a copy?
22    A. I did not.
23    Q. Why not?
24    A. At that point, all I wanted him to do was

Page 37

1  leave my office. I was scared to death of him.
2     Q. You felt that you were threatened?
3     A. I did -- I was.
4     Q. Had you ever been threatened by him before?
5     A. He had been loud before, but he'd never
6  raised his fist to me before.
7     Q. What did you understand he was upset about?
8     A. He did not agree with the development plan.
9     Q. Well, you call it a development plan. Are
10 you really referring to what was Exhibit 11, the
11 final written warning?
12       MS. MARKHAM: Well, Exhibit 11 in
13 Mr. McCray's deposition? She doesn't have that in
14 front of her.
15       MR. MANOFF: I'll give her a copy of it.
16 Do you want to show her your copy?
17       MS. MARKHAM: Yes.
18       MR. MANOFF: Okay, thank you.
19       MS. MARKHAM: So the record is clear,
20 I've handed the witness Exhibit 11 from Mr. McCray's
21 deposition.
22    Q. Is that what you mean by the development
23 plan?
24    A. Yes, it is.

10 (Pages 34 to 37)

Linda Murphy                                                                                06/08/2005

Page 38

1  Q. So really you meant the final written
2  warning?
3  A. Yes.
4  Q. Who wrote that, Exhibit 11?
5  A. Francine Gill.
6  Q. Whose idea was it to give it to Mr. McCray?
7  A. Francine Gill asked me to present it to him.
8  Q. Did you tell Mr. McCray that this came from
9  Francine Gill and not from you?
10 A. I did.
11 Q. But he still appeared to be angry at you?
12 A. Yes.
13 Q. Did he say why he was angry at you?
14 A. He was just very angry.
15 Q. Did he say what he was angry about?
16 A. He did not agree with the form in front of
17 him. And he --
18 Q. Exhibit 11?
19 A. Correct. He was not in agreement with it
20 and became extremely hostile and stood up. I was
21 sitting down. He was over me with his fist in my
22 face, and I was very afraid.
23 Q. So you started the meeting by giving him
24 McCray Exhibit 11?

Page 39

1  A. I did. I started the meeting by handing it
2  to him and explaining to him that Francine had asked
3  me to discuss these matters with him.
4  Q. Did you give him a chance to read it?
5  A. I did.
6  Q. So he took some time to read it, just like
7  he did today?
8  A. Yes, he did.
9  Q. Then what was the next -- after he read it,
10 is that when you said he threatened you?
11 A. Yes.
12 Q. So there was no time to discuss any of the
13 specifics?
14 A. He said that this was -- none of it was
15 untrue.
16 Q. None of it was true, you mean, or none of
17 it --
18 A. He said none of it was true. He got very
19 angry. He stood up, had his fist drawn back, and I
20 was afraid I was going to get hit.
21 Q. That was the end of the meeting?
22 A. That was the end of the meeting.
23 Q. And you immediately called Ms. Gill?
24 A. I certainly did.

Page 40

1  Q. What was the conversation with Ms. Gill?
2  A. I told her I would not talk to him again
3  unless there was somebody else physically present in
4  the building, in the room. That I was afraid of
5  him. And that I just -- I asked her to please
6  handle it. I was done as far as handling this
7  matter with him. I was not going to discuss
8  anything else with him. That I was very afraid.
9  Q. What did Ms. Gill say?
10 A. She said she would handle it.
11 Q. What's the next time you discussed
12 Mr. McCray with her?
13 A. I reported to her daily that he was not in
14 the office.
15 Q. Why wasn't Mr. McCray terminated immediately
16 after he threatened you?
17 A. You will have to ask Francine Gill that
18 question.
19 Q. Did you ask her that?
20 A. No, I did not.
21 Q. You never discussed with her why he wasn't
22 terminated as a result of his conduct of the meeting
23 of January 14th?
24 A. I don't recall asking her that.

