UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

*********************************************

ADRIAN MCCRAY,

  Plaintiff

v.           C.A. NO. 04-CV-12232-PBS

H&R BLOCK EASTERN ENTERPRISES, INC.
and LINDA MURPHY,

  Defendants

*********************************************

FILED
IN CLERKS OFFICE

2005 DEC -8  P 1:46

U.S. DISTRICT COURT
DISTRICT OF MASS.

## AFFIDAVIT OF PAUL A. MANOFF

I, Paul A. Manoff, hereby depose and say as follows:

1. I am the attorney for the plaintiff in the above action.

2. Attached hereto are true copies of a deposition in this action:

Deposition of Linda Murphy, pages 1, 27, 29-31, 35-36, 44-45 and 47.

Signed under the pains and penalties of perjury this 8th day of December, 2005.

               _____
               Paul A. Manoff

mccray\affpam

Linda Murphy                                                    06/08/2005

27

1   Q. By whom?
2   A. Francine Gill and advice of counsel.
3   Q. You had no role in making that decision?
4   A. They called me and asked my opinion.
5   Q. Who is they?
6   A. Francine Gill and counsel.
7   Q. Who was the counsel?
8   A. Louise Galletstone.
9   Q. That's an employee of H&R Block?
10  A. Correct.
11  Q. What did you tell him?
12          MS. MARKHAM: Objection. To the extent
13  it's a discussion with counsel, I'm not going to let
14  her answer. But you certainly can ask her about her
15  own opinion on it, separate from the conversation.
16  Q. Did you recommend -- I'll just ask you, did
17  you recommend that Mr. McCray be terminated?
18  A. The decision was not mine.
19  Q. But your recommendation was solicited?
20  A. I was asked questions by counsel, which I
21  answered.
22          MS. MARKHAM: Nothing else about the
23  conversation. He's entitled to ask you what you
24  contributed to the decision, but not the

1    Q.  Had you had any conversations with
2    Mr. McCray in January of 2003 about him being
3    absent?
4    A.  Yes.
5    Q.  When had you had such a conversation?
6    A.  I discussed his performance with him on the
7    14th.
8    Q.  And he was out those three or four days that
9    you say he was terminated for, that was after the
10   14th?
11   A.  He was -- on the 14th after our discussion,
12   he left and never returned to work.
13   Q.  So he was fired for being absent, then,
14   sometime between the 14th and the 20th?
15   A.  Correct.
16   Q.  That's why he was fired, because he was
17   absent without excuse between the 14th and the 20th?
18   A.  He was also fired for insubordination.
19   Q.  What was the insubordination?
20   A.  He almost hit me in the discussion, during
21   the discussion.
22   Q.  On the 14th?
23   A.  Correct.
24   Q.  So why didn't you fire him on the 14th?

Linda Murphy                                                06/08/2005

31

1    A.   I reported it to Francine. I did not have
2    the authority to fire him.
3    Q.   You didn't have the authority to fire him?
4    A.   I did not.
5    Q.   Did she?
6    A.   Yes, she did.
7    Q.   Even though you were higher in the company,
8    you couldn't fire him but she could?
9    A.   He did not report to me directly.
10   Q.   So was she at the meeting on January 14th?
11   A.   She was not.
12   Q.   Had Mr. McCray been working prior to the
13   14th or had he been absent sometime in January prior
14   to the 14th?
15   A.   He had been absent off and on.
16   Q.   Intermittently?
17   A.   Correct.
18   Q.   Had you had any discussions with him as to
19   why he had been absent intermittently in the period
20   of early January of 2003?
21   A.   I reported it to Francine Gill.
22   Q.   What?
23   A.   That he was absent.
24   Q.   But had you spoken to Mr. McCray about it?

Linda Murphy                                                  06/08/2005

35

1     A.  Francine.
2     Q.  So -- well, what did she tell you, if
3  anything, you should discuss with Mr. McCray on the
4  14th?
5     A.  What was on the development plan.
6     Q.  Well, when had the development plan been
7  given to him?
8     A.  Francine instructed me to discuss the
9  development plan with him on the 14th.
10    Q.  Is that the first time you discussed a
11 development plan with him?  Was he first given a
12 development plan on the 14th?
13    A.  I don't know.
14    Q.  You don't know.  So what discussion did you
15 have with him on the 14th?
16    A.  I started to review the development plan
17 with him step by step.  He became very hostile, very
18 agitated.  Stood up with his fist raised at my face.
19 I was very afraid, and stood up and stepped towards
20 him and asked him to please sit down.  I was shaking
21 so bad at that point, I would not continue the
22 discussion.
23    Q.  Well, what can you remember saying to him,
24 other than sit down?

