UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
─────────────────────────────
                            )
ADRIAN McCRAY,              )
                            )
            Plaintiff,      )
                            )
      v.                    )   CIVIL ACTION NO. 04-12232-PBS
                            )
H&R BLOCK EASTERN ENTERPRISES, )
INC., and LINDA MURPHY,     )
                            )
            Defendants.     )
─────────────────────────────
```

**MEMORANDUM AND ORDER**

May 10, 2006

Saris, U.S.D.J.

Plaintiff Adrian McCray alleges that Defendants H&R Block Eastern Enterprises, Inc. ("Block") and Linda Murphy, the Vice President and Managing Director of Block's Northeast Division, terminated his employment on January 20, 2003 in retaliation for his having filed a complaint before the Massachusetts Commission Against Discrimination (the "MCAD"), in violation of Mass. Gen. Laws ch. 151B, § 4(4). Plaintiff also asserts violations of the Family Medical Leave Act (the "FMLA"), 29 U.S.C. §§ 2601-2654. Defendants move for summary judgment, and Plaintiff opposes. After hearing and review of the briefs, the motion is **ALLOWED**.

## I. BACKGROUND

The facts and procedural history pertinent to this motion follow. Except where noted, the facts are not in dispute.

A.  **April 2002 Investigation**

In August 2001, Block hired McCray to serve as a regional resources manager and assigned him to its Pembroke, Massachusetts office.  He reported jointly to Murphy and Franciene Gill ("Gill"), the Director of Field Human Resources and an African-American woman.

In April 2002, McCray and a co-worker were assigned to investigate a complaint alleging that district manager Rick Bartlett failed to respond to inappropriate comments about an employee's sexual orientation and discriminated himself against that employee.  Bartlett is Murphy's son-in-law.  At the end of the investigation, Plaintiff concluded that Bartlett had engaged in wrongful conduct, but Murphy instructed Plaintiff to write a report exonerating Bartlett.  According to Plaintiff, Murphy told him that any time she wanted, she could make a case against someone to get him fired, and that she would get anyone who made a negative statement about her son-in-law.  In April 2002, McCray drafted a report stating that the investigation was inconclusive, but he warned Murphy that he would not write any more fraudulent reports.  Plaintiff believes that this disagreement was the source of a future vendetta by Murphy.

B.  **Problems with Performance**

Gill and Murphy described performance deficiencies in Plaintiff's first performance review dated May 15, 2002.  In that

review, Plaintiff received a rating of "meets expectations minus" in four of seven categories based on several specific deficiencies, including: lack of timeliness in entering cases into Block's Clarify database; taking time off with short notice; inflexible and rigid interaction with his field management team; and inadequate reporting.  Accordingly, the review instructed Plaintiff to focus on written communication skills, acting as a team player, listening and responding appropriately, and reporting absences in a timelier manner.  Plaintiff disputes the allegations in this review and alleges there was no criticism of his job performance before he protested Murphy's actions during the Bartlett investigation.

Gill and Murphy issued Plaintiff a written warning dated May 31, 2002 alleging that Plaintiff failed to notify either of his supervisors that he would be on vacation on May 24, 2002, the Friday before his scheduled vacation week.  The warning further alleged he failed to finish certain assigned tasks that needed to be completed before his vacation.  Plaintiff alleges he received approval for this additional vacation day and denies Defendants' allegation that there was work due prior to his vacation that he failed to complete.

In August 2002, Gill and Murphy issued a development plan to Plaintiff.  Similar to his May 15, 2002 performance review, the development plan instructed Plaintiff to improve both his written communication skills and ability to act as team player, listen

3

and respond appropriately, and report absences on a timelier basis. The plan gave Plaintiff specific steps to undertake and required him to meet with Gill and/or Murphy on a periodic basis to discuss his work performance. Plaintiff contends there was no basis, other than a retaliatory one, for him to receive the development plan.

## C.     The Car Accident

In late November 2002, Plaintiff informed Gill and Murphy that he had suffered back injuries in a car accident and ultimately requested leave under the FMLA. Block conditionally granted Plaintiff's request for FMLA leave pending the receipt of medical certification. In response to a medical certification from a chiropractor stating Plaintiff was completely unable to work from November 17 to December 2, 2002, Block approved Plaintiff's request for FMLA leave for that time period. Another note from the same chiropractor indicated he could return to work part-time (twenty to forty hours per week) as of December 2, 2002. However, Plaintiff failed to report to work on December 2, 3, 4, and 6. There is nothing in the record to explain this four-day absence.