Page 41

1  Q. Who wrote the letter terminating him?
2  A. Counsel.
3  Q. It was signed by Ms. Gill?
4  A. Correct.
5  Q. Who provided the information to the counsel
6  that was used -- female counsel, did I get that
7  right?
8  A. Correct.
9  Q. Who provided the information to her that she
10 used to write the letter?
11 A. Francine Gill.
12 Q. Did you review this letter before it went
13 out to Mr. McCray?
14 A. I did.
15 Q. Did you change it at all or modify it?
16 A. I did not.
17 Q. Did Mr. McCray refuse to perform any tasks
18 in the meeting of January 14th?
19 A. Yes, he did.
20 Q. What tasks did he refuse to perform?
21 A. He said he wasn't going to do any of it, and
22 he just started screaming at me.
23 Q. What were the assigned tasks that he was
24 asked to perform by Monday, the 20th?

11 (Pages 38 to 41)

LegaLink Boston
(617) 542-0039

Page 42

1   A. I don't recall. All I really recall is his
2   fist in my face.
3   Q. Did anybody ask Mr. McCray to provide a note
4   for his absenteeism between the 14th and the 20th?
5   A. It is my understanding that Francine Gill
6   tried to reach him to ask him for that.
7   Q. What did she tell you?
8   A. She just said that she would work on it and
9   get him to get some documentation.
10  Q. To find out why he was absent?
11  A. Correct.
12  Q. Did you tell her that he had produced a note
13  from a podiatrist saying he needed to be out four to
14  six weeks?
15  A. The four to six weeks was to start on
16  January 23rd. It was not to start on the 14th.
17  Q. That didn't answer my question. Did you
18  tell her that he produced a note to you saying he
19  needed to be out four to six weeks?
20  A. I told Francine that during the meeting, he
21  had given me this note that said he would be out
22  four to six weeks starting the 23rd.
23  Q. Calling your attention to McCray deposition
24  Exhibit 15.

Page 43

1       (Document exhibited to witness.)
2   Q. Have you ever seen that before?
3   A. I've seen it here.
4   Q. You didn't see it back in 2003?
5   A. No, it was handled by our corporate
6   headquarters. All FMLA leave is handled by our
7   corporate headquarters.
8   Q. Does the corporate headquarters notify you
9   when leave is granted?
10  A. Yes.
11  Q. So wouldn't, in the normal course of
12  business, you receive this form showing that
13  Mr. McCray had been requested leave?
14  A. No, they would not normally send me that
15  request. They would verbally tell me that a request
16  had been made and granted.
17  Q. So they did tell you this back in 2003?
18  A. If they --
19      MS. MARKHAM: Objection. Go ahead.
20  A. If they had agreed to the leave, they would
21  have told me so.
22  Q. Did they agree to the leave?
23  A. No.
24  Q. They didn't? Who turned down a request for

Page 44

1   a leave?
2   A. Kansas City.
3   Q. Who in Kansas City?
4   A. Francine Gill.
5   Q. Who told you that?
6   A. Francine.
7   Q. When did she tell you that?
8   A. I don't recall.
9   Q. What did she tell you was the reason?
10  A. It was an inappropriate time for him to be
11  out.
12  Q. Why was that?
13  A. Because it's our peak season.
14  Q. Any other reason she gave you?
15  A. No.
16  Q. You still have the exhibit in front of you?
17  A. Yes.
18  Q. Look at page 2, section six. Doesn't this
19  form indicate that Ms. Gill approved the leave?
20  A. I don't believe that, that's what the
21  signature represents. But I don't know, because I'm
22  not that familiar with FMLA leave.
23  Q. The form?
24  A. I am not that familiar with the form. I'm

Page 45

1   not in HR. Francine Gill and our HR department
2   handles all FMLA leave. I've never requested it
3   myself. So I don't know.
4   Q. Are you familiar with Francine Gill's
5   signature?
6   A. Yes.
7   Q. Does that look to be her signature at
8   section six?
9   A. Correct.
10  Q. But you didn't see this on -- in January of
11  '03, you never saw this until this week?
12  A. Yes.
13  Q. How about the next to last page of this
14  exhibit, are you familiar with that form?
15  A. I am not in the HR department, and I really
16  am not familiar with FMLA paperwork.
17  Q. So you never saw this form, either, until
18  recently?
19  A. Correct.
20  Q. Who is Natalie Smith?
21  A. She is an associate in our HR department in
22  corporate headquarters.
23  Q. Does she have the authority to approve FMLA
24  leave?