Linda Murphy                                    06/08/2005

36

1   A.   What I remember saying to him was please sit
2   down.
3   Q.   Is there anything else you remember saying
4   to him that day?
5   A.   I asked him to please calm down and sit down
6   and let's discuss this.
7   Q.   Anything else you said to him?
8   A.   He then said, "And next week I'm going to be
9   out again," and tossed this piece of paper at me
10  that was on a doctor's prescription pad that gave a
11  description of an ailment.  And then said on it that
12  he would be out four to six weeks.
13  Q.   For his foot problem?
14  A.   Correct.  It was from a podiatrist.  And he
15  asked for the note back, and I gave it to him.
16  Q.   So you saw a note from a podiatrist saying
17  he needed to be out of work for four to six weeks?
18  A.   It was on a prescription pad, yes.
19  Q.   Why did you give it back to him?
20  A.   Because he asked for it.
21  Q.   Did you make a copy?
22  A.   I did not.
23  Q.   Why not?
24  A.   At that point, all I wanted him to do was

LegaLink Boston
(617) 542-0039

Linda Murphy                                              06/08/2005

44

1   a leave?
2       A.  Kansas City.
3       Q.  Who in Kansas City?
4       A.  Francine Gill.
5       Q.  Who told you that?
6       A.  Francine.
7       Q.  When did she tell you that?
8       A.  I don't recall.
9       Q.  What did she tell you was the reason?
10      A.  It was an inappropriate time for him to be
11  out.
12      Q.  Why was that?
13      A.  Because it's our peak season.
14      Q.  Any other reason she gave you?
15      A.  No.
16      Q.  You still have the exhibit in front of you?
17      A.  Yes.
18      Q.  Look at page 2, section six.  Doesn't this
19  form indicate that Ms. Gill approved the leave?
20      A.  I don't believe that, that's what the
21  signature represents.  But I don't know, because I'm
22  not that familiar with FMLA leave.
23      Q.  The form?
24      A.  I am not that familiar with the form.  I'm

Linda Murphy                                                    06/08/2005

45

1   not in HR.  Francine Gill and our HR department
2   handles all FMLA leave.  I've never requested it
3   myself.  So I don't know.
4       Q.  Are you familiar with Francine Gill's
5   signature?
6       A.  Yes.
7       Q.  Does that look to be her signature at
8   section six?
9       A.  Correct.
10      Q.  But you didn't see this on -- in January of
11  '03, you never saw this until this week?
12      A.  Yes.
13      Q.  How about the next to last page of this
14  exhibit, are you familiar with that form?
15      A.  I am not in the HR department, and I really
16  am not familiar with FMLA paperwork.
17      Q.  So you never saw this form, either, until
18  recently?
19      A.  Correct.
20      Q.  Who is Natalie Smith?
21      A.  She is an associate in our HR department in
22  corporate headquarters.
23      Q.  Does she have the authority to approve FMLA
24  leave?

Linda Murphy                                            06/08/2005

47

1      Q.   What conversations did you have with
2   Mr. McCray about that?
3      A.   I did not.  He sent an e-mail saying that he
4   had decided not to work on Saturdays.
5      Q.   You write in your answers to interrogatories
6   that I received this morning that plaintiff had
7   requested FMLA leave for elective surgery.  What's
8   your basis for saying the surgery was elective?
9      A.   It was not life threatening.
10     Q.   Any other basis?
11     A.   That's my opinion.
12     Q.   I don't deny that.  But that's what I'm
13  asking you, that's your basis, because it wasn't
14  life threatening?
15     A.   I did not -- it was not in my authority to
16  grant or not grant FMLA leave.
17     Q.   I didn't ask you that.  I was just asking
18  you what made you think it was elective surgery?
19     A.   I really don't understand the question.
20     Q.   Well, you write here in answer to
21  interrogatory number five, "Plaintiff had requested
22  FMLA for elective surgery."  So these are your
23  words.  I want to understand what --
24     A.   It is my understanding that elective surgery