## D.     First MCAD Complaint

On December 4, 2002, Plaintiff filed a charge of discrimination with the MCAD, in which he alleged he had been subject to different terms and conditions of employment based on

4

his African-American race.  The MCAD ultimately issued a lack of probable cause finding with respect to this first MCAD complaint. Plaintiff did not appeal and does not press the race discrimination claim in this case.

**E.    Deterioration**

On December 9, 2002, Plaintiff returned to work in the same position with the same duties.  At this juncture, the parties hotly dispute what happened.  Defendants contend that on December 9, Murphy and Gill had a meeting with Plaintiff to discuss his performance under the August 2002 development plan.  According to Defendants, Murphy and Gill informed Plaintiff that he was not making sufficient progress and warned him that his recruitment of new employees had deteriorated, the disorganized condition of his office was unacceptable, there were complaints about training sessions he had led, he had been rude and insubordinate to Murphy, and he was failing to work his scheduled hours. Plaintiff contends that this meeting never occurred and that he told Gill of his first MCAD complaint prior to December 10. Defendants dispute that they knew about the first MCAD complaint at the time of the meeting.

On December 11, 2002, Plaintiff provided Block with a supplemental doctor's note indicating that he continued to suffer from injuries incurred in the car accident, should not perform any lifting or bending at the waist, and should limit his work to

between twenty and forty hours per week for the next four to eight weeks.  After informing Gill and Murphy that he would not report to work the following two days because he had aggravated his back lifting boxes, Plaintiff was absent on December 12 and 13.  On December 12, Gill informed Plaintiff that he would be required to work six hours a day, five days a week, for the remainder of the time he needed a part-time schedule.

In late December 2002, Gill and Murphy attended one of Plaintiff's training sessions in response to alleged complaints about Plaintiff's training performance in mid-November. Defendants allege that Plaintiff was unprepared, read directly from the training materials, and failed to make certain logistical arrangements, such as providing coffee and lunch for participants.  Plaintiff contends that he gave Gill a stack of favorable reviews and denies he failed to make appropriate logistical arrangements.

Block asked Plaintiff to submit to an independent medical examination, but Plaintiff later indicated that he was no longer in need of leave.  Plaintiff ultimately submitted to the independent medical examination on January 6, 2003, and the doctor scheduled Plaintiff for a follow-up MRI on January 13, 2003.

**F.    <u>More Problems A-Foot</u>**

Between January 7 and 10, 2003, Plaintiff was absent from work for foot problems. He requested FMLA leave from January 6 to January 22. On January 9, Gill approved this request conditionally pending receipt of medical documentation. On either January 10 or 13, Plaintiff presented Block with medical documentation in support of his request that stated he suffered from an intractable plantar keratoma (a callus on the bottom of the foot) and could work provided he was permitted to sit 60% of the time and stand 40%. Accordingly, Block requested that he return to work. An additional note stated that Plaintiff planned to undergo surgery for his foot condition on January 23.

On January 13, Defendants allege that despite Gill's specific directive to attend a training in Kansas City, Plaintiff reported to work in Pembroke instead. Plaintiff denies he received specific instructions to attend the training.

On January 14, Gill and Murphy issued Plaintiff a final written warning. It summarized Plaintiff's alleged performance problems, including his failure to be prepared for training sessions, meet the expectations of the August 2002 development plan, report absences, complete work in a timely manner, and attend the Kansas City training. The warning further required Plaintiff to take specific steps to improve. Plaintiff contends that he complied with the August 2002 development plan, completed his work in a timely manner, and reported his absences in the

7

required fashion.  The warning also stated that the medical certification for the foot absences were inadequate.

A meeting between Murphy and Plaintiff to discuss this final written warning also took place on January 14, 2003.  Plaintiff gave Murphy a note from his podiatrist, which indicated Plaintiff would have to miss four to six weeks because of his foot problem, and Murphy returned the note.  Murphy alleges she informed Plaintiff that his FMLA leave request for surgery was denied because he had not provided the company with thirty-day notice and had scheduled the leave during the busiest time of Block's business cycle.  Murphy contends that Plaintiff became "very hostile [and] very agitated" and "[s]tood up with his fist raised at [her] face" and that during the meeting, she was "very afraid" of him.  Murphy further alleges that Plaintiff made it clear that he would not comply with the final written warning and would continue to take time off despite the denial of his request for FMLA leave.  Plaintiff denies he engaged in this conduct.