Page 46

1   A. I don't know.
2   Q. Did you discuss Mr. McCray's taking leave
3   with her?
4   A. I did not.
5   Q. If Mr. McCray was applying for FMLA leave,
6   would he submit the medical evidence to you or would
7   he submit it directly to Kansas City?
8   A. Directly to Kansas City.
9   Q. Did you ever discuss with Mr. McCray his
10  refusal to work Saturdays during the tax season?
11  A. Yes.
12  Q. When did you discuss that with him?
13  A. I don't recall the exact dates.
14  Q. Approximately when was that?
15  A. In mid November.
16  Q. What conversation did you have with him at
17  that time?
18  A. I didn't have a conversation. I sent an
19  e-mail to him and to Chris Curry, the other HR
20  person who reports to Kansas City and has a dotted
21  line to me. And I, as an accommodation to them, as
22  a courtesy, I allowed them to alternate Saturdays.
23  And I wanted to know who was going to be on what
24  Saturdays during the tax season.

Page 47

1   Q. What conversations did you have with
2   Mr. McCray about that?
3   A. I did not. He sent an e-mail saying that he
4   had decided not to work on Saturdays.
5   Q. You write in your answers to interrogatories
6   that I received this morning that plaintiff had
7   requested FMLA leave for elective surgery. What's
8   your basis for saying the surgery was elective?
9   A. It was not life threatening.
10  Q. Any other basis?
11  A. That's my opinion.
12  Q. I don't deny that. But that's what I'm
13  asking you, that's your basis, because it wasn't
14  life threatening?
15  A. I did not -- it was not in my authority to
16  grant or not grant FMLA leave.
17  Q. I didn't ask you that. I was just asking
18  you what made you think it was elective surgery?
19  A. I really don't understand the question.
20  Q. Well, you write here in answer to
21  interrogatory number five, "Plaintiff had requested
22  FMLA for elective surgery." So these are your
23  words. I want to understand what --
24  A. It is my understanding that elective surgery

Page 48

1   is any surgery that is not life threatening.
2   Q. Okay. You go on to say in the same
3   sentence, "Which had been denied." What makes you
4   think that his request for FMLA leave had been
5   denied?
6   A. Francine Gill told me it had been denied.
7   Q. When did she tell you that?
8   A. When?
9   Q. Yes, approximately.
10  A. It certainly would have been the week of the
11  14th of January.
12  Q. You answer in the last one that you
13  participated in the determination to discharge
14  plaintiff from his employment. How did you
15  participate in that determination?
16  A. I had discussions with Francine Gill.
17  Q. What did you tell her?
18  A. I reported that he wasn't at work, and I did
19  report to her that he had almost hit me.
20  Q. Did you tell her that he didn't have a good
21  reason for not being at work?
22  A. It was my opinion that he did not have a
23  good reason for being there, because he would not
24  give us any reason. He never left on my voice mail

Page 49

1   a reason. He said, "This is Dray. I'm sick," and
2   slammed the receiver down.
3   Q. Did you ever call him back and tell him you
4   needed to have documentation or a reason?
5   A. I tried to reach him.
6   Q. How did you try?
7   A. I called his cell phone.
8   Q. You left a message?
9   A. I don't recall.
10  Q. Did you have an opinion that his absenteeism
11  in November relative to his auto accident was
12  excessive?
13  A. He told me the morning of the 18th that --
14  Q. 18th of what?
15  A. 18th of November that he had been in an
16  automobile accident on the way to training. And
17  that the reason he was late that morning was because
18  he had, had the auto accident. I expressed concern
19  for his well-being. He said, "I'm fine. I am going
20  to continue the training today. I will continue
21  this week. I may need a couple of days off to
22  attend to paperwork." I said, "So you're fine?" He
23  said, "Yes."
24  Q. How long was he off as a result of the

13 (Pages 46 to 49)