The same day, after the meeting between Plaintiff and Murphy, Gill sent Plaintiff a follow-up email stating his FMLA leave was denied because he had failed to provide thirty-day notice and had scheduled the surgery during Block's busiest time of year.  It also stated that McCray had to file a daily report of tasks he completed each day, notify the directors of Block via email when he arrived and left each day, and that he was required to work certain Saturdays.

Plaintiff alleges he planned to return from leave by February 1, when the busy tax season began.

**G.    Denouement**

Plaintiff never reported to work after January 14, 2003.  He called in sick for four days after January 14, contending that he still had sick days coming to him.  However, there is no evidence that Plaintiff was actually sick or that those absences were otherwise justified or authorized.  According to Defendants, Murphy called Plaintiff on January 20, 2003 to inquire about his status.  Defendants allege Plaintiff informed Murphy that he would not report to work that day and that Murphy thus informed him that his employment was terminated.  While Plaintiff denies having this phone conversation with Murphy, it is undisputed that he received a letter dated January 20, 2003 indicating he was terminated.  The letter stated that his termination was the result of his "[a]bsenteeism, in conjunction with insubordination during the meeting on January 14, 2003, [his] refusal to perform work as assigned and unacceptable work performance."

**H.    Second MCAD Complaint**

On February 3, 2003, Plaintiff filed a second MCAD complaint claiming that his termination and other adverse actions were in retaliation for the filing of his first MCAD complaint.  On March 30, 2004, Plaintiff requested that the MCAD dismiss the retaliation charge and issue him a "right to sue" letter.

9

Subsequently, Plaintiff filed the instant Complaint in
Massachusetts Superior Court, and Defendants removed the case to
this Court on the basis of his FMLA claim providing federal
question jurisdiction.

## II.  DISCUSSION

### A.  <u>Summary Judgment Standard</u>

"Summary judgment is appropriate when 'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law.'"  <u>Barbour v.
Dynamics Research Corp.</u>, 63 F.3d 32, 36 (1st Cir. 1995) (quoting
Fed. R. Civ. P. 56(c)).  "To succeed [in a motion for summary
judgment], the moving party must show that there is an absence of
evidence to support the nonmoving party's position."  <u>Rogers v.
Fair</u>, 902 F.2d 140, 143 (1st Cir. 1990); <u>see also</u> <u>Celotex Corp.
v. Catrett</u>, 477 U.S. 317, 325 (1986).

"Once the moving party has properly supported its motion for
summary judgment, the burden shifts to the non-moving party, who
'may not rest on mere allegations or denials of his pleading, but
must set forth specific facts showing there is a genuine issue
for trial.'"  <u>Barbour</u>, 63 F.3d at 37 (quoting <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)).  "There must be
'sufficient evidence favoring the nonmoving party for a jury to

return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" Rogers, 902 F.2d at 143 (quoting Anderson, 477 U.S. at 249-50) (citations and footnote in Anderson omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  Barbour, 63 F.3d at 36.

**B.   Unlawful Retaliation Claim**

Plaintiff asserts that Defendants terminated him because he filed the first MCAD complaint.

**1.   Exhaustion of Administrative Remedies**

"Chapter 151B require[s] an employee to file an administrative charge as a prerequisite to commencing a civil action for employment discrimination." Lattimore v. Polaroid Corp., 99 F.3d 456, 464 (1st Cir. 1996) (citing Mass. Gen. Laws ch. 151B, §§ 5-9).  Civil complaints for employment discrimination are limited in scope to the charge filed with the MCAD and "'the investigation which can reasonably be expected to grow out of that charge.'"  Id. (quoting Powers v. Grinnell Corp., 915 F.2d 34, 38 (1st Cir. 1990)).  "Even a *pro se* complainant is required to describe the essential nature of the claim and to identify the core facts on which it rests."  Id. (citation omitted).

Defendants argue that Plaintiff's retaliation claim based on

his handling of the sexual orientation harassment investigation
is barred for failure to exhaust his administrative remedies.
This argument is a red herring because Plaintiff's retaliation
claim is based on his second, rather than his first, MCAD
complaint.  In his second MCAD complaint Plaintiff did not even
mention his handling of the sexual harassment investigation.
Instead, Plaintiff described "the essential nature of [his]
claim" by alleging that his termination was in retaliation for
filing his first MCAD complaint based on racial discrimination.
Lattimore, 99 F.3d at 464.  Plaintiff further "identif[ied] the
core facts on which [his claim] rest[ed]" in the second MCAD
complaint.  Id.

> Since the filing of the complaint I feel that
> Respondent's [sic] commenced to retaliate against
> me, the incident [sic] that transpired are as
> following: 1.  They alleged that the Training
> session where [sic] insufficient in substance
> and/or not long enough; . . . 5. I was subjected to
> a hostile work environment in that Respondent's
> told everyone about the complaint I filed; 6.
> Subjected to harassing statements and comments by
> Linda Murphy, Supervisor; she called me a liar; and
> 7.   Francine Gill, HR cancelled a medical
> appointment using my confidential information with
> out my permission. . . .  On January 20, 2003, I
> was terminated for absences and fabricated
> performance problems."

(Aff. Belli Ex. 33, at 4.)  Accordingly, Defendants' argument
that Plaintiff failed to exhaust his administrative remedies
fails.

Plaintiff's civil action, however, is limited to the
retaliation claim he asserted in his second MCAD complaint,

alleging retaliation for the filing of his first MCAD complaint, and "the investigation which c[ould] reasonably be expected to grow out of that charge." Lattimore, 99 F.3d at 464 (citing Powers, 915 F.2d at 38). Plaintiff did not exhaust any claim of retaliation based on his handling of the sexual orientation investigation involving Murphy's son-in-law.

    2.   Protected Activity

A plaintiff who has no direct evidence of a retaliatory motive has the burden of establishing a prima facie case of retaliation. See Mole v. Univ. of Mass., 442 Mass. 582, 591, 814 N.E.2d 329, 338 (2004).

> Once a prima facie case is delineated, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. If this is accomplished, the ultimate burden falls on the plaintiff to show that the employer's proffered reason is a pretext masking retaliation . . . . As in the discrimination context proper, courts confronted by summary judgment motions must at this point focus on the ultimate question, scrapping the burden-shifting framework in favor of considering the evidence as a whole. Thus, the critical inquiry becomes whether the aggregate evidence of pretext and retaliatory animus suffices to make out a jury question.

Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992) (applying this burden-shifting framework to a retaliation case under the Age Discrimination in Employment Act) (citations omitted); see also Mole, 442 Mass. at 591, 814 N.E.2d at 338 (applying framework to Mass. Gen. Laws ch. 151B, § 4(4) retaliation claim).

13

To satisfy his initial burden of proof and establish a prima facie case, Plaintiff must establish that "he engaged in protected conduct, that he suffered some adverse action, and that 'a causal connection existed between the protected conduct and the adverse action.'" <u>Mole</u>, 442 Mass. at 591-592, 814 N.E.2d at 338-39 (quoting <u>Mesnick</u>, 950 F.2d at 827) (footnotes omitted).

It is unlawful "[f]or any employer . . . to discharge, expel or otherwise discriminate against any person . . . because he has filed a complaint" with the MCAD.  Mass. Gen. Laws ch. 151B, § 4(4).  As Defendants concede, Plaintiff engaged in protected activity when he filed his first MCAD complaint based on racial discrimination.  While the MCAD ultimately concluded that Plaintiff's racial discrimination claim lacked probable cause, "[t]he fact that a complaint is later found to be unmeritorious does not preclude a retaliation claim based on the protected activity of pursuing that complaint." <u>Mole</u>, 442 Mass. at 592 n.13, 814 N.E.2d at 339 n.13.  Moreover, it is undisputed that Plaintiff's termination was adverse action.

The pivotal issue is whether Plaintiff has established a causal connection.  "[T]he mere fact that one event followed another is not sufficient to make out a causal link." <u>Mole</u>, 442 Mass. at 592, 814 N.E.2d at 339 (quotations and citations omitted).  Where "adverse action is taken against a satisfactorily performing employee in the immediate aftermath of

14

the employer's becoming aware of the employee's protected activity, an inference of causation is permissible." <u>Id.</u> (citation omitted).  As Plaintiff was terminated approximately six weeks after Defendants became aware of his filing of an MCAD complaint, the two events were "*very closely* connected in time." <u>Id.</u> at 595, 814 N.E.2d at 341 (quoting <u>Anderson v. Coors Brewing Co.</u>, 181 F.3d 1171, 1179 (10th Cir. 1999)); <u>see</u> <u>Calero-Cerezo v. U.S. Dept. of Justice</u>, 355 F.3d 6, 25-26 (1st Cir. 2004) (finding temporal proximity where Plaintiff received her first suspension six weeks after Defendants became aware Plaintiff filed an employment discrimination complaint under Title VII).

"Where, [however], adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation." <u>Mole</u>, 442 Mass. at 594, 814 N.E.2d at 340; <u>see also</u> <u>Dziamba v. Warner & Stackpole LLP</u>, 56 Mass. App. Ct. 397, 407, 778 N.E.2d 927, 935 (2002) (finding lack of "evidentiary support for a claim of retaliatory conduct by the employer" where there had been "expressions of dissatisfaction, warnings about unsatisfactory accomplishment," and decisions not to raise the employee's salary beginning well before the employee "'had done or said anything

that could be characterized as an exercise of protected rights'"
(citation omitted)).

Defendants offer evidence that Plaintiff was an
unsatisfactory employee well before he filed his first MCAD
complaint on December 4, 2002 through, for example, their
submission of his May 15, 2002 performance review, his May 31,
2002 written warning, and his August 2002 development plan.

Plaintiff responds that these complaints about his
performance between May and December 2002 stemmed not from the
quality of his work but rather, from his protest of Murphy's
handling of the sexual orientation harassment investigation.
While relations may have been taxed because of Plaintiff's
resistance to exonerating Murphy's son-in-law, the bottom line is
that Plaintiff yielded to Murphy, and there is sparse evidence
that the taxed relationship caused Murphy to give Plaintiff
persistent bad reviews.  Moreover, even assuming that Plaintiff
had engaged in protected conduct in criticizing Murphy's son-in-
law for sexual harassment and discrimination and that Murphy had
an improper retaliatory motivation, there is no evidence that
Gill, Plaintiff's other supervisor, who joined in the negative
employment reviews, was similarly motivated.

The undisputed record is that there had been a series of
long-standing disagreements between Plaintiff and Block over a
host of employment-related issues, which was worsening.  While in
other circumstances, the temporal relationship between the filing

16

of the first MCAD complaint and the termination might support an
inference of retaliatory motive, the mere filing of a MCAD
complaint to stave off imminent discipline for pre-existing
problems by a savvy human resource employee who sees the
handwriting on the wall is insufficient to support an inference
of causal connection.  <u>Mole</u>, 442 Mass. at 592, 814 N.E.2d at 339.
Accordingly, Plaintiff's unlawful retaliation claim fails.

**C.    <u>FMLA Claims</u>**

Plaintiff also alleges that he was discharged in retaliation
for exercising his FMLA rights arising from a foot problem.  29
U.S.C. § 2615(a)(1).  "The FMLA entitles an employee to twelve
workweeks of leave during any twelve-month period '[b]ecause of a
serious health condition that makes the employee unable to
perform the functions of the position of such employee.'"
<u>Hodgens v. Gen. Dynamics Corp.</u>, 144 F.3d 151, 161 (1st Cir. 1998)
(citing 29 U.S.C. § 2612(a)(1)(D)).  Whether Plaintiff's FMLA
claims will survive summary judgment is analyzed under the
<u>McDonnell Douglas</u> burden-shifting framework.  <u>Hodgens</u>, 144 F.3d
at 160-61.

Plaintiff asserts he was discharged for taking leave under
the FMLA in January 2003 due to his intractable plantar keratoma
(a foot callous).  In order to establish a prima facie case of
retaliation, plaintiff must "show that (1) he availed himself of
a protected right under the FMLA; (2) he was adversely affected

17

by an employment decision; [and] (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action."  Id.

While an employee may be eligible for FMLA leave due to a serious medical condition under 29 U.S.C. § 2612(a)(1)(D), employers may require that a request for leave be supported by a certification by the health care provider of the eligible employee under 29 U.S.C. § 2613(a).  In instances where an employer finds a certification incomplete, the employer must advise the employee and "provide the employee a reasonable opportunity to cure any such deficiency."  29 C.F.R. § 825.305(d).

Defendants do not contest Plaintiff's claim on grounds that the foot problem was not a serious medical condition, but they do argue that he failed to provide adequate certification for his January 7-10, 2003 leave.  Plaintiff had requested FMLA leave and was conditionally granted that leave pending medical certification.  After his leave, Plaintiff provided Defendants with a document stating that he suffered from an intractable plantar keratoma and could return to work provided he was permitted to sit 60 percent of the time and stand 40 percent. Because the document stated that Plaintiff could return to work, Defendants take the position that McCray never presented the required certification for his earlier four-day absence.  Under

29 C.F.R. § 825.305(d), it was the duty of Defendants to notify Plaintiff if the documentation he provided was insufficient and afford him an opportunity to cure any deficiency.  While Defendants requested that he return to work, there is no evidence that Defendants afforded Plaintiff the required opportunity to cure.  Accordingly, Plaintiff has established that his January 7-10, 2003 leave was protected under the FMLA.

In response to Plaintiff's second request for FMLA leave in January 2003 in order to have surgery on his intractable plantar keratoma, Defendants argue that Plaintiff failed to provide thirty-day notice or to make a reasonable effort to schedule his surgery at a time when it would not unduly disrupt their operations.

"[W]hen the need to obtain treatment and diagnosis is foreseeable, the employee must provide adequate notice." Hodgens, 144 F.3d at 165 n.10 (citing 29 U.S.C. § 2612(e)(2)). The employee "shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave."  29 U.S.C. § 2612(e)(1). Where, however, "30 days notice is not practicable, such as because of a lack of knowledge of approximately when leave will be required to begin, a change in circumstances, or a medical emergency, notice must be given as soon as practicable."  29 C.F.R. § 825.302(a).  In addition, where the necessity for leave

19

is foreseeable, the employee "shall make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer, subject to the approval of the health care provider of the employee."  29 U.S.C. § 2612(e)(2)(A).

In <u>Hopson v. Quitman County Hosp. & Nursing Home, Inc.</u>, the Fifth Circuit noted:

> What constitutes a "change in circumstances," whether a plaintiff's notice is given "as soon as practicable", and whether the employee has made a reasonable effort to schedule her treatment so as not to disrupt unduly the operations of the employer requires an inquiry into the particular facts and circumstances of each case. Such determinations are questions of fact and are better left to the jury with its traditional function of assessing human behavior and expectations.

126 F.3d 635, 640 (5th Cir 1997).

In this case, Plaintiff provided Defendants with a second note on either January 10 or 13, 2003, which indicated he was having surgery on January 23 for his foot condition.  Whether Plaintiff's scheduled surgery involved a circumstance making 30-day notice impractical, whether he gave notice as soon as practicable, and whether he made reasonable efforts to schedule his surgery to avoid unduly disrupting Defendant Block's operations are questions of fact.  Therefore, there are genuine issues as to whether Plaintiff availed himself of a protected right under the FMLA when he requested leave for surgery.

Plaintiff has also provided evidence to establish the second and third prongs of his prima facie case.  Not only did his

20

termination constitute an adverse action, but there is a
sufficient basis for concluding that there is a causal connection
between his protected activity and Defendants' adverse action.
Defendants cited absenteeism as a basis for termination, and the
termination occurred within ten days after Plaintiff notified
Defendant of his foot surgery.  Thus, Plaintiff has established a
prima facie case that the termination was improperly motivated.

Now that the ball is in their court, Defendants point out
that many of Plaintiff's absences were unprotected and argue they
took into account his non-FMLA protected absences, in addition to
his insubordinate attitude and prior poor performance in their
decision to terminate him.  While absenteeism would not serve as
a legitimate, nondiscriminatory reason for termination if
Plaintiff were terminated for FMLA-protected absences, Defendants
"w[ere] not precluded from taking . . . unprotected absences into
account in evaluating [Plaintiff's] performance" and terminating
him.  Hodgens, 144 F.3d at 172.  While some of the absences
related to his back and foot were protected by the FMLA,
Plaintiff presented no evidence that the absences from January 14
to January 20 were FMLA protected.  He provides no justification
for taking those days off after having been ordered to return to
work other than that he still had sick days coming to him.  There
is no evidence he was actually sick, and the evidence of defiance
of an order is undisputed.

Plaintiff argues that the temporal proximity between his

21

exercise of FMLA protected rights and his termination, his claim that charges insubordination at the meeting on January 14 were trumped up, and the improper (and extraordinary) decision of the company to cancel his surgery without his permission, create disputed fact issues. Were it not for the final act of defiance from January 14 to January 20, I might agree. However, those final days of absence were utterly unprotected under the FMLA. When the evidence of prior job-related performance is combined with the unprotected absenteeism, Plaintiff has not produced enough admissible evidence for a reasonable trier of fact to find in his favor of retaliation for the exercise of FMLA rights.

**ORDER**

Defendants' motion for summary judgment is **ALLOWED**. (Docket No. 13.)


                                        **S/PATTI B. SARIS**
                                        United States District Judge